

## CSC

# Notice of Service of Process

| | |
|---|---|
| Primary Contact: | Marti Cornwell<br>UNUM Group<br>1 Fountain Square<br>Chattanooga, TN 37402 |
| Electronic copy provided to: | Jen Majic<br>Janna Mullin-Erickson<br>Judy Drake |

| | |
|---|---|
| Entity: | Provident Life and Accident Insurance Company<br>Entity ID Number  2979576 |
| Entity Served: | Provident Life and Accident Insurance Company |
| Title of Action: | Stephen M. Neely vs. Provident Life and Accident Insurance Company |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Contract |
| Court/Agency: | Wilson County Chancery Court, Tennessee |
| Case/Reference No: | 2017CV171 |
| Jurisdiction Served: | Tennessee |
| Date Served on CSC: | 05/31/2017 |
| Answer or Appearance Due: | 30 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Sender Information: | Jason G. Denton<br>615-443-8772 |

| | |
|---|---|
| Notes: | Lines/marks on document |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

To avoid potential delay, please do not send your response to CSC
2711 Centerville Road  Wilmington, DE 19808  (888) 690-2882  |  sop@cscglobal.com



EXHIBIT
A

SUMMONS TO THE SHERIFF OF WILSON COUNTY

STATE OF TENNESSEE

CHANCERY COURT OF WILSON COUNTY

Stephen M. Neely
                 Plaintiff

vs

Provident Life and Accident Insurance Company,
individually, Provident Life and   Defendant
Accident Insurance Company d/b/a Unum

Group Corporation, Unum Group   Defendant
Corporation, individually
_____
                 Defendant

CIVIL ACTION

NO. 2017CV171

SUMMONS

To the above named Defendant(s): Unum Group Corporation, individually
Serve on Registered Agent:   Corporation Service Company
                      2908 Poston Ave
                      Nashville, TN 37203

You are hereby summoned and required to serve upon Jason G. Denton

plaintiff's attorney, whose address is 109 North Castle Heights Avenue, Lebanon, TN 37087

and answer to the complaint which is herewith served upon you within thirty (30) days after service of this summons upon you, exclusive of
the day of service. If you fail to do so, judgement by default will be taken against you for the relief demanded in the complaint.

Witness, Barbara Webb, Clerk and Master of said court, issued at office the

25th of May A.D. 20 17

TESTE: First Monday in May 25, 20 17   Barbara Webb
                                 Barbara Webb, Clerk and Master

                   By Dere Jennigan
                                Deputy Clerk and Master

Received this _____ day of _____, 20 ____

_____
                                 Deputy Sheriff

(This summons is issued pursuant to Rule 4 of the Tennessee Rules of Civil Procedure.)

## SUMMONS CIVIL ACTION CHANCERY COURT WILSON COUNTY, TENNESSEE
### RETURN ON SERVICE OF SUMMONS

I hereby certify and return, that on the _____ day of _____, 20 _____

I served this summons together with the complaint herein as follows: _____

_____

_____

_____

_____ Sheriff

_____ Deputy Sheriff,

_____ County

### RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return, that on the _____ day of _____, 20 _____

I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case # _____ to the defendant, _____;

on _____ day of _____, 20 _____, I received the return receipt, which had been

signed by _____ on the _____ day of _____,

20 _____. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk and Master.

Sworn to and subscribed before me on this _____

day of _____, 20 _____.

Signature of: _____ Notary Public of: _____ Deputy Clerk and Master

_____

My commission expires: _____          Signature of plaintiff, plaintiff's attorney or other person
                                                 authorized by statute to serve process.

### CERTIFICATION (IF APPLICABLE)

I, Barbara Webb, Clerk and Master of the Chancery Court in the State of Tennessee, Wilson County, do certify this to be a true and correct copy of the original summons issued in this case.

Barbara Webb, Clerk and Master

by: _____ X
                                     D.C. & M.

26-2-301

26-205 PROCEDURE FOR EXERCISING EXEMPTION
NOTICE

10,000

TO THE DEFENDANT (S):

Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgement. If a judgement should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgement becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

# NOTICE

 "If you have a disability and require assistance,
please call (615) 466-5063."

Thank You



CSC

# Notice of Service of Process

| | |
|---|---|
| Primary Contact: | Marti Cornwell<br>UNUM Group<br>1 Fountain Square<br>Chattanooga, TN 37402 |
| Electronic copy provided to: | Jen Majic<br>Janna Mullin-Erickson<br>Judy Drake |

| | |
|---|---|
| Entity: | Provident Life and Accident Insurance Company<br>Entity ID Number 2979576 |
| Entity Served: | Provident Life & Accident Ins. Co. |
| Title of Action: | Stephen M. Neely vs. Provident Life and Accident Insurance Company |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Contract |
| Court/Agency: | Wilson County Chancery Court, Tennessee |
| Case/Reference No: | 2017-CV-171 |
| Jurisdiction Served: | Tennessee |
| Date Served on CSC: | 06/09/2017 |
| Answer or Appearance Due: | 30 Days |
| Originally Served On: | CSC |
| How Served: | Certified Mail |
| Sender Information: | Jason G. Denton<br>615-443-8772 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscglobal.com

**STATE OF TENNESSEE**
**Department of Commerce and Insurance**
**500 James Robertson Parkway**
**Nashville, TN 37243-1131**
**PH - 615.532.5260, FX - 615.532.2788**
**Jerald.E.Gilbert@tn.gov**

June 2, 2017


Provident Life & Accident Ins. Co.                    Certified Mail
2908 Poston Avenue, % Corp. Svc. Co.                  Return Receipt Requested
Nashville, TN 37203                                   7016 0750 0000 2775 9071
NAIC # 68195                                          Cashier # 32538


Re:    Stephen M. Neely   V.   Provident Life & Accident Ins. Co.

       Docket # 2017-CV-171

To Whom It May Concern:

Pursuant to Tennessee Code Annotated § 56-2-504 or § 56-2-506, the Department of
Commerce and Insurance was served June 1, 2017, on your behalf in connection with the
above-styled proceeding.  Documentation relating to the subject is herein enclosed.


Jerald E. Gilbert
Designated Agent
Service of Process

Enclosures

cc: Chancery Court Clerk
    Wilson County
    P O Box 1557
    Lebanon, Tn 37088

# SUMMONS TO THE SHERIFF OF WILSON COUNTY

## STATE OF TENNESSEE

## CHANCERY COURT OF WILSON COUNTY

Stephen M. Neely
_____
**Plaintiff**

VS

Provident Life and Accident Insurance Company,
individually, Provident Life and **Defendant**
Accident Insurance Company d/b/a Unum
_____

Group Corporation, Unum Group **Defendant**
Corporation, individually
_____
**Defendant**

**CIVIL ACTION**

NO. $2017$-CV- 171

**SUMMONS**

To the above named Defendant(s):  Provident Life and Accident Insurance Company

SERVE VIA THE COMMISSIONER OF INSURANCE

You are hereby summoned and required to serve upon  Jason G. Denton _____

plaintiff's attorney, whose address is  109 North Castle Heights Avenue, Lebanon, TN  37087 ____

and answer to the complaint which is herewith served upon you within thirty (30) days after service of this summons upon you, exclusive of

the day of service. If you fail to do so, judgement by default will be taken against you for the relief demanded in the complaint.

Witness, Barbara Webb, Clerk and Master of said court, issued at office the

25th ____ of May _____ A.D. 20 17

TESTE, First Monday in May 25 , 20 17 _____

Barbara Webb
Barbara Webb, Clerk and Master

By _____
Deputy Clerk and Master

Received this _____ day of _____ , 20 ____

_____
Deputy Sheriff

(This summons is issued pursuant to Rule 4 of the Tennessee Rules of Civil Procedure.)

I hereby certify and return, that on the _____ day of _____, 20 _____.

I served this summons together with the complaint herein as follows:

_____

_____

_____

_____

_____ Sheriff

_____ Deputy Sheriff

_____ County

### RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return, that on the _____ day of _____, 20 _____.

I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case # _____ to the defendant, _____

on _____ day of _____, 20 _____, I received the return receipt, which had been signed by _____ on the _____ day of _____, 20 _____. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk and Master.

Sworn to and subscribed before me on this _____ day of _____, 20 _____.

Signature of: _____ Notary Public or _____ Deputy Clerk and Master

My commission expires: _____

_____

Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process.

### CERTIFICATION (IF APPLICABLE)

I, Barbara Webb, Clerk and Master of the Chancery Court in the State of Tennessee, Wilson County, do certify this to be a true and perfect copy of the original instrument on file in this case.

_25_ day of _May_, 20_17_.

BARBARA WEBB, CLERK & MASTER

_____ IC 26-2-301

by: _____ X
D.C. & M.

Barbara Webb, Clerk and Master

### 26-205 PROCEDURE FOR EXERCISING EXEMPTION
### NOTICE

TO THE DEFENDANT (S):                    10,000

Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgement. If a judgement should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgement becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

IN THE CHANCERY COURT OF WILSON COUNTY, TENNESSEE
AT LEBANON

FILED
MAY 25 2017
A.M. 3:29 P.M.
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

STEPHEN M. NEELY, )
)
Plaintiff, )
)
v. ) No. 2017-CUr 171
)
PROVIDENT LIFE AND ACCIDENT )
INSURANCE COMPANY, individually, )
PROVIDENT LIFE AND ACCIDENT )
INSURANCE COMPANY d/b/a )
UNUM GROUP CORPORATION, )
UNUM GROUP CORPORATION, )
individually, )
)
Defendants. )

## VERIFIED COMPLAINT

Comes now the Plaintiff, Stephen M. Neely, MD and states:

1.     This is an action by the Plaintiff, Stephen M. Neely, MD, ("Dr. Neely") to recover
benefits overdue to him pursuant to an individual disability policy issued by the Defendants
Provident Life And Accident Insurance Company, individually, and Provident Life And
Accident Insurance Company d/b/a Unum Group Corporation (collectively known as
"Provident"), and Defendant Unum Group Corporation, individually (hereinafter "Unum").

2.     Dr. Neely is a resident of Wilson County Tennessee.

3.     Provident, upon information and belief, is an insurance company and corporation
organized and existing under the laws of the State of Tennessee with its principal place of
business in the State of Tennessee.  They may be served process by and through their registered
agent Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312,
and through the Commissioner of Insurance.

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 9 of 256 PageID #: 17

4.     Unum is an insurance company and corporation and is authorized to do business in Tennessee.  Upon information and belief, Provident is a subsidiary of Unum, although the policy at issue was issued by Provident.  Also, upon information and belief, Unum is the third party administrator/agent that has handled the processing and denial of the claim at issue for Provident.    Unum may be served process by and through their registered agent Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312, and through the commissioner of insurance.

5.     Venue is proper, given the most significant contacts were in Lebanon, Wilson County, Tennessee; the policy purchase took place by and through Provident's agent, William Dodds – First Insurance Group, who is located Lebanon, Wilson County, Tennessee; Provident is a Tennessee Corporation; and the most significant contacts have been Lebanon, Wilson County, Tennessee.

6.     Dr. Neely purchased Individual Disability policy (No.: R 6PC-462631) as attached hereto as **Exhibit I**, ("the policy") from Provident by and through their agent registered agent William Dodds – First Insurance Group, located in Lebanon, Wilson County, Tennessee to cover his profession as an orthopedic surgeon.

7.     On or about May 5, 2015, Dr. Neely began to experience pain, weakness, and loss of range of motion in his right upper extremity while performing a hip procedure.

8.     Approximately one week later, on or about May 11, 2015, Dr. Neely injured his right shoulder again during a total knee replacement on an obese patient.

9.     Dr. Neely sought medical attention and was medically evaluated and treated during this time.

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 10 of 256 PageID #: 18

10.     The MRI performed on July 23, 2015 found a high-grade partial-thickness rotator cuff tear of the infraspinatus, a labral tear with associated paralabral cysts, and a low-grade partial-thickness tear of the supraspinatus. The plaintiff was determined to have injuries, including but not limited to, right shoulder rotator cuff tear, subacromial impingement, tendonitis in his biceps, right upper extremity, and his body as a whole.

11.     Dr. Neely, as an orthopedic surgeon, requires the full strength, functioning, use, and range of motion in his upper extremities to perform orthopedic surgeries. Dr. Neely is right-hand dominant.

12.     Due to his injuries, Dr. Neely could not and can no longer perform his duties as an orthopedic surgeon based upon the anatomical injuries, pain and weakness in his right arm and shoulder.

13.     Dr. Neely had to call upon another surgeon, Dr. Jonathan P. Cornelius to assist and help manage performance of the remaining surgeries Dr. Neely had through July, August and September of 2015.

14.     Due to the worsening of his shoulder, Dr. Neely had to stop performing surgeries altogether on September 30, 2015.

15.     Orthopedic surgeon Chad Price, MD provided medical treatment to Dr. Neely and performed an Independent Medical Exam on July 15, 2016. Dr. Price opined that nonsurgical treatments to the shoulder had been unsuccessful, and there was continued pain and weakness resulting in Dr. Neely no longer performing surgery because of safety issues, and recreational activities had also been greatly limited. Dr. Price unequivocally stated that Dr. Neely was unable to return to his normal occupation as an operating orthopedic surgeon as a result of his work-related shoulder/arm injuries. See Dr. Price Report attached hereto as **Exhibit II.**

16. Following his injuries and medical diagnosis, Dr. Neely timely made his claim pursuant to the policy for individual disability benefits.

17. Provident by and through their third party administrator/agent, Unum, gave written notice on May 25, 2016 denying Dr. Neely's individual disability claim. See **Exhibit III**.

18. Dr. Neely timely appealed the first denial. See **Exhibit IV**.

19. Provident, by and through Unum, denied Dr. Neely's appeal on December 7, 2016. See **Exhibit V**.

20. Provident, by and through Unum, issued further denial and explanation on February 14, 2017, See **Exhibit VI**.

21. Dr. Neely timely appealed the second denial and provided more supporting evidence of his disability. See **Exhibit VII**.

22. Provident, by and through Unum, issued an additional denial on May 18, 2017. See **Exhibit VIII**.

23. The policy issued by Provident does not have any mandatory requirement that an appeal must be exhausted before an action to recover benefits can be prosecuted.

24. This cause of action has been brought after all administrative processes have been exhausted, a right to sue letter has been issued by Provident and within the three (3) year limitations under the plan from the date of the alleged disability and within 7 days of the last denial by Provident, by and through Unum.

25. Dr. Neely is disabled from performing surgeries as an orthopedic surgeon and suffers from the aforementioned injuries and maladies, and remains under the care of Dr. Price

and Dr. Cornelius for medical treatment and currently takes medication for inflammation and takes Tylenol on occasion for pain.

26. Dr. Neely is disabled as defined by the policy and entitled to any and all disability benefits covered under the policy purchased by him to cover this circumstance.

27. Dr. Neely has satisfied all policy prerequisites required for him to recover the post-age 65 disability benefits to which he is entitled.

28. The acts and omissions of Provident and Unum in denial of Dr. Neely's individual disability benefits were denied wrongfully, negligently and intentionally without cause. The wrongful, negligent and intentional denial by Provident and UNUM violated the terms of the individual disability policy and is a breach of contract.

29. Unum as a third party administrator has wrongfully, negligently and intentionally interfered with contract between Provident and Dr. Neely.

30. The acts and omissions of Provident and Unum in denial of Dr. Neely's individual disability benefits were wrongfully, negligently and intentionally without cause. Provident and Unum have negligently, wrongfully, and intentionally interfered with contract between Provident and Dr. Neely.

31. Provident and UNUM have breached the contract and failed and refused to pay the benefits to which Dr. Neely entitled under the Policy.

32. Provident and UNUM acts and omissions constitute a wrongful, negligent, and intentional breach of contract and/or interference with a contract in the following particulars:

(a) Knowingly applying a definition of disability in the claims handling of Dr. Neely and others, in a manner inconsistent and in direct conflict with the policy's definition of disability;

(b)     Mischaracterizing Dr. Neely's occupation and/or its duties in determining whether Dr. Neely is disabled as an orthopedic surgeon;

(c)     Misapplying the disability provisions of the policy;

(d)     Continuing to seek additional information where claimants have provided adequate proof of disability, thus unfairly shifting the burden of the investigation to Dr. Neely.

(e)     Selectively using independent medical examinations (IMEs) to Defendant's own advantage;

(f)     Selectively using portions of medical records and IME findings to Defendant's own advantage;

(g)     Overruling the opinion of Dr. Neely's treating physician after Defendant's in house medical personnel have conducted a paper review of the Plaintiff's claim; and

(h)     Overruling the opinion of in house medical personnel who supported a finding of disability or the need for specific objective testing.

33.     Due to Defendants' conduct, Dr. Neely has incurred damages not limited to past due and future benefits and interests on said benefits.

34.     Dr. Neely seeks all compensatory damages available to him under the law of the State of Tennessee.

35.     From May 25, 2016 to the present date, **365** days, the Defendants are guilty of engaging in unfair and deceptive acts or practices in the conduct of its' business within the State of Tennessee, involving Dr. Neely's claim for benefits and continued denial of said benefits.

36.     Dr. Neely alleges that from the time Dr. Neely received his initial denial of disability benefits from Provident and Unum, May 25, 2016, up to the present date, the Defendants are guilty of engaging in unfair and deceptive acts or practices in the conduct of its'

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 14 of 256 PageID #: 22

·business within the State of Tennessee, involving his claim for benefits and continued denial of said benefits.

37.   Defendants are guilty of violating the Tennessee Consumer Protection Act in its' dealings with the Plaintiff, as codified at Tennessee Code Annotated, Section, 47-18-101 through Section 47-18-109.

38.   The Defendants acted knowingly, intentionally and in bad faith in its dealings with Dr. Neely and the continued denial of the Plaintiff's claim.

39.   The Defendants are guilty of misrepresentation in the handling and denial of Dr. Neely's claim for individual disability.

40.   The Defendants have knowingly concealed relevant information from Dr. Neely as to their internal methodology and reasoning for denial of his claim for individual disability benefits and that said acts are ongoing and continuing by the Defendants to this date.

41.   Dr. Neely seeks punitive damages for the Defendants' willful, intentional and malicious conduct in denying his claim, including any interest that may accumulate or accrue from the time of the date of the onset of disability and/or date of denial of disability and/or upon any damages awarded in this matter.

42.   Dr. Neely seeks treble damages and all attorney fees at trial and on appeal if necessary regarding damages determined pursuant to violations of the Tennessee Consumer Protection Act.

43.   Dr. Neely seeks any and all such other damages they may have sustained which were proximately caused by the Defendant's acts and/or omissions herein above described.

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 15 of 256 PageID #: 23

Wherefore, premises considered, the Dr. Neely respectfully prays:

1.      That proper process issue requiring the Defendants to answer this Complaint in the time prescribed by law and in the event that Defendants fail to timely Answer then Dr. Neely hereby moves the Court of an Order granting Default Judgment pursuant to Tenn. R. Civ. P. Rule 55;

2.      Damages for the specific amount of disability benefits Dr. Neely is entitled to receive under the policy for his disabilities as an orthopedic surgeon;

3.      Prejudgment and post-judgment interest;

4.      Dr. Neely seeks a judgment against the Defendants for the sum of greater than $300,000.00 in compensatory damages;

5.      Dr. Neely seeks not less than $900,000.00 in punitive damages (treble damages) against the Defendants; and

6.      Dr. Neely would further seek any and all equitable relief and other relief, whether general or specific that this Court should deem appropriate under the circumstances, including any and all costs and attorney fees available under the law.

_Stephen M. Neely_ 25 May 17

Dr. Stephen M. Neely

Respectfully Submitted,

_[signature]_

Jason G. Denton, BPR No. 22759
Brett Rozell, BPR No. 32718
Attorney for Plaintiff
ROCHELLE, McCULLOCH & AULDS, PLLC
109 Castle Heights Avenue North
Lebanon, TN 37087
615.443.8772 or 615.443.8780
615.443.8775 (facsimile)
E-mail: jdenton@rma-law.com

STATE OF TENNESSEE            )
                             )
COUNTY OF __Wilson__          )

    I, __Stephen Neely__, being first duly sworn, hereby makes oath and aver that I have read the foregoing Complaint to be filed in this cause on his behalf; and that all of the statements contained in said Complaint are true and complete to the best of my knowledge, information and belief.

_Stephen M. Neely_

Sworn to and subscribed before me this _25th_ day of _May_, _2017_.

_[signature]_
NOTARY PUBLIC

_[notary seal: ALICIA H BROWNING, STATE OF TENNESSEE, NOTARY PUBLIC, RUTHERFORD COUNTY]_

My Commission Expires:

_1-28-2019_



FILED

A.M. MAY 2 5 2017 P.M.
3:29
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# I

# PROVIDENT

## LIFE AND ACCIDENT INSURANCE COMPANY
A Stock Company . . . Chattanooga, Tennessee



Hereby insures you, the person named below as the insured, subject to the exceptions and other provisions herein contained, against loss covered by this policy commencing while it is in force and resulting from: (1) accidental bodily injuries occurring while this policy is in force, hereinafter referred to as Injuries; or (2) sickness or disease which is first manifested while this policy is in force, hereinafter referred to as Sickness.

This policy is issued in consideration of the payment in advance of the required premium shown herein, and of the statements and representations in the application, a copy of which is attached to and made a part of the policy.

All of the provisions on this and the following pages are a part of this policy.

_John Barner_         _Winston W Walker_

Vice President            President and Chief Executive Officer

Countersigned by _Todd Baker_

Duly Licensed Resident Agent.

**NOTICE TO INSURED OF 10 DAY RIGHT TO EXAMINE POLICY**
It is the Company's wish that you fully understand and be entirely satisfied with the coverage afforded under your policy. Read it carefully. If for any reason you are not satisfied with the policy you may return it within 10 days from the date you receive it. In this event the policy shall be deemed void from the beginning and any premium paid for it will be refunded.

ACCIDENT AND SICKNESS POLICY

NON-CANCELLABLE AND GUARANTEED CONTINUABLE
TO AGE 65

QUALIFIED RIGHT TO CONTINUE TO AGE 70

PREMIUMS GUARANTEED TO AGE 65

330 (MW)

330 65-65 (80)

## DUPLICATE

INSURED STEPHEN M NEELY MD       POLICY NUMBER 6PC-462691

**NON-CANCELLABLE AND GUARANTEED CONTINUABLE TO AGE 65 AT GUARANTEED PREMIUMS:** You have the right to continue this policy in force by the payment of premiums when due at the premium rate expressed herein until the next premium due date after your 65th birthday.

**QUALIFIED RIGHT TO CONTINUE TO AGE 70:** If you are actively and gainfully employed on a full-time basis on the next premium due date after your 65th birthday, you shall have the guaranteed right to renew this policy to the next premium due date after your 70th birthday by the payment of premiums when due at the Company's premium rates in force at time of renewals. The maximum benefit periods applicable to periods of disability commencing while this policy is so continued are set forth in the Policy Schedule on Page 3. The monthly benefits shall be the same as shown in the Policy Schedule unless you elect to renew this policy with a lesser monthly benefit.

**TERM:** The first term of this policy begins on the Effective Date shown in the Policy Schedule and ends on the First Renewal Date shown therein. Subsequent terms shall be the periods for which renewal premiums are paid by you when due. All terms shall begin and end at 12:01 A.M., Standard Time, at your residence. The renewal premium for each term shall be due on the day the preceding term expires, subject to the Grace Period.

**GRACE PERIOD:** A grace period of 31 days from the date due will be granted for the payment of any premium after the first premium, during which grace period this policy shall continue in force.

**WAIVER OF PREMIUM:** If Injuries or Sickness result in Total Disability requiring the care and attendance of a Physician, and if such Total Disability continues for 90 days, the Company (a) will refund any premiums already paid which became due during such 90 day period and (b) will waive the payment of each premium which may thereafter become due during the continuance of such Total Disability, even beyond the period for which indemnity is payable. After the termination of a period of Total Disability during which the premium has been waived, the insurance provided by this policy shall continue in full force and effect, until the next premium due date, at which time you shall have the right to resume the payment of premiums to the extent provided in this policy.

**SUSPENSION DURING MILITARY SERVICE:** If you enter full-time active duty in the military (land, sea or air) service of any nation or international authority (other than active duty for training lasting 3 months or less), you shall have the option to suspend this policy. The provisions of the policy will not be in effect during a period of suspension and premium payment will not be required. If you elect suspension, the Company will, upon receipt of your written request to suspend the policy, refund the pro-rata portion of any premium paid for any period beyond the date such request is received.

Upon termination of your full-time active duty in military service, you shall have the right to place this policy back in force, without evidence of insurability, effective upon receipt by the Company of your written request to place the policy back in force and payment of the required pro-rata premium for coverage until the next premium due date, provided such request and payment is received within 90 days following the date such full-time active duty terminates. Premiums will be payable at the same rate that would have been applicable had the policy remained in force. The policy shall not cover loss resulting from accidental bodily injuries which occurred, or sickness or disease which was first manifested, during the period of suspension. In all other respects you and the Company shall have the same rights under the policy as you each had before it was suspended.

330 65-65 (80)

DUPLICATE

INSURED STEPHEN M NEELY MD          POLICY NUMBER 6PC-462691

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 20 of 256 PageID #: 28

# POLICY SCHEDULE

EFFECTIVE DATE – MARCH 04, 1981    FIRST RENEWAL DATE –   JUNE 04, 1981
POLICY PREMIUM – $610.89           RENEWAL TERM –     THREE MONTHS

------------------------MONTHLY BENEFIT FOR TOTAL DISABILITY---------------------

ACCIDENT OR SICKNESS – $4,950.00  COMMENCING ON THE 91st DAY OF TOTAL DISABILITY (NO BENEFITS ARE PAYABLE FOR THE FIRST     DAYS OF TOTAL DISABILITY). BENEFITS ARE PAYABLE FOR AS LONG AS THE APPLICABLE MAXIMUM BENEFIT PERIOD SET FORTH BELOW.

-----------------MAXIMUM BENEFIT PERIODS WHILE TOTALLY DISABLED-----------------

TOTAL DISABILITY COMMENCING PRIOR TO YOUR 65TH BIRTHDAY . . . . . . TO YOUR 65TH
                                                BIRTHDAY, BUT
                                              NOT LESS THAN
                                              24 MONTHS
TOTAL DISABILITY COMMENCING ON OR AFTER YOUR 65TH BIRTHDAY. . . .24 MONTHS

-------------------------------------------------------------------------------

REHABILITATION EXPENSE. . . . . . . . . . . . . . $ 4,950.00   MAXIMUM AMOUNT

TREATMENT OF INJURIES (PAID IN LIEU OF OTHER
 BENEFITS AT YOUR OPTION). . . . . . . . . . . . $ 2,475.00   MAXIMUM AMOUNT

-------------------------ADDITIONAL BENEFITS----------------------------------
   (THE PREMIUM SHOWN FOR EACH BENEFIT IS INCLUDED IN THE POLICY PREMIUM)

RESIDUAL DISABILITY..............................PAGE 5(D)..PREMIUM $69.80
  RESIDUAL DISABILITY MONTHLY BENEFIT AMOUNT IS A PERCENTAGE OF THE MONTHLY
  BENEFIT FOR TOTAL DISABILITY SHOWN AT TOP OF THIS PAGE.
COST OF LIVING ADJUSTMENT........................PAGE 5(E)..PREMIUM $126.35

THIS POLICY IS ISSUED IN LIEU OF AND REPLACES POLICY
NUMBER 06 PC- 203641 DATED DECEMBER 01, 1974.

330.65-65 (80)

DUPLICATE

INSURED  STEPHEN M NEELY MD      POLICY NUMBER 6PC-462691

## BENEFIT PROVISIONS

### DEFINITION OF TOTAL DISABILITY:

(a) Until the date you attain age 55, or until the date Indemnity for total disability has been paid during a period of disability under this policy for 5 years, whichever is later, "Total Disability" means your inability to perform the duties of your occupation.

(b) During the continuance of a period of disability beyond the later of either of the two dates named in (a) above, Total Disability means your inability to engage in any gainful occupation in which you might reasonably be expected to engage because of education, training or experience, and with due regard to your vocation and earnings at the beginning of disability.

Nothing in this definition shall be construed to extend or limit the maximum periods for which indemnity for disability is payable under this policy.

### DEFINITION OF PHYSICIAN: "Physician" means any legally qualified physician other than yourself.

### SEPARATE PERIODS OF DISABILITY: Successive periods of disability will be considered separate periods of disability unless the later period of disability is due to the same or a related cause and commences less than 6 months after the end of the previous period of disability.

### TOTAL DISABILITY—ACCIDENT OR SICKNESS: If Injuries or Sickness result in Total Disability, the Company will pay periodically during the continuance of such Total Disability, Indemnity at the rate of the Monthly Benefit for Total Disability shown in the Policy Schedule and commencing on the applicable specified day, but indemnity will not be paid beyond the applicable Maximum Benefit Period shown in the Policy Schedule during a period of disability.

Indemnity will not be paid for disability during any period of time that you are not under the care and attendance of a Physician.

### PRESUMPTIVE TOTAL DISABILITY—LOSS OF SPEECH, HEARING OR SIGHT, OR USE OF TWO LIMBS—ACCIDENT OR SICKNESS: If Injuries or Sickness result in the entire and irrecoverable loss of speech or hearing or sight of both eyes, or result in the entire and irrecoverable loss of the use of both hands, both feet or one hand and one foot, and satisfactory proof of such loss is furnished, you shall be deemed to be totally disabled, irrespective of your ability to engage in any gainful occupation and without requirement of further medical care and attendance. Indemnity will be payable in accordance with the Total Disability provisions of this policy except that payment will begin from the date of such loss, if earlier than the day on which benefits commence as shown in the Policy Schedule and, if such loss occurs prior to your 65th birthday, Indemnity will, regardless of the Maximum Benefit Period shown in the Policy Schedule, be paid for so long as you shall live.

### REHABILITATION—ACCIDENT OR SICKNESS:

**Total Disability**—If Injuries or Sickness result in Total Disability and, while so disabled, you participate in a program of occupational rehabilitation, such participation will not of itself be deemed recovery from Total Disability.

**Expense**—If Injuries or Sickness result in Total Disability and you participate in occupational rehabilitative training which is approved by the Company, the Company will pay the expense actually incurred by you for such training, but payment shall not exceed in the aggregate the Maximum Amount shown in the Policy Schedule for Rehabilitation Expense.

### TREATMENT OF INJURIES (Payable in lieu of other policy benefits, at your option): If Injuries require medical treatment prescribed by a Physician and no other benefit is paid under this policy for disability or other loss as a result of the same accident, the Company will pay a benefit equal to the expense you incur for such treatment, but payment shall not exceed in the aggregate, as the result of any one accident, the Maximum Amount shown in the Policy Schedule for Treatment of Injuries.

## EXCEPTIONS

This policy does not cover loss caused by (1) war or any act of war, whether war is declared or not; or (2) pregnancy.

C-330-DR(4)

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 22 of 256 PageID #: 30

## AMENDMENT CHANGING "DEFINITION OF TOTAL DISABILITY"

The words "age 65" replace the words "age 55" appearing in paragraph (a) of the "DEFINITION OF TOTAL DISABILITY" on Page 4 of the policy, thereby changing the definition to read as follows:

### "DEFINITION OF TOTAL DISABILITY:

(a) Until the date you attain age 65, or until the date indemnity for total disability has been paid during a period of disability under this policy for 5 years, whichever is later, "Total Disability" means your inability to perform the duties of your occupation.

(b) During the continuance of a period of disability beyond the later of either of the two dates named in (a) above, "Total Disability" means your inability to engage in any gainful occupation in which you might reasonably be expected to engage because of education, training or experience, and with due regard to your vocation and earnings at the beginning of disability.

Nothing in this definition shall be construed to extend or limit the maximum periods for which indemnity for disability is payable under this policy."

This amendment forms a part of the policy to which it is attached.

PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY

W. H. Wyett
Vice President

Case 3:17-cv-00996  Document 1-2  Filed 06/29/17  Page 23 of 256 PageID #: 31

The following provision becomes a part of the section of the policy titled "Benefit Provisions."

## RESIDUAL DISABILITY — ACCIDENT OR SICKNESS

(Nothing herein stated shall be construed to limit the policy definition of "Total Disability")

**General Definitions**

"Monthly Income" means monthly income from salary, wages, bonuses, commissions, fees or other remuneration, after deduction of normal and customary business expenses but before deduction of any income taxes, earned for services performed by you. It does not include dividends, rents, royalties, annuities or other forms of unearned income.

"Prior Monthly Income" means your average Monthly Income during the 12 months immediately prior to the period of Total Disability which preceded the Residual Disability for which claim is being made or your average Monthly Income during the calendar year immediately prior to said period of Total Disability, whichever average is the greater.

"Current Monthly Income" means your Monthly Income during each month of Residual Disability for which claim is made.

"Loss of Monthly Income" means the difference between Prior Monthly Income and Current Monthly Income with the loss of income being caused by the Residual Disability for which claim is being made. However, such difference must be at least equal to 25% of Prior Monthly Income to be deemed Loss of Monthly Income under this provision. If the Loss of Monthly Income is more than 75% of Prior Monthly Income, it shall be deemed to be 100%.

"Residual Disability" means:

(a) your inability to perform one or more of your important daily business duties, or

(b) your inability to perform your usual daily business duties for as much time as is usually required for the performance of such duties.

"Monthly Benefit for Total Disability" is shown in the Policy Schedule.

"Residual Disability Monthly Benefit" is the benefit payable for Residual Disability under this provision, determined monthly by the following formula:

$$\frac{\text{Loss of Monthly Income}}{\text{Prior Monthly Income}} \times \text{Monthly Benefit for Total Disability} = \text{Residual Disability Monthly Benefit}$$

**Residual Disability Benefit:**

If Injuries or Sickness result in Residual Disability immediately following a period of Total Disability which resulted from the same or a related cause and such Total Disability continued as long as or longer than the Minimum Qualification Period for Residual Disability specified in the Policy Schedule, the Company, beginning on the later of:

(1) the day following the Minimum Qualification Period for Residual Disability shown in the Policy Schedule, or

(2) the day shown in the Policy Schedule as to when indemnity for Total Disability would have commenced, or

(3) the day following a period of Total Disability described above for which benefits have been paid,

will pay periodically during the continuance of such Residual Disability, indemnity at the rate of the Residual Disability Monthly Benefit until your 65th birthday. In no event, however, will indemnity for Residual Disability be payable for longer than 18 months if you were age 55 or older at the commencement of Total Disability and the period of Total Disability did not exceed 365 days.

Benefits payable for the first 6 months of Residual Disability during a period of disability will be at the rate of 50% of the Monthly Benefit for Total Disability or at the rate of the Residual Disability Monthly Benefit, whichever is greater.

Indemnity for Residual Disability will not be paid (1) for any period of time during which your Loss of Monthly Income is not at least 25% of your Prior Monthly Income, nor (2) for any period of time that you are not under the care and attendance of a Physician, nor (3) for any period of time for which indemnity is payable under this policy for Total Disability or Presumptive Total Disability.

The Company reserves the right to require reasonable proof of your Current Monthly Income and Prior Monthly Income.

The premium for the above benefit provisions is included in the Policy Premium shown in the Policy Schedule and is also shown separately therein.

PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY

*Sandy Cade*

Vice President

330-RD-65

(rc)

This benefit provision is a part of your policy.

## COST OF LIVING ADJUSTMENT FOR TOTAL AND RESIDUAL DISABILITY

### DEFINITIONS

**CPI-U** means the Consumer Price Index for All Urban Consumers. It is published by the Bureau of Labor Statistics of the United States Department of Labor. If the CPI-U is discontinued or if its method of computation is changed, the Company may use another nationally published index. An index comparable in scope and purpose to the CPI-U will be chosen. CPI-U will then mean the chosen index.

**Review Date** means each anniversary date of the start of a period of disability.

**Index Month** means the calendar month three months before the Review Date. But, the first Index Month means the calendar month three months before the start of a period of disability. All changes in the CPI-U will be measured from the first Index Month.

**Monthly Benefit for Total Disability** is shown on Page 3.

**Adjusted Monthly Benefit for Total Disability** means the Monthly Benefit for Total Disability plus the Cost of Living Adjustment.

### BENEFITS

For Total or Residual Disability, the Cost of Living Adjustment will be computed on each Review Date. In computing the adjustment, the Company will compare the CPI-U for the latest Index Month to the one for the first Index Month.

Annual computations of the Cost of Living Adjustment will end on the earliest of:

1) the date your disability ends, subject to the definition of Separate Periods of Disability on Page 4;
2) the date a benefit period ends; or
3) your 65th birthday.

If the computations end because of 1) or 2) above, benefits payable at the start of a later Separate Period of Disability will not include the Cost of Living Adjustment. A new first Index Month and Review Date will apply to a later Separate Period of Disability.

If the computations end because of 3) above and if you qualify for monthly benefits beyond your 65th birthday for a period of disability starting before your 64th birthday, the Company will continue to pay the same monthly benefit amount payable just before your 65th birthday. No more adjustments will be made. One adjustment will be made on the first Review Date for a period of disability that starts between your 64th and 65th birthdays.

If Injuries or Sickness results in a period of disability lasting at least one year, your benefits will be adjusted as follows:

For Total Disability—

1) For any Monthly Benefit for Total Disability which accrues on or after each Review Date, the Company will pay instead the Adjusted Monthly Benefit for Total Disability.

2) On each Review Date, the Adjusted Monthly Benefit for Total Disability will be computed by multiplying the Monthly Benefit for Total Disability by a factor equal to the CPI-U for the latest Index Month divided by the CPI-U for the first Index Month. But, the Adjusted Monthly Benefit for Total Disability will not:
   a) be paid if you are engaged in any occupation for wage or profit;
   b) exceed the Monthly Benefit for Total Disability increased at 6% compounded annually from the first to the latest Index Month;
   c) exceed two times the Monthly Benefit for Total Disability; or
   d) be reduced below the amount of the Monthly Benefit for Total Disability.

3) If during a period of disability you qualify for Total Disability benefits after Residual Disability benefits were payable, the Company will start paying the Adjusted Monthly Benefit for Total Disability. It will be paid as if your entire period of disability had been Total Disability.

(Continued on Reverse Side)

330-COLA-TR



F I L E D

A.M. MAY 2 5 2017 P.M.

BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# II

805 ALDER CT · NASHVILLE, TN 37220
PHONE 615·444·4406 · FAX 615·444·4496 · E·MAIL PRICECHAD@HOTMAIL.COM

# CHAD PRICE

## EMPLOYMENT

Elite Sports Medicine and Orthopaedic Center – *2013-present*

Chad T. Price, MD, PC – *2010- 2013*

Petty Orthopedics and Sports Medicine, *2008-2009*

## EDUCATION

BACHELOR OF SCIENCE

*UNIVERSITY OF TENNESSEE, KNOXVILLE, 1994-1998*

- Major: Biology

DOCTOR OF MEDICINE

*UNIVERSITY OF TENNESSEE, MEMPHIS, 1998-2002*

RESIDENT PHYSICIAN

*UNIVERSITY OF FLORIDA/SHANDS HOSPITAL, GAINESVILLE, 2002-2007*

FELLOWSHIP – Sports Medicine and Shoulder Reconstruction

*STEADMAN HAWKINS CLINIC, SPARTANBURG, SC, 2007-2008*

## AWARDS/HONORS

*Alpha Omega Alpha (2002) – Medical Honor Society*

*Imhotep Society (2000) – UT Memphis leadership honor society*

*Phi Beta Kappa (1998) – academic honor society*

## EXPERIENCE

*Administrative Chief Resident, University of Florida (2006-7)*

*Team Physician, Oak Hall School, Gainesville, FL (2006-2007)*

*Team Physician, Broom High School, Spartanburg, SC (2007)*

*Assistant to Team Physician, University of South Carolina, Upstate (2007)*

*Spring Training Physician, Colorado Rockies (2008)*

*Team Physician, Mt. Juliet High School, Mt. Juliet, TN (2008-present)*

*Affiliate Team Physician, Tennessee Titans (2009-2012)*

## PUBLICATIONS

*"Tibial Fixation of Bone-Patellar Tendon-Bone Grafts in Anterior Cruciate Ligament Reconstruction: A Cadaveric Study of Bovine Bone Screw and Biodegradable Interference Screw" Zheng, Price, Indelicato. AJSM, Dec 2008.*

## LICENSES AND CERTIFICTAIONS

*Tennessee Medical License — 42715*

*Florida Medical License - ME 93221*

*USMLE Exams - Step 1 (1999), Step 2 (2000), Step 3 (2002)*

*Orthopedic Licensing Exam — Board Certified 2010*

*Subspecialty Certification in Sports Medicine - 2012*



**ELITE**
SPORTS MEDICINE AND
ORTHOPAEDIC CENTER

July 15, 2016

This is an Independent Medical Examination for Dr. Steven Neely. Dr. Neely is 70 years of age with a date of birth June 1, 1945. I am a board certified orthopedic surgeon with an additional certificate of qualification in sports medicine. My CV is attached.

Dr. Neely was involved in an accident on May 5, 2015. He was performing a total hip replacement 300 pound patient. While pulling on a bone to dislocate the femoral head, he felt a strain in his shoulder. He then had a second accident on May 11, 2015 while performing a total knee replacement. He was pulling out the intramedullary guide rod and felt another strain in the same right shoulder.

Since the incident under the care of Dr. Jon Cornelius. I have his records available for review. He has attempted physical therapy, and intra-articular injection of steroids, rest, and activity modification. An MRI was performed on July 23, 2015. The MRI showed a high-grade partial-thickness rotator cuff tear of the infraspinatus, a labral tear with associated paralabral cysts, and a low-grade partial-thickness tear of the supraspinatus. So far the nonsurgical treatments to Dr. Neely's shoulder have been unsuccessful. He continues to have pain with overhead activity, weakness with overhead activity and with extension of the arm away from the body, and a moderate degree of rest pain. Professionally this is caused him to stop operating. Being his dominant arm, he was unable to continue safely performing surgery. The weakness and pain have also caused him to limit recreational activities that he wants enjoyed such as golf. He has considered surgical treatment for his shoulder; however, he has significant medical risk from his cardiac condition. In addition, his cardiologist does not want him to stop anticoagulants. This bleeding risk complicates the potential for arthroscopic surgery.

NASHVILLE • MIDTOWN • MEDICALPLAZAII • 2021 CHURCH STREET, SUITE 200 • NASHVILLE, TENNESSEE 37203
NASHVILLE • GREEN HILLS • 2001 WOODMONT BLVD • NASHVILLE, TENNESSEE 37216
NASHVILLE • CENTENNIAL CAMPUS • 356 24TH AVENUE NORTH, SUITE 200 • NASHVILLE, TENNESSEE 37203
COOL SPRINGS • MEDICAL OFFICE BUILDING • 7105 SOUTH SPRINGS DRIVE, SUITE 100 & 111 • FRANKLIN, TENNESSEE 37067
LEBANON • MEDICAL OFFICE BUILDING • 107 GLIDEPATH WAY • LEBANON, TENNESSEE 37090
phone 615.284.1600 • toll free 877.284.3840 • fax 615.284.2008
www.ELITEORTHOPAEDIC.com



ELITE
SPORTS MEDICINE AND
ORTHOPAEDIC CENTER

## Physical examination

He has a well-developed well-nourished male in no acute distress and cooperative with the examination.

Right shoulder

- full passive range of motion in all planes including 160° forward elevation, 65° external rotation at the side, at 90° of abduction there is 90° of external rotation and 60° internal rotation.
- Active range of motion - 140° forward elevation, 65° external rotation at the side, internal rotation to L2 midline
- Strength testing – 4/5 abduction; 4+/5 external rotation; 5/5 internal rotation; 5/5 biceps and triceps; 5/5 wrist flexion and extension; 5/5 hand intrinsics
- Signs - positive Neer, positive Hawkins, positive O'Brien's, negative apprehension, negative posterior drawer
- Neurovascular - 2+ radial pulse, normal sensation, normal reflexes

Cervical spine - expected range of motion with no pain; negative Spurling's sign bilaterally

Left shoulder

- Full passive and active range of motion in all planes
- Strength testing – 5/5 abduction, external rotation, internal rotation of the shoulder; 5/5 biceps, triceps, wrist flexion and extension, hand intrinsics
- Signs - negative Neer, Hawkins, O'Brien's, apprehension, posterior drawer
- Neurovascular - 2+ radial pulse, normal sensation, normal reflexes

## Impression

This is a 70-year-old orthopedic surgeon with a work-related injury to his right shoulder. This injury is now over a year old. Dr. Neely has been unable to return to his normal occupation as an operating orthopedic surgeon as a result of this injury. I find that because of his weakness in the dominant shoulder that he would have reasonable difficulty performing total joint replacement surgery. This type

NASHVILLE • MIDTOWN • MEDICALPLAZAN • 2021 CHURCH STREET, SUITE 200 • NASHVILLE, TENNESSEE 37203
NASHVILLE • GREEN HILLS • 2001 WOODMONT BLVD • NASHVILLE, TENNESSEE 37215
NASHVILLE • CRITERNAL CAMPUS • 866 24TH AVENUE NORTH, SUITE 200 • NASHVILLE, TENNESSEE 87209
COOLSPRINGS • MEDICAL OFFICE BUILDING • 7105 SOUTH SPRINGS DRIVE, SUITE 100 & 111 • FRANKLIN, TENNESSEE 87067
LEBANON • MEDICAL OFFICE BUILDING • 107 OLIDEPATH WAY • LEBANON, TENNESSEE 37090
phone 615.324.1600 • toll free 877.284.3840 • fax 615.284.2008
www.ELITEORTHOPAEDIC.com



**ELITE**
SPORTS MEDICINE AND
ORTHOPAEDIC CENTER

of surgery is very physically demanding. Maneuvers such as dislocating a hip, holding a saw at eye level to perform the necessary cuts, and using a hammer to impact components would not be possible due to the level of weakness demonstrated in his right shoulder. Given that extensive conservative treatment has failed to alleviate his symptoms and return his strength and normal, I think it is unlikely that his shoulder strength will return to a level necessary to perform orthopedic surgery. There is a possibility that operative intervention might help, but there are no guarantees that his strength would return to normal even with surgery. I will give him permanent restrictions of no overhead lifting, no lifting/pushing/pulling greater than 10 pounds with the right arm, and no repetitive overhead movements. I give these opinions with a reasonable degree of medical certainty.

Sincerely,

Chad T Price M.D.

NASHVILLE • MIDTOWN • MEDICAL PLAZA II • 2021 CHURCH STREET, SUITE 200 • NASHVILLE, TENNESSEE 37203
NASHVILLE • GREEN HILLS • 2001 WOODMONT BLVD • NASHVILLE, TENNESSEE 37215
NASHVILLE • CENTENNIAL CAMPUS • 366 24TH AVENUE NORTH, SUITE 200 • NASHVILLE, TENNESSEE 37203
COOLSPRINGS • MEDICAL OFFICE BUILDING • 7105 SOUTH SPRINGS DRIVE, SUITE 100 & 111 • FRANKLIN, TENNESSEE 37067
LEBANON • MEDICAL OFFICE BUILDING • 107 OLIDEPATH WAY • LEBANON, TENNESSEE 37090
phone 615.324.1600 • toll free 877.284.3940 • fax 615.284.2008
WWW.ELITEORTHOPAEDIC.com



F I L E D

A.M. MAY 2 5 2017 P.M.
3. 29.
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# III

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: 1-888-226-7959
Fax: 1-866-562-4794
www.unum.com



May 25, 2016

STEPHEN M NEELY MD
169 POWELL GROVE ROAD
LEBANON, TN 37090

RE:   Neely, Stephen M
      Claim Number:            5200462691001
      Provident Life and Accident Insurance Company

Dear Dr. Neely:

This letter is a follow-up to our conversation on May 25, 2016 about the decision we have made on your Individual Disability benefits. As we discussed, we will not be able to approve your claim and continue the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason
- Information about your benefit check
- Other important information
- Information that supports our decision
- Provisions outlined in your Individual disability policy
- Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

0287500551i400601

### Decision/Reason:

We have determined that you are able to perform the duties of your occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent you from performing these duties on a full-time basis.

Because you are not disabled according to the policy, benefits are not payable.

### Information About Your Benefit Check:

Our last benefit payment, in the amount of $4,950.00, was mailed directly to you on April 27, 2016.

### Other Important Information:

We provided benefits under a Reservation of Rights while our claim decision was pending. We paid four months' worth of benefits, totaling $19,800.00. We will not be requesting repayment of these benefits.

### Information That Supports Our Decision:

We received your claim on January 21, 2016. You stated that as of October 1, 2015 you were no longer performing the duties of your occupation as an orthopedic surgeon. You were seeing patients for regular office visits and independent medical evaluations, but not performing surgery.

You explained that you were unable to continue working due to an injury that occurred on May 5, 2015 while you were doing an orthopedic procedure. You tried to dislocate a hip with a bone hook and felt a sharp pain in your right shoulder, followed by weakness. You continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Your treatment plan included injections and topical creams. You state that your shoulder became inflamed but you tried to continue performing surgery; however, you were unable to do so.

You informed us you stopped performing surgeries on September 30, 2015 because of shoulder pain and because it was taking longer for you to complete procedures.

On the Attending Physician Statement completed by Dr. Jonathan P. Cornelius on January 20, 2016, he listed restrictions of "no lifting, pushing, pulling over 15 lbs., right arm" and "no work at shoulder level or above with right arm." He listed limitations of "He is unable to transfer patients to OR table, unable to position patients on OR table, unable to manipulate patient's extremities during orthopedic surgery, unable to use OR equipment, such as mallets or saws..., unable to examine heavy patients." Dr. Cornelius gave the duration of these restrictions and limitations as extending from September 30, 2015 to "permanent."

We requested treatment records from Dr. Cornelius. This information was reviewed by our physician who is board-certified in orthopedic surgery. The records indicate that you reported right shoulder injuries on May 5 and May 11, 2015, but were not advised to stop working until September 30, 2015. You were able to golf after the incidents. Our physician told us that the

02875005511400602



July 23, 2015 MRI revealed primarily tendinosis of cuff with questioned tearing, no retraction of tendons, and no atrophy of cuff muscles.

To improve our understanding of your condition and any associated restrictions (activities you should not do) and limitations (activities you cannot do), our physician spoke to Dr. Cornelius on March 9, 2016. Dr. Cornelius said that there were no surgical indications, and no muscle atrophy on the MRI, but added that you were noticing weakness while doing surgery.

You continued to work as a primary surgeon for joint replacement and shoulder arthroscopy, as documented in the 2015 CPT code information submitted by your employer. The CPT data shows that you continued to perform surgery through September 2015; no surgeries were noted after September 2015. Although the months of May and June 2015 appear to show billing charges below prior months' charges, the charges increased in July 2015 and August 2015 to a level similar to some months prior to May 2015. Billing charges were lower in May and June 2015 when compared to previous months, but they increased in July and August 2015 to approximate prior levels.

Our physician advised us that restrictions and limitations are not supported by the medical information. Our physician noted that your shoulder does not need surgery, and your range of motion was satisfactory with no obvious atrophy of shoulder musculature. Our physician further noted that in the month when you stopped doing surgery, September 2015, you also performed procedures that would require right shoulder strength and mobility; these procedures reflected your usual and customary procedures prior to your reported injury in May 2015.

Our vocational consultant reviewed the occupation information provided to us, including your Occupation Description form, Physician Questionnaire, and CPT/production data from your employer. The important duties of your occupation involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient exam, review of x-rays, performing injections, prescribing medication and physical therapy, performing office-based procedures (e.g., aspirations, debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

The strength demands of your occupation are in the "light" range. "Light" is defined as the occasional lifting or applying force up to 20 lbs. or the frequent lifting or applying force up to 10 lbs. Other physical demands of your occupation include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

Our physician advised us that the medical records support your ability to perform the physical demands of your occupation.

In view of the lack of agreement between our physician and Dr. Cornelius on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported, explaining that the limited diagnostic findings and limited treatment are not consistent with a severity of pain that would be expected to impact your functional capacity.

Based on our review, the information in your claim file indicates you are able to perform the duties of your own occupation on a full-time basis. As you do not meet the policy's definition of Total Disability, we are unable to approve your claim and provide further benefits. Your claim has been closed effective May 25, 2016.

0287500551140602

### Information about the waiver of premium benefit

Your policy provides a Waiver of Premium benefit, which was approved as of November 1, 2015. Please note that the refund of the November 1, 2015 semi-annual premium was paid under Reservation of Rights. Your policy premiums are due on a semi-annual basis (May 1 and November 1 of each year). Waiver of premium will end and billing will resume starting with the November 1, 2016 premium.

### Policy renewal information

In order to keep this policy in force, you must be actively and gainfully working full time; there is no age limit. Before the enhancement that was effective on June 1, 1986, you could renew your policy only to age 75. Your policy is now renewable for life.

### Policy Provisions And Definitions:

The following provisions and definitions are applicable to our claim decision.

### Individual Disability policy 6PC-462691

We included a copy of your Individual Disability policy 6PC-462691 with our previous letter dated February 8, 2016. The following policy provisions and/or definitions can be found in that copy.

- Information regarding the renewability of your policy after age 65 can be found on the policy improvement brochure dated April 1987
- The definition for "Waiver of Premium" can be found on page 2 of the policy
- The definition for "Total Disability" can be found on page 4
- The amendment changing the "Definition Of Total Disability" can be found on page 5(A)

### Next Steps Available To You:

### What if you disagree with the decision and you have *new information* to submit?

If you disagree with our decision and you have new information to submit, you may request to have your file reevaluated by the Disability Benefits Specialist who made the initial decision.

### How much time do you have to request a reevaluation of your claim?

Please submit your written request within 180 days from the date you receive this letter.

### How does the reevaluation process work?

If you have new information you want us to consider, please send it to us as soon as possible. The Disability Benefits Specialist who made the initial decision will review the claim again, taking the new information into consideration. The Disability Benefits Specialist will provide you with a written response within 90 days of our receipt of the new information.

After this review, we will send you a letter explaining our decision. If you still disagree with our decision, you will have the option to request an additional independent review by our Appeals Department.



### What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for reevaluation and new information?

Reevaluation Request
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

### What if you disagree with the decision, but *do not have new information* to submit?

If you disagree with our decision but do not have new information to submit, you may request to have your file reviewed by our Appeals Department. Please submit a written letter of appeal outlining the basis for your disagreement.

### How much time do you have to request an Appeal?

Please submit your written request for appeal within 180 days from the date you receive this letter.

### How does the Appeal process work?

An Appeals Specialist will review your entire claim and may consult medical and vocational experts or other resources. The Appeal Specialist will make an independent decision on your claim.

### How much time does the Appeal review take?

We are committed to making an appeal decision within 45 days after we receive your written appeal. There may be special circumstances in which the review can take longer. We will notify you if more time is needed.

### What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for Appeal?

The Appeals Unit
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

We will send you a letter acknowledging receipt of your request within 7 days.

Dr. Neely, if you have questions about your claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension 75352.

We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist



F I L E D

A.M. MAY 2 5 2017 P.M.
3:29
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# IV

Jason G. Denton
615/443-8772
jdenton@rma-law.com



**Rochelle, McCulloch & Aulds, PLLC**

ATTORNEYS AT LAW

Jere N. McCulloch
(1973 – 2013)

Robert Rochelle
Jo Ann "Jody" Aulds
David B. Foutch
Alan Poindexter
Gregory S. Gill
Julie M. Robinson
T. Price Thompson, III
Byron M. Gill
Jason G. Denton
Matthew H. Ryan
Tom Walsh
Debra L. Dishman
Brett Rozell

September 7, 2016

*via facsimile 866.562.4794*
*and FedEx No.:*

UNUM
The Appeals Unit
P.O. Box 15112
Worcester, MA 01615-0112

RE:     Client/Claimant:     Stephen Neely
        Claim No.:           5200462691001

## NOTICE OF APPEAL OF DENIAL OF INDIVIDUAL
## DISABILITY BENEFITS

To the Appeals Unit:

Please be advised that Dr. Stephen Neely does hereby appeal the denial of individual disability benefits for his right shoulder injuries that occurred while he was at work on May 5, 2015 and May 11, 2015 *(please see attached denial, Exhibit A)*. In support of this appeal, attached please find causation and damage statements from Dr. Gregory White and Dr. Chad Price, as well as affidavits from Dr. Stephen Neely, Dr. Jonathan Cornelius, David Eldridge, and Kenny Oliver *(please see attached, collective Exhibit B)*.

### I.     Dr. Neely No Longer Can Perform Physically Accurate Surgeries

Dr. Neely has been irreparably damaged as a result of his injuries. He is an orthopaedic surgeon, and did perform orthopaedic surgeries at an extremely high rate before 2015. Surgeries require very precise maneuvers and 100% accuracy, and his physical limitations simply prevented him from continuing as he had in the past. The required physical demands of the surgeries are intense. He was unable to perform a number of duties that were required to make each surgery a success. Dr. Neely opposes the description by your vocational consultant that orthopaedic surgery is "light" work, as it is a very strenuous activity that requires banging and cutting limbs and bones with hammers and saws, and is incredibly taxing on the body.



Dr. Neely could not simply modify his operative techniques after he realized he could not get his right arm in a stable position to make pocket saw cuts. There were legal considerations Dr. Neely had to take into consideration as well because he knew his lack of strength, dexterity, and precision were compromised. Counter to what is in his denial report, Dr. Neely desperately worked on improving his physical conditioning through range of motion and band exercises once a day for over a month. He was confident he could do those exercises as part of his physical therapy, as he is an orthopaedic surgeon and knows the importance of repetition, stretching, and strengthening. Also, it is mentioned in the denial report that he was able to modify his golf swing after his work injuries, and as such, should be able to modify his surgical operative techniques. That is a correct statement about his golf swing, but it has literally no bearing on his ability to perform life-altering, corrective surgical procedures at a very high level as he had done numerous times in the past. Standing on a practice range striking golf balls posed no risk to anyone but Dr. Neely. Inaccurately hitting, splicing, or hooking a golf ball holds no weight as compared to the consequence of being even millimeters off when performing surgery on a patient's body. You cannot simply remove more bone and tissue if mistakes are made and assume that the results would be as good as index perfect cuts.

As it was becoming apparent that Dr. Neely could not perform his surgical duties as he had in the past due to pain and weakness in his right arm and shoulder, Dr. Jonathon Cornellius was brought along to help with the remaining surgeries he had through July, August, and September of 2015. Dr. Neely is a very well-respected surgeon in Middle Tennessee, and many of the surgeries from July through September 2015 were scheduled many months in advance. He felt he could not let those patients down by cancelling or not being involved in the ones that were already scheduled, but he could not fully participate in them as well. Dr. Neely would adhere to the lighter physical work as he could during this time, and Dr. Cornellius would use the mallet and saw and perform all or most of the physical and grueling parts of these procedures when Dr. Neely could not. As a result of that arrangement, he split the fees with Dr. Cornellius accordingly. That is the reason that billing codes were still high during this period even though Dr. Neely was not performing the physically demanding aspects of them.

## II.    Supportive Medical Testimony

In his letter, Dr. Gregory White gives his opinion as an active general orthopedic surgeon that orthopedic surgery in general, and specifically the practice of total joint and trauma surgery, are two of the most physically demanding and labor-intensive of all surgical disciplines. It often requires lifting, holding, and manipulation of very heavy, dead-weighted extremities, and

www.rma-law.com
109 North Castle Heights Avenue • Lebanon, TN 37087 • 615/444-1433 • Fax 615/443-8775
2745 North Mt. Juliet Road • Mt. Juliet, TN 37122

Case 3:17-cv-00996  Document 1-2  Filed 06/29/17  Page 41 of 256 PageID #: 49



can be performed at awkward positions which require significant strength and stamina, and also puts great stress on the surgeons' body.

Dr. Chad Price performed an Independent Medical Exam of Dr. Neely on July 15, 2016. It shows that an MRI was performed on July 23, 2015, which found a high-grade partial-thickness rotator cuff tear of the infraspinatus, a labral tear with associated paralabral cysts, and a low-grade partial-thickness tear of the supraspinatus. Dr. Price opined that nonsurgical treatments to the shoulder had been unsuccessful, and there was continued pain and weakness resulting in Dr. Neely no longer performing surgery because of safety issues, and recreational activities had also been greatly limited. Dr. Price unequivocally states that Dr. Neely is unable to return to his normal occupation as an operating surgeon as a result of his work-related shoulder injuries. Weakness would cause reasonable difficulty in maneuvers such as dislocating a hip, and holding a saw at eye level to perform necessary cuts. Using a hammer to impact components would not be possible due to the physically-demanding task of performing total joint replacement surgeries.

In his affidavit, Dr. Stephen Neely states that he injured his right shoulder on May 5, 2015 while performing a hip procedure. He continued to work as normal, and approximately one week later, injured his shoulder again during a total knee replacement on an obese patient. An effort was made to continue operating on a reduced surgical schedule, but he was unable to complete some of the tasks necessary on a routine basis. Unable to safely use the saw or mallet, Dr. Cornellius' services were required to complete already scheduled hip, shoulder, and knee surgeries from July through September 2015. During this time, Dr. Neely lost approximately $10,000.00 as the receipts from surgery that were split with Dr. Cornellius, and the portions in which Dr. Neely could not perform were completed by Dr. Cornellius. Due to the worsening of his shoulder, Dr. Neely had to stop performing surgeries on September 30, 2015.

Dr. Jonathon Cornellius opines in his affidavit that he assisted Dr. Neely during the months of July through September 2015 because Dr. Neely was unable to perform multiple hip, shoulder, and knee procedures by himself because of his shoulder injuries. Dr. Neely continued to worsen so much that he could not perform any surgery of any kind after September 30, 2015. Dr. Cornellius completed an Attending Physician Statement, giving Dr. Neely permanent restrictions of no lifting, pushing, or pulling over 15 pounds with his right arm and no work at shoulder level or above with his right arm. It was also noted that Dr. Neely was no longer able to transfer patients to the operating table, unable to position patients on the operating table, and unable to manipulate patient's extremities during orthopedic surgery, unable to use equipment in the operating room such as mallets or saws, and unable to examine heavy patients.



Rochelle, McCulloch & Aulds, PLLC

David Eldridge and Kenny Oliver are certified surgical technicians and certified first assistants, and have worked with Dr. Neely for 25 years. In their affidavits, Mr. Eldridge and Mr. Oliver state that Dr. Neely hurt his right shoulder on May 5, 2015, then reinjured it one week later. Due to those injuries, Dr. Neely was unable to perform total shoulder arthroplasty or total hip replacements by himself. It was noted that Dr. Cornellius scrubbed in to assist in surgeries from July through September 2015, and that Dr. Neely has not been able to perform surgery at all since September 2015.

## III. Conclusion

As is stated above, Dr. Neely's permanent medical injuries and conditions prevent him from performing his duties as an orthopaedic surgeon in an accurate, safe, and physically beneficial manner for his clients without the medical and physical assistance of another surgeon or medical professional. Therefore, the previous denial of individual disability benefits for his 2015 shoulder injuries is hereby appealed. Dr. Neely requests that these benefits be approved going forward, and back benefits be rewarded from May 2016, the time when benefits were denied. Your time and consideration of this matter is greatly appreciated.

Sincerely,

ROCHELLE, McCULLOCH & AULDS, PLLC

Jason G. Denton

JGD/blr

Enclosures

www.rma-law.com
109 North Castle Heights Avenue • Lebanon, TN 37087 • 615/444-1433 • Fax 615/443-8775
2745 North Mt. Juliet Road • Mt. Juliet, TN 37122

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 43 of 256 PageID #: 51



F I L E D
A.M. MAY 25 2017 P.M.
3:29
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# EXHIBIT

# A

Unum
The Benefit Center
PO Box 100282
Columbia, SC 29202
Phone: 1-888-226-7959
Fax: 1-800-562-4704
www.unum.com



May 25, 2016

STEPHEN M NEELY MD
169 POWELL GROVE ROAD
LEBANON, TN 37090

RE:     Neely, Stephen M
        Claim Number:            5200462691001
        Provident Life and Accident Insurance Company

Dear Dr. Neely:

This letter is a follow-up to our conversation on May 25, 2016 about the decision we have made on your Individual Disability benefits. As we discussed, we will not be able to approve your claim and continue the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason
- Information about your benefit check
- Other important information
- Information that supports our decision
- Provisions outlined in your Individual disability policy
- Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-00

02875006611400601

### Decision/Reason:

We have determined that you are able to perform the duties of your occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent you from performing these duties on a full-time basis.

Because you are not disabled according to the policy, benefits are not payable.

### Information About Your Benefit Check:

Our last benefit payment, in the amount of $4,950.00, was mailed directly to you on April 27, 2016.

### Other Important Information:

We provided benefits under a Reservation of Rights while our claim decision was pending. We paid four months' worth of benefits, totaling $19,800.00. We will not be requesting repayment of these benefits.

### Information That Supports Our Decision:

We received your claim on January 21, 2016. You stated that as of October 1, 2015 you were no longer performing the duties of your occupation as an orthopedic surgeon. You were seeing patients for regular office visits and independent medical evaluations, but not performing surgery.

You explained that you were unable to continue working due to an injury that occurred on May 5, 2015 while you were doing an orthopedic procedure. You tried to dislocate a hip with a bone hook and felt a sharp pain in your right shoulder, followed by weakness. You continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Your treatment plan included injections and topical creams. You state that your shoulder became inflamed but you tried to continue performing surgery; however, you were unable to do so.

You informed us you stopped performing surgeries on September 30, 2015 because of shoulder pain and because it was taking longer for you to complete procedures.

On the Attending Physician Statement completed by Dr. Jonathan P. Cornelius on January 20, 2016, he listed restrictions of "no lifting, pushing, pulling over 15 lbs., right arm" and "no work at shoulder level or above with right arm." He listed limitations of "He is unable to transfer patients to OR table, unable to position patients on OR table, unable to manipulate patient's extremities during orthopedic surgery, unable to use OR equipment, such as mallets or saws..., unable to examine heavy patients." Dr. Cornelius gave the duration of these restrictions and limitations as extending from September 30, 2015 to "permanent."

We requested treatment records from Dr. Cornelius. This information was reviewed by our physician who is board-certified in orthopedic surgery. The records indicate that you reported right shoulder injuries on May 5 and May 11, 2015, but were not advised to stop working until September 30, 2015. You were able to golf after the incidents. Our physician told us that the

02875005511400602

July 23, 2015 MRI revealed primarily tendinosis of cuff with questioned tearing, no retraction of tendons, and no atrophy of cuff muscles.

To improve our understanding of your condition and any associated restrictions (activities you should not do) and limitations (activities you cannot do), our physician spoke to Dr. Cornelius on March 9, 2016. Dr. Cornelius said that there were no surgical indications, and no muscle atrophy on the MRI, but added that you were noticing weakness while doing surgery.

You continued to work as a primary surgeon for joint replacement and shoulder arthroscopy, as documented in the 2015 CPT code information submitted by your employer. The CPT data shows that you continued to perform surgery through September 2015; no surgeries were noted after September 2015. Although the months of May and June 2015 appear to show billing charges below prior months' charges, the charges increased in July 2015 and August 2015 to a level similar to some months prior to May 2015. Billing charges were lower in May and June 2015 when compared to previous months, but they increased in July and August 2015 to approximate prior levels.

Our physician advised us that restrictions and limitations are not supported by the medical information. Our physician noted that your shoulder does not need surgery, and your range of motion was satisfactory with no obvious atrophy of shoulder musculature. Our physician further noted that in the month when you stopped doing surgery, September 2015, you also performed procedures that would require right shoulder strength and mobility; these procedures reflected your usual and customary procedures prior to your reported injury in May 2015.

Our vocational consultant reviewed the occupation information provided to us, including your Occupation Description form, Physician Questionnaire, and CPT/production data from your employer. The important duties of your occupation involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient exam, review of x-rays, performing injections, prescribing medication and physical therapy, performing office-based procedures (e.g., aspirations, debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

The strength demands of your occupation are in the "light" range. "Light" is defined as the occasional lifting or applying force up to 20 lbs, or the frequent lifting or applying force up to 10 lbs. Other physical demands of your occupation include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

Our physician advised us that the medical records support your ability to perform the physical demands of your occupation.

In view of the lack of agreement between our physician and Dr. Cornelius on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported, explaining that the limited diagnostic findings and limited treatment are not consistent with a severity of pain that would be expected to impact your functional capacity.

Based on our review, the information in your claim file indicates you are able to perform the duties of your own occupation on a full-time basis. As you do not meet the policy's definition of Total Disability, we are unable to approve your claim and provide further benefits. Your claim has been closed effective May 25, 2016.

0287500551400602

### Information about the waiver of premium benefit

Your policy provides a Waiver of Premium benefit, which was approved as of November 1, 2015. Please note that the refund of the November 1, 2015 semi-annual premium was paid under Reservation of Rights. Your policy premiums are due on a semi-annual basis (May 1 and November 1 of each year). Waiver of premium will end and billing will resume starting with the November 1, 2016 premium.

### Policy renewal information

In order to keep this policy in force, you must be actively and gainfully working full time; there is no age limit. Before the enhancement that was effective on June 1, 1986, you could renew your policy only to age 75. Your policy is now renewable for life.

### Policy Provisions And Definitions:

The following provisions and definitions are applicable to our claim decision.

### Individual Disability policy 6PC-462691

We included a copy of your Individual Disability policy 6PC-462691 with our previous letter dated February 8, 2016. The following policy provisions and/or definitions can be found in that copy.

- Information regarding the renewability of your policy after age 65 can be found on the policy Improvement brochure dated April 1987
- The definition for "Waiver of Premium" can be found on page 2 of the policy
- The definition for "Total Disability" can be found on page 4
- The amendment changing the "Definition Of Total Disability" can be found on page 5(A)

### Next Steps Available To You:

### What if you disagree with the decision and you have *new information* to submit?

If you disagree with our decision and you have new information to submit, you may request to have your file reevaluated by the Disability Benefits Specialist who made the initial decision.

### How much time do you have to request a reevaluation of your claim?

Please submit your written request within 180 days from the date you receive this letter.

### How does the reevaluation process work?

If you have new information you want us to consider, please send it to us as soon as possible. The Disability Benefits Specialist who made the initial decision will review the claim again, taking the new information into consideration. The Disability Benefits Specialist will provide you with a written response within 90 days of our receipt of the new information.

After this review, we will send you a letter explaining our decision. If you still disagree with our decision, you will have the option to request an additional independent review by our Appeals Department.

02875005511400802

**What information is available to you?**

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

**Where do you mail or fax your written request for reevaluation and new information?**

Reevaluation Request
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

**What if you disagree with the decision, but *do not have new information* to submit?**

If you disagree with our decision but do not have new information to submit, you may request to have your file reviewed by our Appeals Department. Please submit a written letter of appeal outlining the basis for your disagreement.

**How much time do you have to request an Appeal?**

Please submit your written request for appeal within 180 days from the date you receive this letter.

**How does the Appeal process work?**

An Appeals Specialist will review your entire claim and may consult medical and vocational experts or other resources. The Appeal Specialist will make an independent decision on your claim.

**How much time does the Appeal review take?**

We are committed to making an appeal decision within 45 days after we receive your written appeal. There may be special circumstances in which the review can take longer. We will notify you if more time is needed.

**What information is available to you?**

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

**Where do you mail or fax your written request for Appeal?**

The Appeals Unit
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

We will send you a letter acknowledging receipt of your request within 7 days.

Dr. Neely, if you have questions about your claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension 75352.

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 49 of 256 PageID #: 57

We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist



F I L E D
A.M. MAY 2 5 2017
3.24          P.M.
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# EXHIBIT

# B



FLORIDA HOSPITAL
NEW SMYRNA
*HealthCare Partners*

Dear Mr. Denton,

I am writing to you as an active general orthopedic surgeon, to express my objection to the notion that the practice of orthopedic surgery is less than exceptionally strenuous. Orthopedic surgery, specifically the practice of total joint and trauma surgery are two of the most physically demanding and labor-intensive of all surgical disciplines. Performing these procedures often requires lifting, holding, and manipulation of very heavy extremities in order to achieve stability in the repair long bone fractures or to manipulate joint implants to attain joint stability. Often times, this is performed from awkward positions requiring the weight of the extremity to be lifted and manipulated away from the surgeons body. Doing this moves the center of gravity away from the surgeon's body which multiplies the stress moment arm and thusly, requires significant strength and stamina.

Orthopedic surgery, as a surgical specialty may be the most physically strenuous of the surgical specialties, and is supported by multiple articles in peer reviewed literature and sustained by the American Academy of Orthopedic Surgery. I hope this can contribute to your knowledge when considering the physical requirements of an orthopedic practice.

Sincerely,

Gregory G. White MD, FAAOS, FACS

**Gregory White, MD**
**Orthopaedics**

600 Palmetto Street · New Smyrna Beach, FL 32168
Office: (386) 424-3845 · Fax: (386) 424-3847

www.HCPPhysicians.org

805 ALDER CT · NASHVILLE, TN 37220
PHONE 615-444-4406 · FAX 615-444-4496 · E-MAIL PRICECHAD@HOTMAIL.COM

# CHAD PRICE

## EMPLOYMENT

Elite Sports Medicine and Orthopaedic Center – *2013-present*

Chad T. Price, MD, PC – *2010- 2013*

Petty Orthopedics and Sports Medicine, *2008-2009*

## EDUCATION

BACHELOR OF SCIENCE

*UNIVERSITY OF TENNESSEE, KNOXVILLE, 1994-1998*

- Major: Biology

DOCTOR OF MEDICINE

*UNIVERSITY OF TENNESSEE, MEMPHIS, 1998-2002*

RESIDENT PHYSICIAN

*UNIVERSITY OF FLORIDA/SHANDS HOSPITAL, GAINESVILLE, 2002-2007*

FELLOWSHIP – Sports Medicine and Shoulder Reconstruction

*STEADMAN HAWKINS CLINIC, SPARTANBURG, SC, 2007-2008*

## AWARDS/HONORS

*Alpha Omega Alpha (2002) – Medical Honor Society*

*Imhotep Society (2000) – UT Memphis leadership honor society*

*Phi Beta Kappa (1998) – academic honor society*

## EXPERIENCE

*Administrative Chief Resident, University of Florida (2006-7)*

*Team Physician, Oak Hall School, Gainesville, FL (2006-2007)*

*Team Physician, Broom High School, Spartanburg, SC (2007)*

*Assistant to Team Physician, University of South Carolina, Upstate (2007)*

*Spring Training Physician, Colorado Rockies (2008)*

*Team Physician, Mt. Juliet High School, Mt. Juliet, TN (2008-present)*

*Affiliate Team Physician, Tennessee Titans (2009-2012)*

## PUBLICATIONS

*"Tibial Fixation of Bone-Patellar Tendon-Bone Grafts in Anterior Cruciate Ligament Reconstruction: A Cadaveric Study of Bovine Bone Screw and Biodegradable Interference Screw" Zheng, Price, Indelicato, AJSM, Dec 2008.*

## LICENSES AND CERTIFICTAIONS

*Tennessee Medical License – 42715*

*Florida Medical License - ME 93221*

*USMLE Exams – Step 1 (1999), Step 2 (2000), Step 3 (2002)*

*Orthopedic Licensing Exam – Board Certified 2010*

*Subspecialty Certification in Sports Medicine – 2012*



**ELITE**
SPORTS MEDICINE AND
ORTHOPAEDIC CENTER

July 15, 2016

This is an Independent Medical Examination for Dr. Steven Neely. Dr. Neely is 70 years of age with a date of birth June 1, 1945. I am a board certified orthopedic surgeon with an additional certificate of qualification in sports medicine. My CV is attached.

Dr. Neely was involved in an accident on May 5, 2015. He was performing a total hip replacement 300 pound patient. While pulling on a bone to dislocate the femoral head, he felt a strain in his shoulder. He then had a second accident on May 11, 2015 while performing a total knee replacement. He was pulling out the intramedullary guide rod and felt another strain in the same right shoulder.

Since the incident under the care of Dr. Jon Cornelius. I have his records available for review. He has attempted physical therapy, and intra-articular injection of steroids, rest, and activity modification. An MRI was performed on July 23, 2015. The MRI showed a high-grade partial-thickness rotator cuff tear of the infraspinatus, a labral tear with associated paralabral cysts, and a low-grade partial-thickness tear of the supraspinatus. So far the nonsurgical treatments to Dr. Neely's shoulder have been unsuccessful. He continues to have pain with overhead activity, weakness with overhead activity and with extension of the arm away from the body, and a moderate degree of rest pain. Professionally this is caused him to stop operating. Being his dominant arm, he was unable to continue safely performing surgery. The weakness and pain have also caused him to limit recreational activities that he wants enjoyed such as golf. He has considered surgical treatment for his shoulder; however, he has significant medical risk from his cardiac condition. In addition, his cardiologist does not want him to stop anticoagulants. This bleeding risk complicates the potential for arthroscopic surgery.

NASHVILLE • MIDTOWN • MEDICAL PLAZA II • 2021 CHURCH STREET, SUITE 200 • NASHVILLE, TENNESSEE 37203
NASHVILLE • GREEN HILLS • 2001 WOODMONT BLVD • NASHVILLE, TENNESSEE 37215
NASHVILLE • CENTENNIAL CAMPUS • 356 24TH AVENUE NORTH, SUITE 200 • NASHVILLE, TENNESSEE 37203
COOL SPRINGS • MEDICAL OFFICE BUILDING • 7105 SOUTH SPRINGS DRIVE, SUITE 100 & 111 • FRANKLIN, TENNESSEE 37067
LEBANON • MEDICAL OFFICE BUILDING • 107 GLIDEPATH WAY • LEBANON, TENNESSEE 37090
phone 615.284.1600 • toll free 877.284.3840 • fax 615.284.2003
WWW.ELITEORTHOPAEDIC.com



ELITE
SPORTS MEDICINE AND
ORTHOPAEDIC CENTER

## Physical examination

He has a well-developed well-nourished male in no acute distress and cooperative with the examination.

Right shoulder-

- full passive range of motion in all planes including 160° forward elevation, 65° external rotation at the side, at 90° of abduction there is 90° of external rotation and 60° internal rotation.
- Active range of motion - 140° forward elevation, 65° external rotation at the side, internal rotation to L2 midline
- Strength testing – 4/5 abduction; 4+/5 external rotation; 5/5 internal rotation; 5/5 biceps and triceps; 5/5 wrist flexion and extension; 5/5 hand intrinsics
- Signs - positive Neer, positive Hawkins, positive O'Brien's, negative apprehension, negative posterior drawer
- Neurovascular - 2+ radial pulse, normal sensation, normal reflexes

Cervical spine - expected range of motion with no pain; negative Spurling's sign bilaterally

Left shoulder-

- Full passive and active range of motion in all planes
- Strength testing – 5/5 abduction, external rotation, internal rotation of the shoulder; 5/5 biceps, triceps, wrist flexion and extension, hand intrinsics
- Signs - negative Neer, Hawkins, O'Brien's, apprehension, posterior drawer
- Neurovascular - 2+ radial pulse, normal sensation, normal reflexes

## Impression

This is a 70-year-old orthopedic surgeon with a work-related injury to his right shoulder. This injury is now over a year old. Dr. Neely has been unable to return to his normal occupation as an operating orthopedic surgeon as a result of this injury. I find that because of his weakness in the dominant shoulder that he would have reasonable difficulty performing total joint replacement surgery. This type

NASHVILLE • MIDTOWN • MEDICALPLAZA II • 2021 CHURCH STREET, SUITE 200 • NASHVILLE, TENNESSEE 37203
NASHVILLE • GREEN HILLS • 2001 WOODMONT BLVD • NASHVILLE, TENNESSEE 37215
NASHVILLE • CENTENNIAL CAMPUS • 366 24TH AVENUE NORTH, SUITE 200 • NASHVILLE, TENNESSEE 37203
COOLSPRINGS • MEDICAL OFFICE BUILDING • 7106 SOUTH SPRINGS DRIVE, SUITE 100 & 111 • FRANKLIN, TENNESSEE 37067
LEBANON • MEDICAL OFFICE BUILDING • 107 OLIDEPATH WAY • LEBANON, TENNESSEE 37090
phone 615.324.1600 • toll free 877.284.3840 • fax 615.284.2003
www.ELITEORTHOPAEDIC.com •



ELITE
SPORTS MEDICINE AND
ORTHOPAEDIC CENTER

of surgery is very physically demanding. Maneuvers such as dislocating a hip, holding a saw at eye level to perform the necessary cuts, and using a hammer to impact components would not be possible due to the level of weakness demonstrated in his right shoulder. Given that extensive conservative treatment has failed to alleviate his symptoms and return his strength and normal, I think it is unlikely that his shoulder strength will return to a level necessary to perform orthopedic surgery. There is a possibility that operative intervention might help, but there are no guarantees that his strength would return to normal even with surgery. I will give him permanent restrictions of no overhead lifting, no lifting/pushing/pulling greater than 10 pounds with the right arm, and no repetitive overhead movements. I give these opinions with a reasonable degree of medical certainty.

Sincerely,

Chad T Price M.D.

NASHVILLE • MIDTOWN • MEDICALPLAZA II • 2021 CHURCH STREET, SUITE 200 • NASHVILLE, TENNESSEE 37203
NASHVILLE • GREEN HILLS • 2001 WOODMONT BLVD • NASHVILLE, TENNESSEE 37215
NASHVILLE • CENTENNIAL CAMPUS • 356 24TH AVENUE NORTH, SUITE 200 • NASHVILLE, TENNESSEE 37203
COOLSPRINGS • MEDICAL OFFICE BUILDING • 7105 SOUTH SPRINGS DRIVE, SUITE 100 & 111 • FRANKLIN, TENNESSEE 37067
LEBANON • MEDICAL OFFICEBUILDING • 107 OLDEPATH WAY • LEBANON, TENNESSEE 37090
phone 615.324.1600 • toll free 877.284.9840 • fax 615.284.2003
www.ELITEORTHOPAEDIC.com

---

### AFFIDAVIT OF STEPHEN M. NEELY

---

I, Stephen M. Neely, having been duly sworn, hereby make oath that the following facts are true and correct and are based upon my personal knowledge.

1.     I am an Orthopedic Surgeon and have been performing surgeries for 35 years.

2.     On May 5, 2015, while performing a hip procedure, I injured my right shoulder.

3.     I continued to work as normal, and approximately one week later, I suffered additional injury to my shoulder during a total knee replacement on an obese patient.

4.     I tried to continue operating after first reducing my surgical schedule but was unable to complete some of the tasks necessary on a routine basis in every orthopaedic surgery procedure.

5.     Unable to perform some of the procedures by myself, I required the assistance of Dr. Jonathan Cornelius to complete necessary surgeries for the upcoming months of July, August, and September 2015.

6.     Dr. Jonathan Cornelius scrubbed in and assisted me with hip, shoulder and knee procedures scheduled during July, August, and September 2015.

7.     I was unable to safely use the saw or the mallet to be able to successfully complete these cases. Hammering was very difficult due to pain and weakness in my right shoulder.

8.   During this time, the receipts from surgery were split with Dr. Cornelius and the portions of the cases I could not perform, were done by Dr. Cornelius.

9.   I lost a total of roughly $10,000.00 as a result of having Dr. Cornelius assist with my surgeries during July, August, and September 2015.

10.  Due to worsening of my shoulder, I had to stop performing surgeries on September 30, 2015. I could no longer safely perform orthpaedic surgical procedures.

Further this Affiant saith not.



_____
Stephen M. Neely

Sworn to and subscribed before me this the ___19ᵗʰ___ day of ___July___, 2016.

_____
Notary Public

My Commission Expires: __11-27-18__

---

## AFFIDAVIT OF JONATHAN CORNELIUS

---

I, Jonathan Cornelius, having been duly sworn, hereby make oath that the following facts are true and correct and are based upon my personal knowledge.

1.    I am an Orthopedic Surgeon and have been performing surgeries for 10 years.

2.    On May 5, 2015, Dr. Stephen Neely injured his right shoulder while performing a hip procedure. Approximately one week later, he sustained an additional injury to his right shoulder performing a total knee replacement.

3.    During the months of July, August, and September 2015, I scrubbed in and assisted Dr. Neely in multiple hip, shoulder and knee procedures as he was unable to perform these surgeries by himself due to his shoulder injuries.

4.    Dr. Neely and I split the receipts from these surgeries.

5.    Dr. Neely's shoulder injuries progressively worsened and he became unable to perform surgery of any kind on September 30, 2015.

6.    On January 20, 2016, I completed an Attending Physician Statement with permanent restrictions which began on September 30, 2015.

7.    Dr. Neely has permanent restrictions of no lifting, pushing, or pulling over 15 pounds with his right arm and no work at shoulder level or above with his right arm.

8.    Dr. Neely is unable to transfer patients to the Operating Table, unable to position patients on the Operating Table, unable to manipulate patient's extremities during

orthopedic surgery, unable to use equipment in the Operating Room, such as mallets or saws, and he is unable to examine heavy patients.

Further this Affiant saith not.

_____
Jonathan Cornelius



Sworn to and subscribed before me this the 19th day of ___July___, 2016.

_____
Notary Public

My Commission Expires: 11-27-17

RE:   Claimant Name: Stephen M. Neely
      Claim Number: 5200462691001

---

## AFFIDAVIT OF DAVID ELDRIDGE

---

I, David Eldridge, having been duly sworn, hereby make oath that the following facts are true and correct and are based upon my personal knowledge.

1.   I am a Certified Surgical Technician and Certified First Assistant and have worked with Dr. Stephen Neely for 25 years.

2.   On May 5, 2015, Dr. Neely injured his right shoulder while performing a hip surgery.

3.   Dr. Neely suffered another injury to his right shoulder during another procedure, approximately one week later.

4.   Following the injuries to his right shoulder, Dr. Neely was unable to perform total shoulder arthroplasty or total hip replacement by himself.

5.   Dr. Jonathan Cornelius scrubbed in to assist Dr. Neely with these surgeries during July, August, and September 2015.

6.   Dr. Neely has not been able to perform surgery at all since September 2015.

Further this Affiant saith not.

_David Eldridge_
David Eldridge

Sworn to and subscribed before me this the 19th day of July, 2016.

_Betty Leftrick_
Notary Public

My Commission Expires: 11-29-18

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 63 of 256 PageID #: 71

RE: **Claimant Name:** Stephen M. Neely
**Claim Number:** 5200462691001

## AFFIDAVIT OF KENNY OLIVER

I, Kenny Oliver, having been duly sworn, hereby make oath that the following facts are true and correct and are based upon my personal knowledge.

1. I am a Certified Surgical Technician and Certified First Assistant and have worked with Dr. Stephen Neely for 25 years.

2. On May 5, 2015, Dr. Neely injured his right shoulder while performing a hip surgery.

3. Dr. Neely suffered another injury to his right shoulder during another procedure, approximately one week later.

4. Following the injuries to his right shoulder, Dr. Neely was unable to perform total shoulder arthroplasty or total hip replacement by himself.

5. Dr. Jonathan Cornelius scrubbed in to assist Dr. Neely with these surgeries during July, August, and September 2015.

6. Dr. Neely has not been able to perform surgery at all since September 2015.

Further this Affiant saith not.

_____
Kenny Oliver

Sworn to and subscribed before me this the __19th__ day of __July_____, 2016.

_____Betty Leffler_____
Notary Public

My Commission Expires: __11-27-17__





F I L E D
A.M. MAY 2 5 2017 P.M.
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# V

Unum
THE BENEFIT CENTER
PO BOX 100262
COLUMBIA, SC 29202

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: 1-888-226-7959
Fax: 1-866-562-4794
www.unum.com



December 7, 2016

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

RE:     Neely, Stephen M
        Claim Number:              5200462691001
        Provident Life and Accident Insurance Company

Dear Attorney Denton:

I attempted to reach you via telephone on December 7, 2016 and left you a voice mail. This letter is about the decision we have made on your client, Dr. Stephen Neely's Individual Disability claim for benefits. We will not be able to approve the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason
- Information that supports our decision
- Information Regarding the Appeal Notice
- Provisions outlined in your client's individual disability policy
- Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03


0287500579504950 1

### Decision/Reason:

We have determined Dr. Stephen Neely is able to perform the duties of his occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent him from performing these duties. Because he is not disabled according to the policy, benefits are not payable.

### Information That Supports Our Decision:

Dr. Neely initially submitted claim forms on January 21, 2016. He stated as of October 1, 2015 he was no longer performing the duties of his occupation as an orthopedic surgeon. He states he continues to see patients for regular office visits and independent medical evaluations, but he is not performing surgery.

He explained that he was unable to continue working due to an injury that occurred on May 5, 2015 while he was doing an orthopedic procedure. He informed us he continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Although Dr. Neely listed Crohns Disease and a Cardiac event as a secondary diagnosis, per our telephone conversation with Dr. Neely on February 17, 2016, he indicated the Crohns Disease is very well controlled and he sees his GI doctor once per year and has a colonoscopy done every 14-18 months. Dr. Neely also states he sees his cardiologist every six months for checkups relating to his Cardiac event that occurred on September 7, 2013.

Dr. Neely indicated that he stopped performing surgical procedures on September 30, 2015 because of shoulder pain and because it was taking him longer to complete procedures.

In our letter to Dr. Neely dated May 25, 2016, we informed him based on our review, the information in his claim file indicates he is able to perform the duties of his own occupation on a full-time basis. As he did not meet the policy's definition of Total Disability, we were unable to approve his claim and provide further benefits. His claim was closed effective May 25, 2016.

I have attached a copy of the letter that was mailed to Dr. Neely on May 25, 2016, as this provides details of our decision.

We received an appeal notice from your office dated September 7, 2016 with new information for us to review. The appeal notice included new medical records, an insured acquired Orthopedic Consultation of Dr. Chad Price, and affidavits of Dr. Jonathan Cornelius, Mr. Kenny Oliver (surgical technician), Mr. David Eldridge (surgical technician) as well as a Causation and Damage report from Dr. Gregory White.

Dr. Cornelius reported for July, August and September of 2015 he assisted Dr. Neely with surgical activities and they "split the fees" for those procedures. The affidavit signed by the surgical technicians noted Dr. Cornelius assisted Dr. Neely in the last three months (July, August and September of 2015) of surgeries.

Dr. White, in his letter, asserted orthopedics is not a light duty occupation, but did not quantify as to what level it was other than "physically demanding and labor intensive." Our onsite physician opines that Dr. White provided a personal opinion with no ergonomic data. Our



Vocational Representative also reviewed the file and found that with the retractions and limitations given, Dr. Neely could perform his occupational activities of surgery.

Dr. Price performed a consultation on July 15, 2016 on behalf of Dr. Neely and noted "pain (and weakness) with overhead activity, with extension of the arm away from the body and moderate rest pain." Examination of the right upper shoulder recorded 140 degrees forward flexion with adequate external and internal rotations and full strength 5/5 on the right including biceps and triceps, wrist and hand, except 4/5 abduction and 4+/5 external rotation. The opinion of Dr. Price was that weakness of the right shoulder excluded surgical activities as an orthopedist. He outlined restrictions (activities Dr. Neely should not do) and limitations (activities Dr. Neely cannot do) of no overhead lifting, no lifting, no pushing/pulling greater than 10 pounds with the right arm and no repetitive overhead movements. He outlined these restrictions and limitations to be permanent.

Our onsite physician, who is board-certified in orthopedic surgery, reviewed the information and agreed that Dr. Neely should restrict above shoulder activities and forward flexion beyond 150 degrees and notes that the records support that Dr. Neely has full passive right shoulder motion and active at 140 degrees past shoulder height, with good but not normal strength in abduction and external rotation. The records support that Dr. Neely would have the ability to sit, stand and walk without difficulty, lifting up to 15-25 lbs to chest, with no overhead activities, but to 150 degrees forward flexion, with full strength.

In view of the lack of agreement between our physician and Dr. Price on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported.

The information presented supports the restrictions and limitations as proposed by our on-site physician; however, they would not preclude the performance of an orthopedic surgeon. Our vocational consultant has reviewed Dr. Neely's file. He indicated that the important duties of an orthopedic surgeon, involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient examinations, review of x-rays, performing injections, prescribing medication and physical therapy, performing office based procedures e.g. aspirations, debridement; performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

Our Vocational Representative reviewed the supported restrictions and limitations against the physical demands of Dr. Neely's occupation and determined that although it may be reasonable to conclude that Dr. Neely would sometimes assist in the positioning of a patient on the operating table, there are a number of staff in the operating room to assist with positioning or transferring patients. Manipulating and positioning extremities could also be performed with assistance from other OR staff.

Also, the weight of such equipment as mallets and saws would not exceed his weight restrictions. The posture of his arm required to use these types of equipment will vary depending on the size of the equipment, the required angle of use and the height of the OR table . However, it is unlikely that such equipment would require Dr. Neely's arm to be above shoulder level. Also, if needed, the lowering of the OR table would aid in reducing the flexion or abduction demands of his arm.

The supported restrictions and limitations indicate that Dr. Neely has full strength with 150 degrees flexion. This would suggest that he would not have difficulty grasping and using necessary equipments such as saws, drills and mallets below shoulder level. The lifting and reaching demands of Dr. Neely's occupation do not exceed the supported restrictions and limitations.

Based on our review, the information in Dr. Stephen Neely's claim file indicates he is able to perform the duties of his own occupation. Therefore, his claim remains closed.

**Policy Provisions:**

This information can be found on page 4 of our May 25, 2016 letter to Dr. Neely.

**Next Steps Available to You and Dr. Neely:**

We would like to remind you that the opportunity to appeal our claim determination remains available to you. Within the next 7 days, you will receive a letter from our Appeals Area which will further explain this option.

If you have questions about Dr. Stephen Neely's claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension, 75352. As we will identify his claim by his Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist

Enclosures:     -Claimant: Decision



Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: **1-888-226-7959**
Fax: 1-800-562-4794
www.unum.com

**unum**

May 25, 2016

STEPHEN M NEELY MD
169 POWELL GROVE ROAD
LEBANON, TN 37090

RE: Neely, Stephen M
Claim Number:        5200462691001
Provident Life and Accident Insurance Company

Dear Dr. Neely:

This letter is a follow-up to our conversation on May 25, 2016 about the decision we have made on your Individual Disability benefits. As we discussed, we will not be able to approve your claim and continue the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason
- Information about your benefit check
- Other important information
- Information that supports our decision
- Provisions outlined in your individual disability policy
- Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES
1242-03

02875005511400601

Decision/Reason:

We have determined that you are able to perform the duties of your occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent you from performing these duties on a full-time basis.

Because you are not disabled according to the policy, benefits are not payable.

Information About Your Benefit Check:

Our last benefit payment, in the amount of $4,950.00, was mailed directly to you on April 27, 2016.

Other Important Information:

We provided benefits under a Reservation of Rights while our claim decision was pending. We paid four months' worth of benefits, totaling $19,800.00. We will not be requesting repayment of these benefits.

Information That Supports Our Decision:

We received your claim on January 21, 2016. You stated that as of October 1, 2015 you were no longer performing the duties of your occupation as an orthopedic surgeon. You were seeing patients for regular office visits and independent medical evaluations, but not performing surgery.

You explained that you were unable to continue working due to an injury that occurred on May 5, 2015 while you were doing an orthopedic procedure. You tried to dislocate a hip with a bone hook and felt a sharp pain in your right shoulder, followed by weakness. You continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Your treatment plan included injections and topical creams. You state that your shoulder became inflamed but you tried to continue performing surgery; however, you were unable to do so.

You informed us you stopped performing surgeries on September 30, 2015 because of shoulder pain and because it was taking longer for you to complete procedures.

On the Attending Physician Statement completed by Dr. Jonathan P. Cornelius on January 20, 2016, he listed restrictions of "no lifting, pushing, pulling over 15 lbs., right arm" and "no work at shoulder level or above with right arm." He listed limitations of "He is unable to transfer patients to OR table, unable to position patients on OR table, unable to manipulate patient's extremities during orthopedic surgery, unable to use OR equipment, such as mallets or saws..., unable to examine heavy patients." Dr. Cornelius gave the duration of these restrictions and limitations as extending from September 30, 2015 to "permanent."

We requested treatment records from Dr. Cornelius. This information was reviewed by our physician who is board-certified in orthopedic surgery. The records indicate that you reported right shoulder injuries on May 5 and May 11, 2015, but were not advised to stop working until September 30, 2015. You were able to golf after the incidents. Our physician told us that the

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 73 of 256 PageID #: 81

July 23, 2015 MRI revealed primarily tendinosis of cuff with questioned tearing, no retraction of tendons, and no atrophy of cuff muscles.

To improve our understanding of your condition and any associated restrictions (activities you should not do) and limitations (activities you cannot do), our physician spoke to Dr. Cornelius on March 9, 2016. Dr. Cornelius said that there were no surgical indications, and no muscle atrophy on the MRI, but added that you were noticing weakness while doing surgery.

You continued to work as a primary surgeon for joint replacement and shoulder arthroscopy, as documented in the 2015 CPT code information submitted by your employer. The CPT data shows that you continued to perform surgery through September 2015; no surgeries were noted after September 2015. Although the months of May and June 2015 appear to show billing charges below prior months' charges, the charges increased in July 2015 and August 2015 to a level similar to some months prior to May 2015. Billing charges were lower in May and June 2015 when compared to previous months, but they increased in July and August 2015 to approximate prior levels.

Our physician advised us that restrictions and limitations are not supported by the medical information. Our physician noted that your shoulder does not need surgery, and your range of motion was satisfactory with no obvious atrophy of shoulder musculature. Our physician further noted that in the month when you stopped doing surgery, September 2015, you also performed procedures that would require right shoulder strength and mobility; these procedures reflected your usual and customary procedures prior to your reported injury in May 2015.

Our vocational consultant reviewed the occupation information provided to us, including your Occupation Description form, Physician Questionnaire, and CPT/production data from your employer. The important duties of your occupation involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient exam, review of x-rays, performing injections, prescribing medication and physical therapy, performing office-based procedures (e.g., aspirations, debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

The strength demands of your occupation are in the "light" range. "Light" is defined as the occasional lifting or applying force up to 20 lbs. or the frequent lifting or applying force up to 10 lbs. Other physical demands of your occupation include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

Our physician advised us that the medical records support your ability to perform the physical demands of your occupation.

In view of the lack of agreement between our physician and Dr. Cornelius on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported, explaining that the limited diagnostic findings and limited treatment are not consistent with a severity of pain that would be expected to impact your functional capacity.

Based on our review, the information in your claim file indicates you are able to perform the duties of your own occupation on a full-time basis. As you do not meet the policy's definition of Total Disability, we are unable to approve your claim and provide further benefits. Your claim has been closed effective May 25, 2016.

02875005511400602

### Information about the waiver of premium benefit

Your policy provides a Waiver of Premium benefit, which was approved as of November 1, 2015. Please note that the refund of the November 1, 2015 semi-annual premium was paid under Reservation of Rights. Your policy premiums are due on a semi-annual basis (May 1 and November 1 of each year). Waiver of premium will end and billing will resume starting with the November 1, 2016 premium.

### Policy renewal information

In order to keep this policy in force, you must be actively and gainfully working full time; there is no age limit. Before the enhancement that was effective on June 1, 1986, you could renew your policy only to age 75. Your policy is now renewable for life.

### Policy Provisions And Definitions:

The following provisions and definitions are applicable to our claim decision.

### Individual Disability policy 6PC-462691

We included a copy of your Individual Disability policy 6PC-462691 with our previous letter dated February 8, 2016. The following policy provisions and/or definitions can be found in that copy.

- Information regarding the renewability of your policy after age 65 can be found on the policy improvement brochure dated April 1987
- The definition for "Waiver of Premium" can be found on page 2 of the policy
- The definition for "Total Disability" can be found on page 4
- The amendment changing the "Definition Of Total Disability" can be found on page 5(A)

### Next Steps Available To You:

### What if you disagree with the decision and you have *new information* to submit?

If you disagree with our decision and you have new information to submit, you may request to have your file reevaluated by the Disability Benefits Specialist who made the initial decision.

### How much time do you have to request a reevaluation of your claim?

Please submit your written request within 180 days from the date you receive this letter.

### How does the reevaluation process work?

If you have new information you want us to consider, please send it to us as soon as possible. The Disability Benefits Specialist who made the initial decision will review the claim again, taking the new information into consideration. The Disability Benefits Specialist will provide you with a written response within 90 days of our receipt of the new information.

After this review, we will send you a letter explaining our decision. If you still disagree with our decision, you will have the option to request an additional independent review by our Appeals Department.

### What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for reevaluation and new information?

Reevaluation Request
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

### What if you disagree with the decision, but *do not have new information* to submit?

If you disagree with our decision but do not have new information to submit, you may request to have your file reviewed by our Appeals Department. Please submit a written letter of appeal outlining the basis for your disagreement.

### How much time do you have to request an Appeal?

Please submit your written request for appeal within 180 days from the date you receive this letter.

### How does the Appeal process work?

An Appeals Specialist will review your entire claim and may consult medical and vocational experts or other resources. The Appeal Specialist will make an independent decision on your claim.

### How much time does the Appeal review take?

We are committed to making an appeal decision within 45 days after we receive your written appeal. There may be special circumstances in which the review can take longer. We will notify you if more time is needed.

### What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for Appeal?

The Appeals Unit
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

We will send you a letter acknowledging receipt of your request within 7 days.

Dr. Neely, if you have questions about your claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension 75352.

We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist



F I L E D

A.M. MAY 25 2017 P.M.
3~2a
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# VI

Unum
WORCESTER BENEFITS CENTER - APPEALS UNIT
PO BOX 15112
WORCESTER, MA 01615-0112

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

Unum
Worcester Benefits Center - Appeals Unit
PO BOX 15112
Worcester, MA 01615-0112
Phone: 1-888-226-7959
Fax: 1-774-437-7141
www.unum.com



February 14, 2017

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

RE:   Neely, Stephen M
      Claim Number:          52-00462691-001
      Provident Life and Accident Insurance Company

Dear Attorney Denton:

Provident Life and Accident Insurance Company has completed the appeal review on your client, Dr. Stephen Neely's Individual Disability claim.

Please read the following pages carefully, as they will help you understand how we reached our decision.

This letter includes the following:

* Initial Claim Decision

* The Appeal Decision

* Information that supports the Appeal Decision

* Policy Provisions that apply to the Appeal Decision

* Next steps available to you

If you would like me to review with you the information we have and how this decision was made, please call me at 1-888-226-7959, extension 77423.

**Initial Claim Decision:**

As indicated in their letters of May 25, 2016 and December 7, 2016, the Benefits Center determined Dr. Neely was able to perform the duties of his occupation as an orthopedic surgeon, with no restrictions or limitations to his ability to perform those duties on a full time basis. No benefits were found to be payable under the Total Disability provision, or any other provision, of his policy.

The Benefits Center did provide payments totaling $19,800 under a reservation of rights during their consideration of Dr. Neely's claim; he was not requested to repay this amount.

## Appeal Decision:

We have determined the Benefits Center's decision on Dr. Neely's claim is correct. The medical and vocational information that is available in his file to date does not support the presence of restrictions and limitations to his ability to perform the duties of his occupation on a full time basis.

Based on the facts of Dr. Neely's claim and the terms of his policy, no Total Disability or other benefits were due for his claim.

## Information that Supports our Decision:

To review in brief, Dr. Neely indicated he developed pain, weakness, and loss of range of motion in his right upper extremity beginning May 5, 2015 from conditions including right shoulder rotator cuff tear, subacromial impingement, and tendonitis biceps. He continued to work in his occupation as an orthopedic surgeon, performing surgeries until October 1, 2015. After October 1, 2015, Dr. Neely continued working in his office practice, evaluating patients and performing independent medical examinations for four to six hours on a daily basis.

Dr. Neely's policy does not provide any partial or Residual Disability benefits after age 65. As Dr. Neely was already 70 years old by the date time he first claimed any Total Disability, his claim was appropriately considered under his policy's Total Disability provision with a start date of October 1, 2015.

His Attending Physician, fellow orthopedic surgeon Dr. Jon Cornelius, indicated he advised Dr. Neely not to perform surgery after September 30, 2015. He noted restrictions and limitations to his ability to: lift, push, or pull over 15 pounds; to work at shoulder level or above; to transfer and position patients on the operating table; to manipulate patients' extremities during surgery; to use equipment such as hammers and saws; and to examine heavy patients. Surgery for his condition was not pursued due to Dr. Neely's use of blood thinners for an unrelated cardiac condition that he has stated is not source of impairment for this claim.

Enclosed please find copies of the Benefits Center's letters dated May 25, 2016 and December 7, 2016 discussing their findings that the medical and vocational information available for Dr. Neely's claim did not support the presence of, and treatment consistent with, restrictions and limitations to his ability to perform the duties of his occupation as an orthopedic surgeon on a full time basis. I find these letters to provide a detailed and accurate overview of the Benefits Center's consideration of Dr. Neely's claim, including the review of his file by two board certified orthopedic surgeons with contact made directly to Dr. Cornelius, and later with Dr. Chad Price, and refer you to them as part of today's correspondence.

You appealed the Benefits Center's May 25, 2016 decision, disputing their assessment of the vocational demands of Dr. Neely's occupation, and indicating he is unable to perform physically accurate surgeries and all of the duties needed to make a surgery successful. You indicated



Dr. Neely was unable to modify his operative techniques; could not improve his symptoms with physical therapy, and that his continued activities such as golfing as noted by the Benefits Center were not inconsistent with his inability to perform the duties of his occupation.

You provided a new evaluation by another orthopedic surgeon, Dr. Chad Price, indicating Dr. Neely should not perform orthopedic surgery, in particular total joint replacements, that would require him to use a saw "at eye level", and that shoulder weakness also precluded him from using hammers. Dr. Price noted restrictions of no overhead lifting, no lifting, pushing or pulling greater than 10 pounds with the right arm, and no repetitive overhead movements. Statements were also provided from Dr. Neely and two of his fellow orthopedic surgeons (Dr. Cornelius and Dr. Gregory White) opining on his physical duties, as well as affidavits from two surgical technicians and first assistants (Mr. David Eldridge and Mr. Kenny Oliver).

Prior to proceeding with this appeal review, we requested the Benefits Center consider if this new information changed their decision for Dr. Neely's claim. As explained in the Benefits Center's letter of December 7, 2016, this information was further considered by two physician specialists and a vocational rehabilitation consultant. This information did not change their May 5, 2016 decision for his claim, and his file was returned to me for an appeal review.

I have completed a thorough and fair consideration of the information that is available to date for Dr. Neely's claim and appeal.

I find the medical analyses completed by the Benefits Center, which included review of the available medical information by two board-certified orthopedic surgeons in addition to direct contact with Dr. Price about his examination, appropriately considered Dr. Neely's restrictions and limitations. Those restrictions and limitations that were supported by Dr. Neely's medical testing and treatment information were referred to a vocational rehabilitation specialist to assess if they were in excess of the physical demands of his occupation.

The vocational information available to the Benefits Center demonstrated Dr. Neely retained capacity to perform surgical procedures within the physical demands of his occupation. He continued to perform surgeries after May 5, 2015, and there is no medical information to support any change to his condition to precipitating an inability to perform surgery effective October 1, 2015, including joint replacement procedures or operative arthroscopy of the shoulder or knee.

As part of this appeal review, I requested the further consideration of a vocational rehabilitation specialist who had not seen Dr. Neely's file previously. Our appeal vocational rehabilitation specialist assessed all the available occupational and vocational information for this claim and appeal and considered the medical analyses of the supported limitations and restrictions.

This specialist agreed with the Benefits Center's understanding that the important duties of Dr. Neely's occupation as an orthopedic surgeon involve the diagnosis and treatment of musculoskeletal disorders. His specific duties included patient examinations, review of x-rays, performing injections, prescribing medication and physical therapy, performing office based procedures (including aspirations and debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical

record. The strength demands of this occupation were confirmed to be in the light range. "Light" is defined as occasional lifting or applying force up to 20 pounds or frequently lifting or applying force up to 10 pounds. The other physical demands of this occupation would include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

The restrictions and limitations supported by the medical information in Dr. Neely's file to date were:

- Restrict above shoulder activities
- Restrict forward flexion beyond 150 degrees
- Has full passive right shoulder motion and active at 140 degrees past shoulder height with good but not normal strength in abduction and external rotation.

Dr. Neely has continued working in his office-based practice, where he describes seeing patients (referring those needing surgery to his partners), performing hospital rounds, conducting independent medical examinations and participating in depositions. He has also maintained the ability to:

- sit, stand and walk without difficulty
- lift up to 15-25 pounds to chest, with no overhead activities, and to 150 degrees forward flexion with full strength.

Based on the information available, our appeal vocational rehabilitation consultant found the demands of Dr. Neely's occupation as an orthopedic surgeon were not excess of his supported limitations and restrictions and he retained the physical capacity needed to perform the duties of his occupation.

Our appeal vocational rehabilitation consultant noted:

"Giving consideration to the insured's supported R&L's [restrictions and limitations] as noted above, the insured would retain the physical capacity needed to perform the duties of his occupation. The insured's occupational duties would not require above the shoulder or above the head activities or forward flexion beyond 150 degrees.

The insured's capacity for shoulder motion—("full passive right shoulder motion and active at 140 degrees past shoulder height with good but not normal strength in abduction and external rotation") would also be sufficient for the performance of the occupation.

The insured has been determined to have no difficulties with sitting, standing or walking.

As noted previously, the performance of the Orthopedic Surgeon occupation would not require lifting/carrying/pushing/pulling in excess of the 20 lb. level..."

Our vocational rehabilitation consultant considered each of the affidavits provided for this appeal opining on the physicality of Dr. Neely's work, including transferring patients to the operating table, manipulating their extremities, using equipment (e.g. mallets and saws), and examining heavy patients.




02875005900533302

He also determined that, while it may be reasonable to conclude an orthopedic surgeon would sometimes assist in the positioning of a patient on the operating table, there are also other staff members in the operating room (for example, surgical technicians, nurses, anesthesiologist) to assist with positioning or transferring patients. In addition, the manipulating and positioning extremities could also be performed with assistance from other staff in the operating room.

With respect to the equipment used, as referenced by Dr. Cornelius, our appeal vocational rehabilitation consultant also found that the weight of such equipment, including mallets and saws, would not exceed the medically supported weight restrictions as noted above. As had been noted previously, while the posture of the arm required to use these types of equipment will vary (depending on the size of the equipment, the required angle of use, the height of the operating table, and the size of the surgeon) it is unlikely that such equipment would require his arm to be above shoulder level. By lowering the operating table, the flexion or abduction demands of his arm would be reduced.

Our appeal vocational rehabilitation consultant also agreed Dr. Neely's supported restrictions and limitations indicate that he does maintain full strength with 150 degrees flexion. This was noted to support Dr. Neely would not have difficulty grasping and using necessary equipment such as saws, drills, and mallets below shoulder level.

Based on our appeal review of the facts of Dr. Neely's claim and the terms of his policy, including the information provided with your letter of September 7, 2016, we find he has retained the ability to perform the duties of his occupation, and on a full time basis. He does not meet the definition of Total Disability benefits as defined by his contract, and does not have any coverage for partial or Residual Disability available for this claim.

### Policy Provisions that Apply to the Appeal Decision:

Provident Life and Accident Insurance Company Policy No. 00462691 includes the following provisions, cited in pertinent part below:

#### "DEFINITION OF TOTAL DISABILITY:

(a) Until the date you attain age 65, or until the date indemnity for total disability has been paid during a period of disability under this policy for 5 years, whichever is later, 'Total Disability' means your inability to perform the duties of your occupation.

(b) During the continuance of a period of disability beyond the later of either of the two dates named in (a) above, 'Total Disability' means your inability to engage in any gainful occupation in which you might reasonably be expected to engage because of education, training or experience, and with due regard to your vocation and earnings at the beginning of disability.

Nothing in this definition shall be construed to extend or limit the maximum benefit periods for which indemnity for disability is payable under this policy."

#### "'Residual Disability' means:

028750005900533302

(a) your inability to perform one or more of your important daily business duties, or

(b) your inability to perform your usual daily business duties for as much time as is usually required for the performance of such duties."

## "Residual Disability Benefit:

If Injuries or Sickness results in Residual Disability immediately following a period of at least 30 days of Total Disability which resulted from the same or a related cause, the Company, beginning on:

(1) the day shown on in the Policy Schedule as to when indemnity for Total Disability would have commenced, or
(2) the day following a period of Total Disability described above for which benefits have been paid,

will pay periodically during the continuance of such Residual Disability, indemnity at the rate of the Residual Disability Monthly Benefit until your 65th birthday. In no event, however, will indemnity for Residual Disability be payable for longer than 24 months if you are age 55 or older at the commencement of the preceding period of Total Disability and such period does not exceed 180 days of Total Disability."

"**LEGAL ACTIONS**: No action at law or in equity shall be brought to recover on this policy prior to the expiration of 60 days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of 3 years after the time written proof of loss is required to be furnished."

Our decision was made based on the policy provisions listed above, and Provident Life and Accident Insurance Company reserves its right to enforce other provisions of the policy.

## Next Steps Available to your client:

This completes our appeal review of the information available for Dr. Neely's claim to date. Of you have any new or different information to provide in response to this appeal decision, please do so as soon as possible or before March 14, 2017.

It is our practice to afford significant weight to information from the Social Security Administration. Based on the information available to us to date, it does not appear Dr. Neely, who has continued to perform non-surgical patient care and examinations in an office and hospital setting, has applied for or has been awarded Social Security Disability Insurance (SSDI) benefits. However, if our understanding is incorrect, and Dr. Neely has been awarded any SSDI benefits, please notify me immediately so we may secure this information for further consideration of his claim.

Attorney Denton, if you have any questions about this letter, please contact me toll free at 1-888-226-7959, extension 77423 or directly at 1-774-437-7423.

Sincerely,

*Suzanne Campbell-Lambert ALHC, ACS*

Suzanne Campbell-Lambert ALHC, ACS
Lead Appeals Specialist
Provident Life and Accident Insurance Company

Enclosures:     -Claimant: Decision
                -Attorney: General

0287500590053302

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: 1-888-226-7959
Fax: 1-866-992-4794
www.unum.com



May 25, 2016

STEPHEN M NEELY MD
169 POWELL GROVE ROAD
LEBANON, TN 37090

RE:    Neely, Stephen M
        Claim Number:        5200462691001
        Provident Life and Accident Insurance Company

Dear Dr. Neely:

This letter is a follow-up to our conversation on May 25, 2016 about the decision we have made on your Individual Disability benefits. As we discussed, we will not be able to approve your claim and continue the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

* The decision/reason
* Information about your benefit check
* Other important information
* Information that supports our decision
* Provisions outlined in your Individual disability policy
* Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

Decision/Reason:

We have determined that you are able to perform the duties of your occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent you from performing these duties on a full-time basis.

Because you are not disabled according to the policy, benefits are not payable.

Information About Your Benefit Check:

Our last benefit payment, in the amount of $4,950.00, was mailed directly to you on April 27, 2016.

Other Important Information:

We provided benefits under a Reservation of Rights while our claim decision was pending. We paid four months' worth of benefits, totaling $19,800.00. We will not be requesting repayment of these benefits.

Information That Supports Our Decision:

We received your claim on January 21, 2016. You stated that as of October 1, 2015 you were no longer performing the duties of your occupation as an orthopedic surgeon. You were seeing patients for regular office visits and independent medical evaluations, but not performing surgery.

You explained that you were unable to continue working due to an injury that occurred on May 5, 2015 while you were doing an orthopedic procedure. You tried to dislocate a hip with a bone hook and felt a sharp pain in your right shoulder, followed by weakness. You continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Your treatment plan included injections and topical creams. You state that your shoulder became inflamed but you tried to continue performing surgery; however, you were unable to do so.

You informed us you stopped performing surgeries on September 30, 2015 because of shoulder pain and because it was taking longer for you to complete procedures.

On the Attending Physician Statement completed by Dr. Jonathan P. Cornelius on January 20, 2016, he listed restrictions of "no lifting, pushing, pulling over 15 lbs., right arm" and "no work at shoulder level or above with right arm." He listed limitations of "He is unable to transfer patients to OR table, unable to position patients on OR table, unable to manipulate patient's extremities during orthopedic surgery, unable to use OR equipment, such as mallets or saws..., unable to examine heavy patients." Dr. Cornelius gave the duration of these restrictions and limitations as extending from September 30, 2015 to "permanent."

We requested treatment records from Dr. Cornelius. This information was reviewed by our physician who is board-certified in orthopedic surgery. The records indicate that you reported right shoulder injuries on May 5 and May 11, 2015, but were not advised to stop working until September 30, 2015. You were able to golf after the incidents. Our physician told us that the

July 23, 2015 MRI revealed primarily tendinosis of cuff with questioned tearing, no retraction of tendons, and no atrophy of cuff muscles.

To improve our understanding of your condition and any associated restrictions (activities you should not do) and limitations (activities you cannot do), our physician spoke to Dr. Cornelius on March 9, 2016. Dr. Cornelius said that there were no surgical indications, and no muscle atrophy on the MRI, but added that you were noticing weakness while doing surgery.

You continued to work as a primary surgeon for joint replacement and shoulder arthroscopy, as documented in the 2015 CPT code information submitted by your employer. The CPT data shows that you continued to perform surgery through September 2015; no surgeries were noted after September 2015. Although the months of May and June 2015 appear to show billing charges below prior months' charges, the charges increased in July 2015 and August 2015 to a level similar to some months prior to May 2015. Billing charges were lower in May and June 2015 when compared to previous months, but they increased in July and August 2015 to approximate prior levels.

Our physician advised us that restrictions and limitations are not supported by the medical information. Our physician noted that your shoulder does not need surgery, and your range of motion was satisfactory with no obvious atrophy of shoulder musculature. Our physician further noted that in the month when you stopped doing surgery, September 2015, you also performed procedures that would require right shoulder strength and mobility; these procedures reflected your usual and customary procedures prior to your reported injury in May 2015.

Our vocational consultant reviewed the occupation information provided to us, including your Occupation Description form, Physician Questionnaire, and CPT/production data from your employer. The important duties of your occupation involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient exam, review of x-rays, performing injections, prescribing medication and physical therapy, performing office-based procedures (e.g., aspirations, debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

The strength demands of your occupation are in the "light" range. "Light" is defined as the occasional lifting or applying force up to 20 lbs, or the frequent lifting or applying force up to 10 lbs. Other physical demands of your occupation include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

Our physician advised us that the medical records support your ability to perform the physical demands of your occupation.

In view of the lack of agreement between our physician and Dr. Cornelius on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported, explaining that the limited diagnostic findings and limited treatment are not consistent with a severity of pain that would be expected to impact your functional capacity.

Based on our review, the information in your claim file indicates you are able to perform the duties of your own occupation on a full-time basis. As you do not meet the policy's definition of Total Disability, we are unable to approve your claim and provide further benefits. Your claim has been closed effective May 25, 2016.

## Information about the waiver of premium benefit

Your policy provides a Waiver of Premium benefit, which was approved as of November 1, 2015. Please note that the refund of the November 1, 2015 semi-annual premium was paid under Reservation of Rights. Your policy premiums are due on a semi-annual basis (May 1 and November 1 of each year). Waiver of premium will end and billing will resume starting with the November 1, 2016 premium.

## Policy renewal information

In order to keep this policy in force, you must be actively and gainfully working full time; there is no age limit. Before the enhancement that was effective on June 1, 1986, you could renew your policy only to age 75. Your policy is now renewable for life.

## Policy Provisions And Definitions:

The following provisions and definitions are applicable to our claim decision.

### Individual Disability policy 6PC-462691

We included a copy of your Individual Disability policy 6PC-462691 with our previous letter dated February 8, 2016. The following policy provisions and/or definitions can be found in that copy.

- Information regarding the renewability of your policy after age 65 can be found on the policy Improvement brochure dated April 1987
- The definition for "Waiver of Premium" can be found on page 2 of the policy
- The definition for "Total Disability" can be found on page 4
- The amendment changing the "Definition Of Total Disability" can be found on page 5(A)

## Next Steps Available To You:

### What if you disagree with the decision and you have *new information* to submit?

If you disagree with our decision and you have new information to submit, you may request to have your file reevaluated by the Disability Benefits Specialist who made the initial decision.

### How much time do you have to request a reevaluation of your claim?

Please submit your written request within 180 days from the date you receive this letter.

### How does the reevaluation process work?

If you have new information you want us to consider, please send it to us as soon as possible. The Disability Benefits Specialist who made the initial decision will review the claim again, taking the new information into consideration. The Disability Benefits Specialist will provide you with a written response within 90 days of our receipt of the new information.

After this review, we will send you a letter explaining our decision. If you still disagree with our decision, you will have the option to request an additional independent review by our Appeals Department.

### What Information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for reevaluation and new information?

Reevaluation Request
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

### What if you disagree with the decision, but *do not have new information* to submit?

If you disagree with our decision but do not have new information to submit, you may request to have your file reviewed by our Appeals Department. Please submit a written letter of appeal outlining the basis for your disagreement.

### How much time do you have to request an Appeal?

Please submit your written request for appeal within 180 days from the date you receive this letter.

### How does the Appeal process work?

An Appeals Specialist will review your entire claim and may consult medical and vocational experts or other resources. The Appeal Specialist will make an independent decision on your claim.

### How much time does the Appeal review take?

We are committed to making an appeal decision within 45 days after we receive your written appeal. There may be special circumstances in which the review can take longer. We will notify you if more time is needed.

### What Information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for Appeal?

The Appeals Unit
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

We will send you a letter acknowledging receipt of your request within 7 days.

Dr. Neely, if you have questions about your claim or this process, please call our Contact Center at 1-888-226-7969, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension 75352.

0287500551140060 2

We will identify your claim by your Social Security number or claim number so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist

02875005511400602

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: 1-888-226-7959
Fax: 1-800-662-4794
www.unum.com



December 7, 2016

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

RE:   Neely, Stephen M
      Claim Number:          5200462691001
      Provident Life and Accident Insurance Company

Dear Attorney Denton:

I attempted to reach you via telephone on December 7, 2016 and left you a voice mail. This letter is about the decision we have made on your client, Dr. Stephen Neely's Individual Disability claim for benefits. We will not be able to approve the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

* The decision/reason
* Information that supports our decision
* Information Regarding the Appeal Notice
* Provisions outlined in your client's individual disability policy
* Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1244-03



Decision/Reason:

We have determined Dr. Stephen Neely is able to perform the duties of his occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent him from performing these duties. Because he is not disabled according to the policy, benefits are not payable.

Information That Supports Our Decision:

Dr. Neely initially submitted claim forms on January 21, 2016. He stated as of October 1, 2015 he was no longer performing the duties of his occupation as an orthopedic surgeon. He states he continues to see patients for regular office visits and independent medical evaluations, but he is not performing surgery.

He explained that he was unable to continue working due to an injury that occurred on May 5, 2015 while he was doing an orthopedic procedure. He informed us he continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Although Dr. Neely listed Crohns Disease and a Cardiac event as a secondary diagnosis, per our telephone conversation with Dr. Neely on February 17, 2016, he indicated the Crohns Disease is very well controlled and he sees his GI doctor once per year and has a colonoscopy done every 14-18 months. Dr. Neely also states he sees his cardiologist every six months for checkups relating to his Cardiac event that occurred on September 7, 2013.

Dr. Neely indicated that he stopped performing surgical procedures on September 30, 2015 because of shoulder pain and because it was taking him longer to complete procedures.

In our letter to Dr. Neely dated May 25, 2016, we informed him based on our review, the information in his claim file indicates he is able to perform the duties of his own occupation on a full-time basis. As he did not meet the policy's definition of Total Disability, we were unable to approve his claim and provide further benefits. His claim was closed effective May 25, 2016.

I have attached a copy of the letter that was mailed to Dr. Neely on May 25, 2016, as this provides details of our decision.

We received an appeal notice from your office dated September 7, 2016 with new information for us to review. The appeal notice included new medical records, an insured acquired Orthopedic Consultation of Dr. Chad Price, and affidavits of Dr. Jonathan Cornelius, Mr. Kenny Oliver (surgical technician), Mr. David Eldridge (surgical technician) as well as a Causation and Damage report from Dr. Gregory White.

Dr. Cornelius reported for July, August and September of 2016 he assisted Dr. Neely with surgical activities and they "split the fees" for those procedures. The affidavit signed by the surgical technicians noted Dr. Cornelius assisted Dr. Neely in the last three months (July, August and September of 2015) of surgeries.

Dr. White, in his letter, asserted orthopedics is not a light duty occupation, but did not quantify as to what level it was other than "physically demanding and labor intensive." Our onsite physician opines that Dr. White provided a personal opinion with no ergonomic data. Our

Case 3:17-cv-00996  Document 1-2  Filed 06/29/17  Page 94 of 256 PageID #: 102

Vocational Representative also reviewed the file and found that with the retrictions and limitations given, Dr. Neely could perform his occupational activities of surgery.

Dr. Price performed a consultation on July 15, 2016 on behalf of Dr. Neely and noted "pain (and weakness) with overhead activity, with extension of the arm away from the body and moderate rest pain." Examination of the right upper shoulder recorded 140 degrees forward flexion with adequate external and internal rotations and full strength 5/5 on the right including biceps and triceps, wrist and hand, except 4/5 abduction and 4+/5 external rotation. The opinion of Dr. Price was that weakness of the right shoulder excluded surgical activities as an orthopedist. He outlined restrictions (activities Dr. Neely should not do) and limitations (activities Dr. Neely cannot do) of no overhead lifting, no lifting, no pushing/pulling greater than 10 pounds with the right arm and no repetitive overhead movements. He outlined these restrictions and limitations to be permanent.

Our onsite physician, who is board-certified in orthopedic surgery, reviewed the information and agreed that Dr. Neely should restrict above shoulder activities and forward flexion beyond 150 degrees and notes that the records support that Dr. Neely has full passive right shoulder motion and active at 140 degrees past shoulder height, with good but not normal strength in abduction and external rotation. The records support that Dr. Neely would have the ability to sit, stand and walk without difficulty, lifting up to 15-25 lbs to chest, with no overhead activities, but to 150 degrees forward flexion, with full strength.

In view of the lack of agreement between our physician and Dr. Price on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported.

The information presented supports the restrictions and limitations as proposed by our on-site physician; however, they would not preclude the performance of an orthopedic surgeon. Our vocational consultant has reviewed Dr. Neely's file. He indicated that the important duties of an orthopedic surgeon, involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient examinations, review of x-rays, performing injections, prescribing medication and physical therapy, performing office based procedures e.g. aspirations, debridement, performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

Our Vocational Representative reviewed the supported restrictions and limitations against the physical demands of Dr. Neely's occupation and determined that although it may be reasonable to conclude that Dr. Neely would sometimes assist in the positioning of a patient on the operating table, there are a number of staff in the operating room to assist with positioning or transferring patients. Manipulating and positioning extremities could also be performed with assistance from other OR staff.

Also, the weight of such equipment as mallets and saws would not exceed his weight restrictions. The posture of his arm required to use these types of equipment will vary depending on the size of the equipment, the required angle of use and the height of the OR table . However, it is unlikely that such equipment would require Dr. Neely's arm to be above shoulder level. Also, if needed, the lowering of the OR table would aid in reducing the flexion or abduction demands of his arm.

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 95 of 256 PageID #: 103

The supported restrictions and limitations indicate that Dr. Neely has full strength with 150 degrees flexion. This would suggest that he would not have difficulty grasping and using necessary equipments such as saws, drills and mallets below shoulder level. The lifting and reaching demands of Dr. Neely's occupation do not exceed the supported restrictions and limitations.

Based on our review, the information in Dr. Stephen Neely's claim file indicates he is able to perform the duties of his own occupation. Therefore, his claim remains closed.

**Policy Provisions:**

This information can be found on page 4 of our May 25, 2016 letter to Dr. Neely.

**Next Steps Available to You and Dr. Neely:**

We would like to remind you that the opportunity to appeal our claim determination remains available to you. Within the next 7 days, you will receive a letter from our Appeals Area which will further explain this option.

If you have questions about Dr. Stephen Neely's claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension, 75352. As we will identify his claim by his Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist

Enclosures:    Claimant Decision



F I L E D
A.M. MAY 2 5 2017 P.M.
3:29
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# VII

Jason Denton
615/443-8772
jdenton@rma-law.com



Rochelle, McCulloch & Aulds, PLLC

**ATTORNEYS AT LAW**

Jere N. McCulloch
(1973 – 2013)

Robert Rochelle
Jo Ann "Jody" Aulds
David B. Foutch
Alan Poindexter
Gregory S. Gill
Julie M. Robinson
T. Price Thompson, III
Byron M. Gill
Jason G. Denton
Matthew H. Ryan
Tom Walsh
Debra L. Dishmon
Brett Rozell

March 1, 2017

Suzanne Campbell-Lambert ALHC, ACS
Lead Appeals Specialist
Provident Life & Accident Ins. Co. (Unum)
Worcester Benefits Center – Appeals Unit
P.O. Box 15112
Worcester, MA 01615-0112
(via facsimile 774-437-7141)

> **Re:    Client:**    Stephen Neely, M.D.
>             **Claim No.**    52-00462691-001

Dear Ms. Campbell-Lambert:

Per your letter of December 8, 2016, this correspondence will serve as our continued appeal of Dr. Neely's denial of benefits under his Individual Disability Claim policy. Contained herein is our position statement to rebut some information in your denial.

The suggestions of raising and lowering the operating room table repeatedly to accommodate Dr. Neely's shoulder is disability is poor technique and may be bordering on poor practice of even malpractice. Surgeons have been taught to never bring a non-sterile part of the drapes into the sterile component. This is why there is a sterile drape on the side of some drapes used in hip arthroplasty if an anterior approach is to be used. Physicians would not want the extremity to hang over the side of the table – potentially contaminating it and then bring it back into the sterile operating room field. The same applies to surgical gowns which would be fine as the table goes up, but would certainly risk contamination as the table went back down. This suggestion by your consults was not well thought out and hopefully, not part of their daily routine practice. I would want to re-gown repeatedly if that practice were followed.

Your response stated that Dr. White's letter had no ergonomic data. This is "life-style ergonomic" data. When one leaves the operating room soaked and wet due to physical exertion, they were certainly not sitting in front of a computer screen. They were doing physical work equal to that of a laborer and not able to tolerate fatigue and have a non-exact osteotomy.

www.rma-law.com
109 North Castle Heights Avenue • Lebanon, TN 37087 • 615/444-1433 • Fax 615/443-8775
2745 North Mt. Juliet Road • Mt. Juliet, TN 37122

1

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 98 of 256 PageID #: 106



RMA
ATTORNEYS AT LAW.
Rochelle, McCulloch & Aulds, PLLC

Attached please find an editorial, "Morbid Obesity and Total Joint Replacement: Is it okay to say NO?," from the *Blue Journal of Orthopaedics*. In the third paragraph, they assert that given the length of the surgery, which is often increased because of the size of the patient, the difficulty that positioning and exposure can present. Significant failure and/or injury can become a risk to all parties involved. "[Their] profession is already physically demanding and at times may place surgeons and staff in potentially dangerous positions." Those problems are well recognized in the orthopaedic literature and have been discussed since the 1980s as not having an easy solution.

It is also of note that when Dr. Cornelius assisted Dr. Neely in the total hip arthroplasty, he always completed the portions requiring repeated use of the mallet (note – femoral component broaching and impaction of the final component) As Dr. Neely's inability to perform those specific portions of the operations safely and expeditiously led to the final decision to stop performing orthopaedic surgery.

The right shoulder has actually worsened, there is a little less motion, but significantly more discomfort with even hammering a single nail. The multifaceted requirements of orthopaedic surgery makes this impossible for Dr. Neely to complete.

Basically, there are several classes of instruments which are used daily in the Orthopaedic Surgeons livelihood. These are saws, drills, elevators, curettes, osteotomes, and mallets. The use of the mallet/hammer has become onerous for Dr. Neely. Several blows to an object and sharp pain and weakness follow. This specifically causes him problems with the use of osteotomes but even worse with the use of broaches in the preparation of the femoral canal. This is a learned technique which combines use of the mallet, watching the broach advance, and listening for a change in the sound as the broach advances. Even more difficult is the reverse hammering to extract the broach in the preparation.

When Dr. Neely decided to stop performing surgeries, it was because he was unable to carry out the tasks essential to the precision necessary for a "perfect" outcome. He left an acetabular shell about a 1½ mm proud as he was not able to fully impact the piece for the first time in 35 years.

No matter what alternatives your consults see or suggest, there is no substitute for precision in the operating room. This involves correct, consistent use of the instruments. This is impossible when one encounters a sharp right shoulder pain and the weakness that follows when trying to perform time efficient joint arthroplasty. Dr. Neely has performed over 10,000 such procedures

www.rma-law.com
109 North Castle Heights Avenue • Lebanon, TN 37087 • 615/444-1433 • Fax 615/443-8775
2745 North Mt. Juliet Road • Mt. Juliet, TN 37122

2

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 99 of 256 PageID #: 107



ATTORNEYS AT LAW

Rochelle, McCulloch & Aulds, PLLC

and certainly is capable of knowing and acknowledging the fact that the shoulder injury prevents him from continuing as a surgeon.

It should also be noted in the practice of medicine, one is really not able to consistently arrive at a level of disability unless they have examined and listened to the history.

Dr. Price is a shoulder specialist, and physician for the Tennessee Titans. He is not and never has been professionally associated with Dr. Neely's practice. His only interest was to attempt to lessen the impact of Dr. Neely's shoulder injury, including intra articular steroid injections.

Dr. Neely continues to feel the act of performing orthopaedic procedures cannot be done either physically nor safely with this injury to his shoulder.

Thank you for your time and attention. I look forward to hearing from you soon.

Sincerely,

ROCHELLE, McCULLOCH & AULDS, PLLC

Jason G. Denton

JGD/BLR

Encl

www.rma-law.com
109 North Castle Heights Avenue • Lebanon, TN 37087 • 615/444-1433 • Fax 615/443-8775
2745 North Mt. Juliet Road • Mt. Juliet, TN 37122

3

## AFFIDAVIT OF JONATHAN CORNELIUS

I, Jonathan Cornelius, having been duly sworn, hereby make oath that the following facts are true and correct and are based upon my personal knowledge.

1. I am an Orthopedic Surgeon and have been performing surgeries for 10 years. I am board certified by The American Board of Orthopaedic Surgery.

2. On May 5, 2015, Dr. Stephen Neely injured his right shoulder while performing a hip procedure. Approximately one week later, he sustained an additional injury to his right shoulder performing a total knee replacement.

3. During the months of July, August, and September 2015, I scrubbed in and assisted Dr. Neely in multiple hip, shoulder and knee procedures as he was unable to perform these surgeries by himself due to his shoulder injuries.

4. While assisting Dr. Neely in total hip arthroplasty procedures, I always completed the positions which required repeated use of the mallet, femoral component broaching and impaction of the final component.

5. Dr. Neely and I split the receipts from these surgeries.

6. Dr. Neely's shoulder injuries progressively worsened and he became unable to perform surgery of any kind on September 30, 2015.

7. On January 20, 2016, I completed an Attending Physician Statement with permanent restrictions which began on September 30, 2015.

8. Dr. Neely has permanent restrictions of no lifting, pushing, or pulling over 15 pounds with his right arm and no work at shoulder level or above with his right arm. There is also to be no repeat impacting force, ie. no hammering.

9. Dr. Neely is unable to transfer patients to the Operating Table, unable to position patients on the Operating Table, unable to manipulate patient's extremities during orthopedic surgery, unable to use equipment in the Operating Room, such as mallets, saws, broaches, reamers, or osteotomes, and he is unable to examine heavy patients.

Further this Affiant saith not.

_____
Jonathan Cornelius

Sworn to and subscribed before me this the ___ day of _____, 2017.

_____
Notary Public

My Commission Expires: _11-27-17_

Jason Denton
615/443-8772
jdenton@rma-law.com



Rochelle, McCulloch & Aulds, PLLC

**ATTORNEYS AT LAW**

Jere N. McCulloch
(1973 – 2013)

Robert Rochelle
Jo Ann "Jody" Aulds
David B. Foutch
Alan Poindexter
Gregory S. Gill
Julie M. Robinson
T. Price Thompson, III
Byron M. Gill
Jason G. Denton
Matthew H. Ryan
Tom Walsh
Debra L. Dishmon
Brett Rozell

April 13, 2017

Suzanne Campbell-Lambert ALHC, ACS
Lead Appeals Specialist
Provident Life & Accident Ins. Co. (Unum)
Worcester Benefits Center – Appeals Unit
P.O. Box 15112
Worcester, MA 01615-0112
(via facsimile 774-437-7141)

Re:  Client:  **Stephen Neely, M.D.**
     Claim No.  **52-00462691-001**

Dear Ms. Campbell-Lambert:

Per your letter of April 12, 2017, I have included a copy of the editorial article ("Morbid Obesity and Total Joint Replacement: Is it okay to say No?) referenced on page 2 of our March 1, 2017 letter. If you need any additional information in your review of this appeal, please let us know.

Thank you for your time and attention to this matter. I look forward to hearing from you soon.

Sincerely,

ROCHELLE, McCULLOCH & AULDS, PLLC

Clay Rozell
Paralegal to Jason G. Denton

www.rma-law.com
109 North Castle Heights Avenue • Lebanon, TN 37087 • 615/444-1433 • Fax 615/443-8775
2745 North Mt. Juliet Road • Mt. Juliet, TN 37122

1

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 103 of 256 PageID #: 111




# Morbid Obesity and Total Joint Replacement: Is It Okay to Say No?

Clint Wooten, MD; Brian Curtin, MD

Our waiting room provides evidence each day that obesity continues to be a major problem, if not an epidemic, within the United States. It is particularly challenging in the world of arthroplasty. As reported by the Centers for Disease Control and Prevention in 2013, the obesity rate is approximately 35% and has plateaued at this level for several years.[1,2] Unfortunately, the percentage of obese patients within the population of patients who seek joint replacement seems to be on the rise. In 2007, Fehring et al[3] reported that the percentage of patients undergoing total joint replacement classified as obese nearly doubled between 1990 and 2005, from 30% to 52%.

Professional organizations including the American Association of Hip and Knee Surgeons have put together work groups with the sole objective to evaluate the current evidence-based literature and reach a consensus on risk stratification based on patient body mass index (BMI) and other risk factors. Currently, they support a BMI of less than 40 kg/m[2] for primary joint replacement.[4] Many say that we have both an ethical and an expected duty to provide care for patients regardless of their BMI, reciting the oath we each accepted with our medical school training. However, we argue that elective total joint surgery for a morbidly obese patient with a BMI of greater than 40 kg/m[2] may actually place the physician at risk of violating some core

principles of that very oath. The 4 core principles of nonmaleficence, autonomy, beneficence, and justice each play a role in how we must ultimately make decisions for these patients. Often, the interplay of these 4 principles is not black and white and requires physicians to assess much more than their ability to perform the procedure.

Many technical challenges of surgery present themselves when performing hip or knee replacement for morbidly obese patients. The shear size of the extremity often limits visualization of the surgical field and may compromise the dexterity of the surgeon and/or the assistant. When the posterior approach to the hip is used, the operating room assistant is often saddled with the task of supporting and manipulating a very large extremity. Given the length of the surgery, which is increased because of the size of the patient, and the difficulty that positioning and exposure can present, significant fatigue and/or injury can become a risk for all parties involved. Our profession is already physically demanding and at times may place surgeons and staff in potentially dangerous positions. When a morbidly obese patient enters the operating room, the risk is heightened. Moving a 400-lb patient onto an operating table is physically demanding and carries risk for all involved. Appropriate positioning of these patients is often difficult. Additionally, morbidly obese patients have a higher likelihood of positional changes during the course of surgery, which can result in inadvertent malpositioning of the components.

Nonmaleficence is generally described as an obligation not to inflict harm on one's patient. In many ways, as just described, patients' own body habitus places them in a surgical environment where they are at higher risk of complications. Failure to perform a technically sound operation has been shown to in-

The authors are from the OrthoCarolina Hip and Knee Center, Charlotte, North Carolina.

Dr Wooten has no relevant financial relationships to disclose. Dr Curtin receives personal fees from DePuy Synthes and Ethicon.

Correspondence should be addressed to: Brian Curtin, MD, 2001 Vail Ave, Ste 200A, Charlotte, NC 28207 (Brian.curtin@orthocarolina.com).

doi: 10.3928/01477447-20160628-02

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 104 of 256 PageID #: 112

crease the risk of revision due to mechanical failures, particularly in total knee arthroplasty.[5] Järvenpää et al[6] reported a significantly higher number of technical errors in a group of obese patients who underwent total knee arthroplasty than in a group of nonobese patients who underwent total knee arthroplasty, noting 17 technical errors in 52 obese patients compared with 5 errors in 48 nonobese patients.

Autonomy is perhaps best described by patients' ability to provide informed consent for surgery. In the past few years, some payor entities have actually instituted restrictions based on BMI and have declined to pay for surgeries performed for patients who fall outside of these parameters.[7,8] This is alarming because it completely eliminates patient autonomy and the decision-making process. This is most likely not the answer if we wish to keep patients and surgeons involved in this decision-making process. A thorough discussion of the elevated risks associated with surgery for morbidly obese patients is often enough to persuade these patients that joint replacement is not in their immediate best interest. Obese patients undergoing total knee arthroplasty have an increased risk of perioperative medical complications, including poor wound healing, infection, respiratory complications, and venous thromboembolism.[4,9,10] Morbid obesity has independent risk factors that these individuals are subject to with each passing day, and many of these risk factors are exacerbated when coupled with a major operation such as total joint replacement. By directly explaining to patients that, as physicians, our first duty is to do no harm and that there is a real possibility of our making their conditions worse with potential complications such as stroke, heart attack, implant failure, revision, infection, or even death, we can develop a new level of physician–patient trust and reassure patients that we have their best interests in mind. Autonomy is important for our patients, but so is their ability to understand the magnitude of risk when making decisions. We understand these risks far better than our patients do because we deal with them daily. Although autonomy must be respected, we must serve as stewards to help guide patients in making intelligent decisions based on their circumstances.

The principle of intervening to benefit the well-being of patients, or beneficence, is often cited as why we must provide arthroplasty to morbidly obese patients with severe arthritis. It makes sense because we are obligated to provide the best care for our patients, but the issue becomes what level of care to provide. Conservative measures for treating symptoms are easy but, depending on the severity of the symptoms, may be inadequate in terms of pain relief and function. The difficulty that we face today is determining at what point arthroplasty is the appropriate care. We can provide care to patients that does not involve surgery. We have an obligation to treat the whole patient and not just a specific extremity. It is our duty to optimize modifiable risk factors for each patient, especially when the risks of surgery out-

weigh the benefits. Now, more than ever, our job involves connecting the nonoptimized patient with the appropriate resources for weight management, blood sugar control, low-impact exercise, and nutritional guidance. This excellent type of "caring" allow us to establish relationships with these patients. Although not directly acting on patients' knees or hips, we are helping them move in the right direction to improve their overall health. With appropriate concern and empathy, we can reassure patients that this plan of care is in their best interest. We must emphasize to patients that their taking control of their health is critical to the success of any intervention, whether it be weight loss or recovery from joint replacement surgery in the future. We are charged with providing care for our patients but need them to be active participants. Operative intervention will be much more successful when we work together. Weight loss in morbidly obese patients can often be used as a surrogate marker of how they may fare with rehabilitation and motivation after total joint replacement, which we know is crucial for good outcomes.

Justice can be described as an obligation to promote equal distribution of health care; however, in the current health care system, resources continue to be more finite and diligently distributed. One could argue that the health care dollars spent replacing morbidly obese patients' hips or knees may be better used treating their diabetes and heart disease and funding bariatric surgery. The morbidity and mortality among these patients are more often associated with the medical problems resulting from their obesity and not necessarily the painful arthritic joint. Relieving joint pain may improve their quality of life substantially, but diabetes and cardiovascular disease may end their life, prematurely. Numerous studies have shown that patients do not lose weight following joint replacement surgery and that obese patients have less functional improvement than their nonobese counterparts.[11-13]

As we continue to look to provide care for every patient who enters our practice, the issue is no longer whether we can technically perform the surgery but rather whether the surgery is the right course of action for a particular patient. Obesity is a major societal problem. We have to be prepared to sometimes provide tough answers to tough questions. Is it okay to say no? In the morbidly obese population, no may often be the right answer, provided we supply these patients with the resources to optimize their condition prior to surgical intervention.

## REFERENCES

1. Ogden CL, Carroll MD, Kit BK, Flegal KM. Prevalence of obesity in the United States, 2009-2010. *NCHS Data Brief.* 2012; 82:1-8.

2. Ogden CL, Carroll MD, Kit BK, Flegal KM. Prevalence of obesity among adults: United States, 2011-2012. *NCHS Data Brief.* 2013;(131):1-8.

3. Fehring TK, Odum SM, Griffin WL, Mason JB, McCoy TH. The obesity epidemic: its effect on total joint arthroplasty. *J Arthroplasty.* 2007; 22(6)(suppl 2):71-76.

COPYRIGHT © SLACK INCORPORATED

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 105 of 256 PageID #: 113

4. Workgroup of the American Association of Hip and Knee Surgeons Evidence Based Committee. Obesity and total joint arthroplasty: a literature based review. *J Arthroplasty.* 2013; 28(5):714-721.

5. Dorr LD, Boiardo RA. Technical considerations in total knee arthroplasty. *Clin Orthop Relat Res.* 1986; 205:5-11.

6. Järvenpää J, Kettunen J, Kröger H, Miettinen H. Obesity may impair the early outcome of total knee arthroplasty. *Scand J Surg.* 2010; 99(1):45-49.

7. Dehn T. Joint replacement in the overweight patient. *Ann R Coll Surg Engl.* 2007; 89(3):203.

8. Coombes R. Rationing of joint replacements raises fears of further cuts. *BMJ.* 2005; 331(7528):1290.

9. Yeung E, Thornton-Bott P, Walter WL. Patient obesity: a growing con-

cern of successful total knee arthroplasty. *Semin Arthroplasty.* 2010; 21(2):87-91.

10. Pottie P, Presle N, Terlain B, Netter P, Mainard D, Berenbaum F. Obesity and osteoarthritis: more complex than predicted! *Ann Rheum Dis.* 2006; 65(11):1403-1405.

11. Gillespie GN, Porteous AJ. Obesity and knee arthroplasty. *Knee.* 2007; 14(2):81-86.

12. Collins RA, Walmsley PJ, Amin AK, Brenkel IJ, Clayton RA. Does obesity influence clinical outcome at nine years following total knee replacement? *J Bone Joint Surg Br.* 2012; 94(10):1351-1355.

13. Amin AK, Clayton RA, Patton JT, Gaston M, Cook RE, Brenkel IJ. Total knee replacement in morbidly obese patients: results of a prospective, matched study. *J Bone Joint Surg Br.* 2006; 88(10):1321-1326.

# Retraction: "Pain Management After Total Knee Arthroplasty Using a Multimodal Approach"

This article has been retracted at the request of the authors.

We would like to formally request that the article entitled, "Pain Management After Total Knee Arthroplasty Using a Multimodal Approach," by Morteza Meftah, MD, Anthony C. Wong, BSc, Danyal H. Nawabi, MD, FRCS(Orth), Richard J. Yun, MA, Amar S. Ranawat, MD, and Chitranjan S. Ranawat, MD (volume 35, number 5, pp. e660-e664; doi: 10.3928/01477447-20120426-19), be retracted.

This is because the data were published prematurely and the authors did not have the proper permission from the combined Hospital for Special Surgery work study group. The data have been fully reported in the following publication: "Analgesia After Total Knee Replacement: Local Infiltration Versus Epidural Combined With a Femoral Nerve Blockade. A Prospective, Randomized Pragmatic Trial," by J. T. YaDeau, E. A. Goytizolo, D. E. Padgett, S. S. Liu, D. J. Mayman, A. S. Ranawat, M. C. Rade, and G. H. Westrich, *The Bone & Joint Journal* (volume 95-B, number 5, pp. 629-635; doi:10.1302/0301-620X.95B5.30406).

Morteza Meftah, MD, and Chitranjan S. Ranawat, MD
doi: 10.3928/01477447-20160621-01

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 106 of 256 PageID #: 114



F I L E D

MAY 2 5 2017

A.M. 3:29 P.M.

BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# VIII

To:

**JASON DENTON**
**RMA ATTORNEYS AT LAW**
**109 NORTH CASTLE HEIGHTS AVE**
**LEBANON, TN 37087**

| Fax: | **(615) 443-8775** | | |
|------|-------------------|---|---|
| Re: | **Stephen Neely** | # 11736927 | |

| From: | **Suzanne Campbell-Lambert ALHC, ACS** | | |
|-------|----------------------------------------|---|---|
| Address: | **Worcester Benefits Center - Appeals Unit** | | |
| | **PO BOX 15112** | | |
| | **Worcester, MA 01615-0112** | | |

| Fax: | **1-774-437-7141** | Phone: | **1-888-226-7959** |
|------|-------------------|--------|--------------------|
| Number of Pages: | **22** | Date: | **May 18, 2017** |

**NOTICE REGARDING CONFIDENTIAL COMMUNICATION** -- The information provided in this FAX is intended only for the addressee named above. The contents of this FAX and its attachments may include proprietary or otherwise privileged information and are considered private and confidential. If you are not the intended recipient of the FAX, please promptly deliver the FAX to the intended recipient and do not leave it in a location where it can be seen by others. You are also hereby notified that any other use, dissemination, distribution or reproduction of this information is strictly prohibited. If you received this FAX in error, please immediately notify the sender to determine the best means to resolve the situation.

Unum
Worcester Benefits Center - Appeals Unit
PO BOX 15112
Worcester, MA 01615-0112
Phone: 1-888-226-7959
Fax: 1-774-437-7141
www.unum.com



May 18, 2017

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

RE:    Neely, Stephen M
       Claim Number:          52-00462691-001
       Provident Life and Accident Insurance Company

Dear Attorney Denton:

This letter is to notify you that the additional information you submitted does not change our prior appeal decision concerning your client, Dr. Stephen Neely's Individual Disability Insurance claim. A copy of our February 14, 2017 letter that explains our original decision is enclosed for your reference.

Please read the following information carefully, as it will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason

- Information that supports our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 77423.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03



**Decision/Reason**

As detailed in our appeal decision of February 14, 2017, we find the Benefits Center's May 25, 2016 determination Dr. Neely is able to perform the duties of his occupation as an orthopedic surgeon on a full time basis is correct. There is a lack of medical and vocational information to support the presence of restrictions and limitations to his performance of the duties of his occupation consistent with a Total Disability, and no benefits are due.

**Information That Supports Our Decision**

Dr. Neely's policy provides benefits only when he is unable to perform the duties of his occupation. As he is over age 65, the policy provides benefits for a Total Disability only; there is no coverage for partial or Residual Disability.

Please refer to our appeal decision of February 14, 2017, a copy of which is enclosed, for a detailed review of Dr. Neely's restrictions and limitations supported by the available medical information, and how the demands his occupation as an orthopedic surgeon do not exceed those supported restrictions and limitations. Rather than restating the contents of that letter here, we refer you to it as part of today's correspondence along with copies of the Benefits Centers letters of May 25, 2016 and December 7, 2016.

You responded to our appeal decision in your March 1, 2017 letter, providing additional vocational assertions. You also referenced an article about the performance of joint replacement on obese patients, and included a statement from Dr. Cornelius about his assisting Dr. Neely with procedures requiring repeated use of a mallet. There was no new or different medical information provided for consideration of any changes to Dr. Neely's right shoulder condition, which you indicated has worsened.

Your letter and attachments were provided to our vocational rehabilitation consultant for consideration. This information did not change our vocational findings for Dr. Neely's claim for the reasons outlined below.

As explained on page five of our February 14, 2017 letter, the weight of the equipment being used (including mallets and saws) would not exceed Dr. Neely's medically supported weight restrictions. While the posture of the arm required to use this equipment varies (depending on the size of the equipment, the required angle of use, the height of the operating table, and the size of the surgeon) it is unlikely that such equipment would require Dr. Neely's arm to be above shoulder level. It was observed that by lowering the operating table, flexion or abduction demands of his arm would be reduced.

You have indicated "raising and lowering the operating table repeatedly" is not sterile or an option for Dr. Neely. As noted in the paragraph above, our vocational review was in no way suggesting or contemplating scenarios which require "raising and lowering the operating table repeatedly" as you have stated. Rather, our vocational reviewer's comment simply suggests the initial setting of the operating table height to a position most advantageous to the surgeon from an ergonomic standpoint.

You have noted the information previously provided by Dr. White (referred to on page two of the Benefits Center's letter of December 7, 2016) was "life-style ergonomic" data. The Benefits



Claimant Name: Neely, Stephen M
Claim Number: 5200462691001

May 18, 2017
Page 3 of 4

Center's reviewing physician, one of two board certified orthopedic surgeons who reviewed this file, had previously observed Dr. White had submitted his personal opinion of work as an orthopedic surgeon, but no ergonomic data to support any assertion of the strength demands of this occupation as being beyond the light range.

We have previously considered your and Dr. White's description of the occupational duties of an orthopedic surgeon as having a greater level of physical exertion, at times equivalent to those performed by a "laborer". The physical demands of Dr. Neely's occupation have already been described in the prior vocational reviews, as cited in the Benefits Center's correspondence with you and in our February 14, 2017 appeal decisions. However, the anecdotal description and vocational conclusions you have provided are inconsistent with accepted physical exertion descriptions of the occupation of an orthopedic surgeon and as such, they did not serve as a basis to change our vocational specialist's conclusions.

You referenced and later provided a copy of an editorial article about joint replacement and obese patients, which we considered upon receipt. Our vocational specialist notes that this information explaining the additional physical demands associated with treating obese patients does not alter the overall assessment of the physical demands of Dr. Neely's occupation.

He notes, as has been communicated to you previously, that while it may be reasonable to conclude that the orthopedic surgeon would sometimes assist in the positioning of a patient on the operating table, there are a number of other staff members in the operating room to assist with positioning or transferring patients (for example, surgical technicians, nurses, and anesthesiologist). In addition, manipulating and positioning extremities could also be performed with assistance from other operating room staff. As such, the contents of this article did not serve to alter our prior vocational conclusions.

You provided an additional statement from Dr. Cornelius about his having assisted Dr. Neely with some procedures requiring repeated use of mallet, and also your own assessment of Dr. Neely's physical ability or inability to use various surgical tools in a precise manner. Our vocational specialist considered your comments and Dr. Cornelius' observations about Dr. Neely's level of work capacity. This information, which was not accompanied by any further medical documentation to support any new or different restrictions and limitations for Dr. Neely, does not change our vocational findings for this appeal.

You have indicated Dr. Neely's right shoulder has worsened, with less motion and more discomfort. Again, no new or different medical information has been provided for us to further consider any restrictions and limitations relating to Dr. Neely's claim of Total Disability from October 1, 2015, forward.

Based on the facts of Dr. Neely's claim and the terms of his policy, including the additional information you have provided for this appeal to date, we continue to find the Benefits Center's decision for Dr. Neely's claim was correct. The medical and vocational information available supports he has retained the ability to perform the duties of his occupation on a full time basis, and is not eligible for Total Disability benefits as defined by his policy.

We remind you Dr. Neely must be actively and gainfully employed on a full-time basis to keep his policy in force, paying premiums when due. It is our understanding Dr. Neely continued to work in the non-surgical duties of his occupation beyond October 1, 2015 at a reported rate of 4-

Claimant Name: Neely, Stephen M
Claim Number: 5200462691001

May 18, 2017
Page 4 of 4

6 hours per day, performing patient care and examinations in office and hospital settings. If our understanding is not correct, and Dr. Neely's condition status has changed, please notify us directly.

It is our practice to give significant weight to the findings of the Social Security Administration. Based on the information available to us to date, Dr. Neely has not applied for or been awarded any Social Security Disability Insurance (SSDI) benefits. If our understanding is incorrect, and Dr. Neely has been awarded SSDI benefits, please notify us immediately so we consider this information.

This completes our further appeal review of Dr. Neely's claim. If you have any new or different information in response to this appeal decision, please forward it my attention directly for additional consideration.

Attorney Denton, if you have questions about this appeal decision, you may reach me toll free at 1-888-226-7959, extension 77423 or directly at 1-774-437-7423, extension 77423.

Sincerely,

*Suzanne Campbell-Lambert ALHC, ACS*

Suzanne Campbell-Lambert ALHC, ACS
Lead Appeals Specialist
Provident Life and Accident Insurance Company

Enclosures:      -Attorney: Appeal
                 -Attorney: General
                 -Claimant: Decision

Unum
Worcester Benefits Center - Appeals Unit
PO BOX 15112
Worcester, MA 01615-0112
Phone: **1-888-226-7959**
Fax: **1-774-437-7141**
www.unum.com

**uńum**

February 14, 2017

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

RE:    Neely, Stephen M
       Claim Number:                52-00462691-001
       Provident Life and Accident Insurance Company

Dear Attorney Denton:

Provident Life and Accident Insurance Company has completed the appeal review on your
client, Dr. Stephen Neely's Individual Disability claim.

Please read the following pages carefully, as they will help you understand how we reached our
decision.

This letter includes the following:

• Initial Claim Decision

• The Appeal Decision

• Information that supports the Appeal Decision

• Policy Provisions that apply to the Appeal Decision

• Next steps available to you

If you would like me to review with you the information we have and how this decision was
made, please call me at 1-888-226-7959, extension 77423.

**Initial Claim Decision:**

As indicated in their letters of May 25, 2016 and December 7, 2016, the Benefits Center
determined Dr. Neely was able to perform the duties of his occupation as an orthopedic
surgeon, with no restrictions or limitations to his ability to perform those duties on a full time
basis. No benefits were found to be payable under the Total Disability provision, or any other
provision, of his policy.

The Benefits Center did provide payments totaling $19,800 under a reservation of rights during
their consideration of Dr. Neely's claim; he was not requested to repay this amount.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

02875005900533301

**Appeal Decision:**

We have determined the Benefits Center's decision on Dr. Neely's claim is correct. The medical and vocational information that is available in his file to date does not support the presence of restrictions and limitations to his ability to perform the duties of his occupation on a full time basis.

Based on the facts of Dr. Neely's claim and the terms of his policy, no Total Disability or other benefits were due for his claim.

**Information that Supports our Decision:**

To review in brief, Dr. Neely indicated he developed pain, weakness, and loss of range of motion in his right upper extremity beginning May 5, 2015 from conditions including right shoulder rotator cuff tear, subacromial impingement, and tendonitis biceps. He continued to work in his occupation as an orthopedic surgeon, performing surgeries until October 1, 2015. After October 1, 2015, Dr. Neely continued working in his office practice, evaluating patients and performing independent medical examinations for four to six hours on a daily basis.

Dr. Neely's policy does not provide any partial or Residual Disability benefits after age 65. As Dr. Neely was already 70 years old by the date time he first claimed any Total Disability, his claim was appropriately considered under his policy's Total Disability provision with a start date of October 1, 2015.

His Attending Physician, fellow orthopedic surgeon Dr. Jon Cornelius, indicated he advised Dr. Neely not to perform surgery after September 30, 2015. He noted restrictions and limitations to his ability to: lift, push, or pull over 15 pounds; to work at shoulder level or above; to transfer and position patients on the operating table; to manipulate patients' extremities during surgery; to use equipment such as hammers and saws; and to examine heavy patients. Surgery for his condition was not pursued due to Dr. Neely's use of blood thinners for an unrelated cardiac condition that he has stated is not source of impairment for this claim.

Enclosed please find copies of the Benefits Center's letters dated May 25, 2016 and December 7, 2016 discussing their findings that the medical and vocational information available for Dr. Neely's claim did not support the presence of, and treatment consistent with, restrictions and limitations to his ability to perform the duties of his occupation as an orthopedic surgeon on a full time basis. I find these letters to provide a detailed and accurate overview of the Benefits Center's consideration of Dr. Neely's claim, including the review of his file by two board certified orthopedic surgeons with contact made directly to Dr. Cornelius, and later with Dr. Chad Price, and refer you to them as part of today's correspondence.

You appealed the Benefits Center's May 25, 2016 decision, disputing their assessment of the vocational demands of Dr. Neely's occupation, and indicating he is unable to perform physically accurate surgeries and all of the duties needed to make a surgery successful. You indicated

02875005900533302

Dr. Neely was unable to modify his operative techniques, could not improve his symptoms with physical therapy, and that his continued activities such as golfing as noted by the Benefits Center were not inconsistent with his inability to perform the duties of his occupation.

You provided a new evaluation by another orthopedic surgeon, Dr. Chad Price, indicating Dr. Neely should not perform orthopedic surgery, in particular total joint replacements, that would require him to use a saw "at eye level", and that shoulder weakness also precluded him from using hammers. Dr. Price noted restrictions of no overhead lifting, no lifting, pushing or pulling greater than 10 pounds with the right arm, and no repetitive overhead movements. Statements were also provided from Dr. Neely and two of his fellow orthopedic surgeons (Dr. Cornelius and Dr. Gregory White) opining on his physical duties, as well as affidavits from two surgical technicians and first assistants (Mr. David Eldridge and Mr. Kenny Oliver).

Prior to proceeding with this appeal review, we requested the Benefits Center consider if this new information changed their decision for Dr. Neely's claim. As explained in the Benefits Center's letter of December 7, 2016, this information was further considered by two physician specialists and a vocational rehabilitation consultant. This information did not change their May 5, 2016 decision for his claim, and his file was returned to me for an appeal review.

I have completed a thorough and fair consideration of the information that is available to date for Dr. Neely's claim and appeal.

I find the medical analyses completed by the Benefits Center, which included review of the available medical information by two board-certified orthopedic surgeons in addition to direct contact with Dr. Price about his examination, appropriately considered Dr. Neely's restrictions and limitations. Those restrictions and limitations that were supported by Dr. Neely's medical testing and treatment information were referred to a vocational rehabilitation specialist to assess if they were in excess of the physical demands of his occupation.

The vocational information available to the Benefits Center demonstrated Dr. Neely retained capacity to perform surgical procedures within the physical demands of his occupation. He continued to perform surgeries after May 5, 2015, and there is no medical information to support any change to his condition to precipitating an inability to perform surgery effective October 1, 2015, including joint replacement procedures or operative arthroscopy of the shoulder or knee.

As part of this appeal review, I requested the further consideration of a vocational rehabilitation specialist who had not seen Dr. Neely's file previously. Our appeal vocational rehabilitation specialist assessed all the available occupational and vocational information for this claim and appeal and considered the medical analyses of the supported limitations and restrictions.

This specialist agreed with the Benefits Center's understanding that the important duties of Dr. Neely's occupation as an orthopedic surgeon involve the diagnosis and treatment of musculoskeletal disorders. His specific duties included patient examinations, review of x-rays, performing injections, prescribing medication and physical therapy, performing office based procedures (including aspirations and debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical

record. The strength demands of this occupation were confirmed to be in the light range. "Light" is defined as occasional lifting or applying force up to 20 pounds or frequently lifting or applying force up to 10 pounds. The other physical demands of this occupation would include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

The restrictions and limitations supported by the medical information in Dr. Neely's file to date were:

- Restrict above shoulder activities
- Restrict forward flexion beyond 150 degrees
- Has full passive right shoulder motion and active at 140 degrees past shoulder height with good but not normal strength in abduction and external rotation.

Dr. Neely has continued working in his office-based practice, where he describes seeing patients (referring those needing surgery to his partners), performing hospital rounds, conducting independent medical examinations and participating in depositions. He has also maintained the ability to:

- sit, stand and walk without difficulty
- lift up to 15-25 pounds to chest, with no overhead activities, and to 150 degrees forward flexion with full strength.

Based on the information available, our appeal vocational rehabilitation consultant found the demands of Dr. Neely's occupation as an orthopedic surgeon were not excess of his supported limitations and restrictions and he retained the physical capacity needed to perform the duties of his occupation.

Our appeal vocational rehabilitation consultant noted:

"Giving consideration to the insured's supported R&L's [restrictions and limitations] as noted above, the insured would retain the physical capacity needed to perform the duties of his occupation. The insured's occupational duties would not require above the shoulder or above the head activities or forward flexion beyond 150 degrees.

The insured's capacity for shoulder motion—("full passive right shoulder motion and active at 140 degrees past shoulder height with good but not normal strength in abduction and external rotation") would also be sufficient for the performance of the occupation.

The insured has been determined to have no difficulties with sitting, standing or walking.

As noted previously, the performance of the Orthopedic Surgeon occupation would not require lifting/carrying/pushing/pulling in excess of the 20 lb. level..."

Our vocational rehabilitation consultant considered each of the affidavits provided for this appeal opining on the physicality of Dr. Neely's work, including transferring patients to the operating table, manipulating their extremities, using equipment (e.g. mallets and saws), and examining heavy patients.

Claimant Name: Neely, Stephen M
Claim Number: 5200462691001

He also determined that, while it may be reasonable to conclude an orthopedic surgeon would sometimes assist in the positioning of a patient on the operating table, there are also other staff members in the operating room (for example, surgical technicians, nurses, anesthesiologist) to assist with positioning or transferring patients. In addition, the manipulating and positioning extremities could also be performed with assistance from other staff in the operating room.

With respect to the equipment used, as referenced by Dr. Cornelius, our appeal vocational rehabilitation consultant also found that the weight of such equipment, including mallets and saws, would not exceed the medically supported weight restrictions as noted above. As had been noted previously, while the posture of the arm required to use these types of equipment will vary (depending on the size of the equipment, the required angle of use, the height of the operating table, and the size of the surgeon) it is unlikely that such equipment would require his arm to be above shoulder level. By lowering the operating table, the flexion or abduction demands of his arm would be reduced.

Our appeal vocational rehabilitation consultant also agreed Dr. Neely's supported restrictions and limitations indicate that he does maintain full strength with 150 degrees flexion. This was noted to support Dr. Neely would not have difficulty grasping and using necessary equipment such as saws, drills, and mallets below shoulder level.

Based on our appeal review of the facts of Dr. Neely's claim and the terms of his policy, including the information provided with your letter of September 7, 2016, we find he has retained the ability to perform the duties of his occupation, and on a full time basis. He does not meet the definition of Total Disability benefits as defined by his contract, and does not have any coverage for partial or Residual Disability available for this claim.

**Policy Provisions that Apply to the Appeal Decision:**

Provident Life and Accident Insurance Company Policy No. 00462691 includes the following provisions, cited in pertinent part below:

   **"DEFINITION OF TOTAL DISABILITY:**

   (a) Until the date you attain age 65, or until the date indemnity for total disability has been paid during a period of disability under this policy for 5 years, whichever is later, 'Total Disability' means your inability to perform the duties of your occupation.

   (b) During the continuance of a period of disability beyond the later of either of the two dates named in (a) above, 'Total Disability' means your inability to engage in any gainful occupation in which you might reasonably be expected to engage because of education, training or experience, and with due regard to your vocation and earnings at the beginning of disability.

   Nothing in this definition shall be construed to extend or limit the maximum benefit periods for which indemnity for disability is payable under this policy."

   **"'Residual Disability'** means:

(a) your inability to perform one or more of your important daily business duties, or

(b) your inability to perform your usual daily business duties for as much time as is usually required for the performance of such duties."

**"Residual Disability Benefit:**

If Injuries or Sickness results in Residual Disability immediately following a period of at least 30 days of Total Disability which resulted from the same or a related cause, the Company, beginning on:

(1) the day shown on in the Policy Schedule as to when indemnity for Total Disability would have commenced, or
(2) the day following a period of Total Disability described above for which benefits have been paid,

will pay periodically during the continuance of such Residual Disability, indemnity at the rate of the Residual Disability Monthly Benefit until your 65th birthday. In no event, however, will indemnity for Residual Disability be payable for longer than 24 months if you are age 55 or older at the commencement of the preceding period of Total Disability and such period does not exceed 180 days of Total Disability..."

**"LEGAL ACTIONS:** No action at law or in equity shall be brought to recover on this policy prior to the expiration of 60 days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of 3 years after the time written proof of loss is required to be furnished."

Our decision was made based on the policy provisions listed above, and Provident Life and Accident Insurance Company reserves its right to enforce other provisions of the policy.

**Next Steps Available to your client:**

This completes our appeal review of the information available for Dr. Neely's claim to date. Of you have any new or different information to provide in response to this appeal decision, please do so as soon as possible or before March 14, 2017.

It is our practice to afford significant weight to information from the Social Security Administration. Based on the information available to us to date, it does not appear Dr. Neely, who has continued to perform non-surgical patient care and examinations in an office and hospital setting, has applied for or has been awarded Social Security Disability Insurance (SSDI) benefits. However, if our understanding is incorrect, and Dr. Neely has been awarded any SSDI benefits, please notify me immediately so we may secure this information for further consideration of his claim.

Attorney Denton, if you have any questions about this letter, please contact me toll free at 1-888-226-7959, extension 77423 or directly at 1-774-437-7423.

Claimant Name: Neely, Stephen M
Claim Number: 5200462691001

Sincerely,

*Suzanne Campbell-Lambert ALHC, ACS*

Suzanne Campbell-Lambert ALHC, ACS
Lead Appeals Specialist
Provident Life and Accident Insurance Company

Enclosures:     -Claimant: Decision
                -Attorney: General

02875005900533302

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: 1-888-226-7959
Fax: 1-866-562-4794
www.unum.com



December 7, 2016

JASON DENTON
RMA  ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

RE:   Neely, Stephen M
      Claim Number:              5200462691001
      Provident Life and Accident Insurance Company

Dear Attorney Denton:

I attempted to reach you via telephone on December 7, 2016 and left you a voice mail. This letter is about the decision we have made on your client, Dr. Stephen Neely's Individual Disability claim for benefits. We will not be able to approve the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason
- Information that supports our decision
- Information Regarding the Appeal Notice
- Provisions outlined in your client's individual disability policy
- Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made.  You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03



0287500579504950I

### Decision/Reason:

We have determined Dr. Stephen Neely is able to perform the duties of his occupation as an orthopedic surgeon.  The medical records do not support restrictions or limitations that would prevent him from performing these duties. Because he is not disabled according to the policy, benefits are not payable.

### Information That Supports Our Decision:

Dr. Neely initially submitted claim forms on January 21, 2016. He stated as of October 1, 2015 he was no longer performing the duties of his occupation as an orthopedic surgeon. He states he continues to see patients for regular office visits and independent medical evaluations, but he is not performing surgery.

He explained that he was unable to continue working due to an injury that occurred on May 5, 2015 while he was doing an orthopedic procedure. He informed us he continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Although Dr. Neely listed Crohns Disease and a Cardiac event as a secondary diagnosis, per our telephone conversation with Dr. Neely on February 17, 2016, he indicated the Crohns Disease is very well controlled and he sees his GI doctor once per year and has a colonoscopy done every 14-18 months. Dr. Neely also states he sees his cardiologist every six months for checkups relating to his Cardiac event that occurred on September 7, 2013.

Dr. Neely indicated that he stopped performing surgical procedures on September 30, 2015 because of shoulder pain and because it was taking him longer to complete procedures.

In our letter to Dr. Neely dated May 25, 2016, we informed him based on our review, the information in his claim file indicates he is able to perform the duties of his own occupation on a full-time basis. As he did not meet the policy's definition of Total Disability, we were unable to approve his claim and provide further benefits. His claim was closed effective May 25, 2016.

I have attached a copy of the letter that was mailed to Dr. Neely on May 25, 2016, as this provides details of our decision.

We received an appeal notice from your office dated September 7, 2016 with new information for us to review. The appeal notice included new medical records, an insured acquired Orthopedic Consultation of Dr. Chad Price, and affidavits of Dr. Jonathan Cornelius, Mr. Kenny Oliver (surgical technician), Mr. David Eldridge (surgical technician) as well as a Causation and Damage report from Dr. Gregory White.

Dr. Cornelius reported for July, August and September of 2015 he assisted Dr. Neely with surgical activities and they "split the fees" for those procedures. The affidavit signed by the surgical technicians noted Dr. Cornelius assisted Dr. Neely in the last three months (July, August and September of 2015) of surgeries.

Dr. White, in his letter, asserted orthopedics is not a light duty occupation, but did not quantify as to what level it was other than "physically demanding and labor intensive." Our onsite physician opines that Dr. White provided a personal opinion with no ergonomic data. Our



Claimant Name: Neely, Stephen M
Claim Number: 5200462691001

December 7, 2016
Page 3 of 4

Vocational Representative also reviewed the file and found that with the retractions and limitations given, Dr. Neely could perform his occupational activities of surgery.

Dr. Price performed a consultation on July 15, 2016 on behalf of Dr. Neely and noted "pain (and weakness) with overhead activity, with extension of the arm away from the body and moderate rest pain." Examination of the right upper shoulder recorded 140 degrees forward flexion with adequate external and internal rotations and full strength 5/5 on the right including biceps and triceps, wrist and hand, except 4/5 abduction and 4+/5 external rotation. The opinion of Dr. Price was that weakness of the right shoulder excluded surgical activities as an orthopedist. He outlined restrictions (activities Dr. Neely should not do) and limitations (activities Dr. Neely cannot do) of no overhead lifting, no lifting, no pushing/pulling greater than 10 pounds with the right arm and no repetitive overhead movements. He outlined these restrictions and limitations to be permanent.

Our onsite physician, who is board-certified in orthopedic surgery, reviewed the information and agreed that Dr. Neely should restrict above shoulder activities and forward flexion beyond 150 degrees and notes that the records support that Dr. Neely has full passive right shoulder motion and active at 140 degrees past shoulder height, with good but not normal strength in abduction and external rotation. The records support that Dr. Neely would have the ability to sit, stand and walk without difficulty, lifting up to 15-25 lbs to chest, with no overhead activities, but to 150 degrees forward flexion, with full strength.

In view of the lack of agreement between our physician and Dr. Price on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported.

The information presented supports the restrictions and limitations as proposed by our on-site physician; however, they would not preclude the performance of an orthopedic surgeon. Our vocational consultant has reviewed Dr. Neely's file. He indicated that the important duties of an orthopedic surgeon, involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient examinations, review of x-rays, performing injections, prescribing medication and physical therapy, performing office based procedures e.g. aspirations, debridement; performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

Our Vocational Representative reviewed the supported restrictions and limitations against the physical demands of Dr. Neely's occupation and determined that although it may be reasonable to conclude that Dr. Neely would sometimes assist in the positioning of a patient on the operating table, there are a number of staff in the operating room to assist with positioning or transferring patients. Manipulating and positioning extremities could also be performed with assistance from other OR staff.

Also, the weight of such equipment as mallets and saws would not exceed his weight restrictions. The posture of his arm required to use these types of equipment will vary depending on the size of the equipment, the required angle of use and the height of the OR table . However, it is unlikely that such equipment would require Dr. Neely's arm to be above shoulder level. Also, if needed, the lowering of the OR table would aid in reducing the flexion or abduction demands of his arm.

Claimant Name: Neely, Stephen M                                    December 7, 2016
Claim Number: 5200462691001                                              Page 4 of 4

The supported restrictions and limitations indicate that Dr. Neely has full strength with 150 degrees flexion. This would suggest that he would not have difficulty grasping and using necessary equipments such as saws, drills and mallets below shoulder level. The lifting and reaching demands of Dr. Neely's occupation do not exceed the supported restrictions and limitations.

Based on our review, the information in Dr. Stephen Neely's claim file indicates he is able to perform the duties of his own occupation. Therefore, his claim remains closed.

**Policy Provisions:**

This information can be found on page 4 of our May 25, 2016 letter to Dr. Neely.

**Next Steps Available to You and Dr. Neely:**

We would like to remind you that the opportunity to appeal our claim determination remains available to you. Within the next 7 days, you will receive a letter from our Appeals Area which will further explain this option.

If you have questions about Dr. Stephen Neely's claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension, 75352. As we will identify his claim by his Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist


Enclosures:     -Claimant: Decision

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: **1-888-226-7959**
Fax: 1-866-562-4794
www.unum.com



May 25, 2016

STEPHEN M NEELY MD
169 POWELL GROVE ROAD
LEBANON, TN 37090

RE:    Neely, Stephen M
       Claim Number:              5200462691001
       Provident Life and Accident Insurance Company

Dear Dr. Neely:

This letter is a follow-up to our conversation on May 25, 2016 about the decision we have made on your Individual Disability benefits. As we discussed, we will not be able to approve your claim and continue the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

• The decision/reason
• Information about your benefit check
• Other important information
• Information that supports our decision
• Provisions outlined in your individual disability policy
• Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

02875005511400601

Claimant Name: Neely, Stephen M
Claim Number: 5200462691001

May 25, 2016
Page 2 of 6

### Decision/Reason:

We have determined that you are able to perform the duties of your occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent you from performing these duties on a full-time basis.

Because you are not disabled according to the policy, benefits are not payable.

### Information About Your Benefit Check:

Our last benefit payment, in the amount of $4,950.00, was mailed directly to you on April 27, 2016.

### Other Important Information:

We provided benefits under a Reservation of Rights while our claim decision was pending. We paid four months' worth of benefits, totaling $19,800.00. We will not be requesting repayment of these benefits.

### Information That Supports Our Decision:

We received your claim on January 21, 2016. You stated that as of October 1, 2015 you were no longer performing the duties of your occupation as an orthopedic surgeon. You were seeing patients for regular office visits and independent medical evaluations, but not performing surgery.

You explained that you were unable to continue working due to an injury that occurred on May 5, 2015 while you were doing an orthopedic procedure. You tried to dislocate a hip with a bone hook and felt a sharp pain in your right shoulder, followed by weakness. You continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Your treatment plan included injections and topical creams. You state that your shoulder became inflamed but you tried to continue performing surgery; however, you were unable to do so.

You informed us you stopped performing surgeries on September 30, 2015 because of shoulder pain and because it was taking longer for you to complete procedures.

On the Attending Physician Statement completed by Dr. Jonathan P. Cornelius on January 20, 2016, he listed restrictions of "no lifting, pushing, pulling over 15 lbs., right arm" and "no work at shoulder level or above with right arm." He listed limitations of "He is unable to transfer patients to OR table, unable to position patients on OR table, unable to manipulate patient's extremities during orthopedic surgery, unable to use OR equipment, such as mallets or saws..., unable to examine heavy patients." Dr. Cornelius gave the duration of these restrictions and limitations as extending from September 30, 2015 to "permanent."

We requested treatment records from Dr. Cornelius. This information was reviewed by our physician who is board-certified in orthopedic surgery. The records indicate that you reported right shoulder injuries on May 5 and May 11, 2015, but were not advised to stop working until September 30, 2015. You were able to golf after the incidents. Our physician told us that the

Claimant Name: Neely, Stephen M
Claim Number: 5200462691001

May 25, 2016
Page 3 of 6

July 23, 2015 MRI revealed primarily tendinosis of cuff with questioned tearing, no retraction of tendons, and no atrophy of cuff muscles.

To improve our understanding of your condition and any associated restrictions (activities you should not do) and limitations (activities you cannot do), our physician spoke to Dr. Cornelius on March 9, 2016. Dr. Cornelius said that there were no surgical indications, and no muscle atrophy on the MRI, but added that you were noticing weakness while doing surgery.

You continued to work as a primary surgeon for joint replacement and shoulder arthroscopy, as documented in the 2015 CPT code information submitted by your employer. The CPT data shows that you continued to perform surgery through September 2015; no surgeries were noted after September 2015. Although the months of May and June 2015 appear to show billing charges below prior months' charges, the charges increased in July 2015 and August 2015 to a level similar to some months prior to May 2015. Billing charges were lower in May and June 2015 when compared to previous months, but they increased in July and August 2015 to approximate prior levels.

Our physician advised us that restrictions and limitations are not supported by the medical information. Our physician noted that your shoulder does not need surgery, and your range of motion was satisfactory with no obvious atrophy of shoulder musculature. Our physician further noted that in the month when you stopped doing surgery, September 2015, you also performed procedures that would require right shoulder strength and mobility; these procedures reflected your usual and customary procedures prior to your reported injury in May 2015.

Our vocational consultant reviewed the occupation information provided to us, including your Occupation Description form, Physician Questionnaire, and CPT/production data from your employer. The important duties of your occupation involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient exam, review of x-rays, performing injections, prescribing medication and physical therapy, performing office-based procedures (e.g., aspirations, debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

The strength demands of your occupation are in the "light" range. "Light" is defined as the occasional lifting or applying force up to 20 lbs. or the frequent lifting or applying force up to 10 lbs. Other physical demands of your occupation include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

Our physician advised us that the medical records support your ability to perform the physical demands of your occupation.

In view of the lack of agreement between our physician and Dr. Cornelius on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported, explaining that the limited diagnostic findings and limited treatment are not consistent with a severity of pain that would be expected to impact your functional capacity.

Based on our review, the information in your claim file indicates you are able to perform the duties of your own occupation on a full-time basis. As you do not meet the policy's definition of Total Disability, we are unable to approve your claim and provide further benefits. Your claim has been closed effective May 25, 2016.

0287500551400602

Claimant Name: Neely, Stephen M                                          May 25, 2016
Claim Number: 5200462691001                                              Page 4 of 6

**Information about the waiver of premium benefit**

Your policy provides a Waiver of Premium benefit, which was approved as of November 1, 2015. Please note that the refund of the November 1, 2015 semi-annual premium was paid under Reservation of Rights. Your policy premiums are due on a semi-annual basis (May 1 and November 1 of each year). Waiver of premium will end and billing will resume starting with the November 1, 2016 premium.

**Policy renewal information**

In order to keep this policy in force, you must be actively and gainfully working full time; there is no age limit. Before the enhancement that was effective on June 1, 1986, you could renew your policy only to age 75. Your policy is now renewable for life.

**Policy Provisions And Definitions:**

The following provisions and definitions are applicable to our claim decision.

**Individual Disability policy 6PC-462691**

We included a copy of your Individual Disability policy 6PC-462691 with our previous letter dated February 8, 2016. The following policy provisions and/or definitions can be found in that copy.

- Information regarding the renewability of your policy after age 65 can be found on the policy improvement brochure dated April 1987
- The definition for "Waiver of Premium" can be found on page 2 of the policy
- The definition for "Total Disability" can be found on page 4
- The amendment changing the "Definition Of Total Disability" can be found on page 5(A)

**Next Steps Available To You:**

**What if you disagree with the decision and you have *new information* to submit?**

If you disagree with our decision and you have new information to submit, you may request to have your file reevaluated by the Disability Benefits Specialist who made the initial decision.

**How much time do you have to request a reevaluation of your claim?**

Please submit your written request within 180 days from the date you receive this letter.

**How does the reevaluation process work?**

If you have new information you want us to consider, please send it to us as soon as possible. The Disability Benefits Specialist who made the initial decision will review the claim again, taking the new information into consideration. The Disability Benefits Specialist will provide you with a written response within 90 days of our receipt of the new information.

After this review, we will send you a letter explaining our decision. If you still disagree with our decision, you will have the option to request an additional independent review by our Appeals Department.

Claimant Name: Neely, Stephen M
Claim Number: 5200462691001

May 25, 2016
Page 5 of 6

### What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for reevaluation and new information?

Reevaluation Request
PO Box 15112
Worcester, MA  01615-0112
Fax Number: 1-866-562-4794

### What if you disagree with the decision, but *do not have new information* to submit?

If you disagree with our decision but do not have new information to submit, you may request to have your file reviewed by our Appeals Department. Please submit a written letter of appeal outlining the basis for your disagreement.

### How much time do you have to request an Appeal?

Please submit your written request for appeal within 180 days from the date you receive this letter.

### How does the Appeal process work?

An Appeals Specialist will review your entire claim and may consult medical and vocational experts or other resources. The Appeal Specialist will make an independent decision on your claim.

### How much time does the Appeal review take?

We are committed to making an appeal decision within 45 days after we receive your written appeal. There may be special circumstances in which the review can take longer. We will notify you if more time is needed.

### What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for Appeal?

The Appeals Unit
PO Box 15112
Worcester, MA  01615-0112
Fax Number: 1-866-562-4794

We will send you a letter acknowledging receipt of your request within 7 days.

Dr. Neely, if you have questions about your claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension 75352.

02875005511400602

Claimant Name: Neely, Stephen M
Claim Number: 5200462891001

May 25, 2016
Page 6 of 6

We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist



CSC

# Notice of Service of Process

MDM / ALL
Transmittal Number: 16709682
Date Processed: 06/01/2017

| | |
|---|---|
| Primary Contact: | Marti Cornwell<br>UNUM Group<br>1 Fountain Square<br>Chattanooga, TN 37402 |
| Electronic copy provided to: | Janna Mullin-Erickson<br>Jen Majic<br>Judy Drake |

| | |
|---|---|
| Entity: | UNUM Group Corporation<br>Entity ID Number 2979581 |
| Entity Served: | Unum Group Corporation |
| Title of Action: | Stephen M. Neely vs. Provident Life and Accident Insurance Company |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Contract |
| Court/Agency: | Wilson County Chancery Court, Tennessee |
| Case/Reference No: | 2017CV171 |
| Jurisdiction Served: | Tennessee |
| Date Served on CSC: | 05/31/2017 |
| Answer or Appearance Due: | 30 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Sender Information: | Jason G. Denton<br>615-443-8772 |

Notes:     Lines/marks on document

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscglobal.com

SUMMONS TO THE SHERIFF OF WILSON COUNTY

STATE OF TENNESSEE

CHANCERY COURT OF WILSON COUNTY

Stephen M. Neely
_____
                    Plaintiff

          vs

Provident Life and Accident Insurance Company,
individually, Provident Life and    Defendant
Accident Insurance Company d/b/a Unum
_____

Group Corporation, Unum Group    Defendant
Corporation, individually
_____
                    Defendant

CIVIL ACTION

NO. _2017CV171_

SUMMONS

To the above named Defendant(s):    Provident Life and Accident Insurance Company
Serve on Registered Agent:          Corporation Service Company
                                     2908 Poston Ave
                                     Nashville, TN 37203

You are hereby summoned and required to serve upon __Jason G. Denton__

plaintiff's attorney, whose address is: __109 North Castle Heights Avenue, Lebanon, TN 37087__

and answer to the complaint which is herewith served upon you, within thirty (30) days after service of this summons upon you, exclusive of

the day of service. If you fail to do so, judgement by default will be taken against you for the relief demanded in the complaint.

Witness, Barbara Webb, Clerk and Master of said court, issued at office the

__25th__ of __May__ , A.D. 20 __17__

TESTE: First Monday in __May 25__ , 20 __17__    _Barbara Webb_
                                                  Barbara Webb, Clerk and Master

                                          By _Sue Finnigan_
                                                  Deputy Clerk and Master

Received this _____ day of _____ , 20 ____

_____
                                                  Deputy Sheriff

(This summons is issued pursuant to Rule 4 of the Tennessee Rules of Civil Procedure.)

SUMMONS CIVIL ACTION CHANCERY COURT WILSON COUNTY TENNESSEE
RETURN ON SERVICE OF SUMMONS

I hereby certify and return, that on the _____ day of _____, 20 _____

I served this summons together with the complaint herein as follows: _____

_____

_____

_____

_____

Sheriff

Deputy Sheriff

County

RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return, that on the _____ day of _____, 20 _____,

I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case # _____ to the defendant, _____

on _____ day of _____, 20 _____, I received the return receipt, which had been

signed by _____ on the _____ day of _____

20 _____. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk and Master.

Sworn to and subscribed before me on this _____

day of _____, 20 _____

Signature of: _____ Notary Public or _____ Deputy Clerk and Master              )

My commission expires: _____          Signature of plaintiff, plaintiff's attorney or other person
                                                           authorized by statute to serve process.

CERTIFICATION (IF APPLICABLE)

I, Barbara Webb, Clerk and Master of the Chancery Court in the State of Tennessee, Wilson County, do certify this to be a true and correct copy of the original summons issued in this case.

Barbara Webb, Clerk and Master

by: _____          X _____
                                         D.C. & M.

26-2-301

26-2-203 PROCEDURE FOR EXERCISING EXEMPTION
NOTICE
10,000.

TO THE DEFENDANT (S):

Tennessee law provides a four thousand dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgement. If a judgement should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgement becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

# NOTICE

 "If you have a disability and require assistance, please call (615) 466-5063."

Thank You

FILED
MAY 2 5 2017
A.M. _____ 3:29 _____ P.M.
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

STEPHEN M. NEELY,               )
                                )
        Plaintiff,              )
                                )
    v.                          )     No. 2017-CUr 171
                                )
PROVIDENT LIFE AND ACCIDENT     )
INSURANCE COMPANY, individually, )
PROVIDENT LIFE AND ACCIDENT     )
INSURANCE COMPANY d/b/a         )
UNUM GROUP CORPORATION,         )
UNUM GROUP CORPORATION,         )
individually,                   )
                                )
        Defendants.             )

---

## VERIFIED COMPLAINT

Comes now the Plaintiff, Stephen M. Neely, MD and states:

1.      This is an action by the Plaintiff, Stephen M. Neely, MD, ("Dr. Neely") to recover

benefits overdue to him pursuant to an individual disability policy issued by the Defendants

Provident Life And Accident Insurance Company, individually, and Provident Life And

Accident Insurance Company d/b/a Unum Group Corporation (collectively known as

"Provident"), and Defendant Unum Group Corporation, individually (hereinafter "Unum").

2.      Dr. Neely is a resident of Wilson County Tennessee.

3.      Provident, upon information and belief, is an insurance company and corporation

organized and existing under the laws of the State of Tennessee with its principal place of

business in the State of Tennessee. They may be served process by and through their registered

agent Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312,

and through the Commissioner of Insurance.

4.      Unum is an insurance company and corporation and is authorized to do business in Tennessee. Upon information and belief, Provident is a subsidiary of Unum, although the policy at issue was issued by Provident. Also, upon information and belief, Unum is the third party administrator/agent that has handled the processing and denial of the claim at issue for Provident. Unum may be served process by and through their registered agent Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312, and through the commissioner of insurance.

5.      Venue is proper, given the most significant contacts were in Lebanon, Wilson County, Tennessee; the policy purchase took place by and through Provident's agent, William Dodds – First Insurance Group, who is located Lebanon, Wilson County, Tennessee; Provident is a Tennessee Corporation; and the most significant contacts have been Lebanon, Wilson County, Tennessee.

6.      Dr. Neely purchased Individual Disability policy (No.: R 6PC-462631) as attached hereto as **Exhibit I**, ("the policy") from Provident by and through their agent registered agent William Dodds – First Insurance Group, located in Lebanon, Wilson County, Tennessee to cover his profession as an orthopedic surgeon.

7.      On or about May 5, 2015, Dr. Neely began to experience pain, weakness, and loss of range of motion in his right upper extremity while performing a hip procedure.

8.      Approximately one week later, on or about May 11, 2015, Dr. Neely injured his right shoulder again during a total knee replacement on an obese patient.

9.      Dr. Neely sought medical attention and was medically evaluated and treated during this time.

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 136 of 256 PageID #: 144

10.    The MRI performed on July 23, 2015 found a high-grade partial-thickness rotator cuff tear of the infraspinatus, a labral tear with associated paralabral cysts, and a low-grade partial-thickness tear of the supraspinatus. The plaintiff was determined to have injuries, including but not limited to, right shoulder rotator cuff tear, subacromial impingement, tendonitis in his biceps, right upper extremity, and his body as a whole.

11.    Dr. Neely, as an orthopedic surgeon, requires the full strength, functioning, use, and range of motion in his upper extremities to perform orthopedic surgeries. Dr. Neely is right-hand dominant.

12.    Due to his injuries, Dr. Neely could not and can no longer perform his duties as an orthopedic surgeon based upon the anatomical injuries, pain and weakness in his right arm and shoulder.

13.    Dr. Neely had to call upon another surgeon, Dr. Jonathan P. Cornelius to assist and help manage performance of the remaining surgeries Dr. Neely had through July, August and September of 2015.

14.    Due to the worsening of his shoulder, Dr. Neely had to stop performing surgeries altogether on September 30, 2015.

15.    Orthopedic surgeon Chad Price, MD provided medical treatment to Dr. Neely and performed an Independent Medical Exam on July 15, 2016. Dr. Price opined that nonsurgical treatments to the shoulder had been unsuccessful, and there was continued pain and weakness resulting in Dr. Neely no longer performing surgery because of safety issues, and recreational activities had also been greatly limited. Dr. Price unequivocally stated that Dr. Neely was unable to return to his normal occupation as an operating orthopedic surgeon as a result of his work-related shoulder/arm injuries. See Dr. Price Report attached hereto as **Exhibit II**.

16.     Following his injuries and medical diagnosis, Dr. Neely timely made his claim pursuant to the policy for individual disability benefits.

17.     Provident by and through their third party administrator/agent, Unum, gave written notice on May 25, 2016 denying Dr. Neely's individual disability claim.  See **Exhibit III**.

18.     Dr. Neely timely appealed the first denial. See **Exhibit IV**.

19.     Provident, by and through Unum, denied Dr. Neely's appeal on December 7, 2016. See **Exhibit V**.

20.     Provident, by and through Unum, issued further denial and explanation on February 14, 2017, See **Exhibit VI**.

21.     Dr. Neely timely appealed the second denial and provided more supporting evidence of his disability. See **Exhibit VII**.

22.     Provident, by and through Unum, issued an additional denial on May 18, 2017. See **Exhibit VIII**.

23.     The policy issued by Provident does not have any mandatory requirement that an appeal must be exhausted before an action to recover benefits can be prosecuted.

24.     This cause of action has been brought after all administrative processes have been exhausted, a right to sue letter has been issued by Provident and within the three (3) year limitations under the plan from the date of the alleged disability and within 7 days of the last denial by Provident, by and through Unum.

25.     Dr. Neely is disabled from performing surgeries as an orthopedic surgeon and suffers from the aforementioned injuries and maladies, and remains under the care of Dr. Price

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 138 of 256 PageID #: 146

and Dr. Cornelius for medical treatment and currently takes medication for inflammation and takes Tylenol on occasion for pain.

26. Dr. Neely is disabled as defined by the policy and entitled to any and all disability benefits covered under the policy purchased by him to cover this circumstance.

27. Dr. Neely has satisfied all policy prerequisites required for him to recover the post-age 65 disability benefits to which he is entitled.

28. The acts and omissions of Provident and Unum in denial of Dr. Neely's individual disability benefits were denied wrongfully, negligently and intentionally without cause. The wrongful, negligent and intentional denial by Provident and UNUM violated the terms of the individual disability policy and is a breach of contract.

29. Unum as a third party administrator has wrongfully, negligently and intentionally interfered with contract between Provident and Dr. Neely.

30. The acts and omissions of Provident and Unum in denial of Dr. Neely's individual disability benefits were wrongfully, negligently and intentionally without cause. Provident and Unum have negligently, wrongfully, and intentionally interfered with contract between Provident and Dr. Neely.

31. Provident and UNUM have breached the contract and failed and refused to pay the benefits to which Dr. Neely entitled under the Policy.

32. Provident and UNUM acts and omissions constitute a wrongful, negligent, and intentional breach of contract and/or interference with a contract in the following particulars:

(a) Knowingly applying a definition of disability in the claims handling of Dr. Neely and others, in a manner inconsistent and in direct conflict with the policy's definition of disability;

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 139 of 256 PageID #: 147

(b)     Mischaracterizing Dr. Neely's occupation and/or its duties in determining whether Dr. Neely is disabled as an orthopedic surgeon;

(c)     Misapplying the disability provisions of the policy;

(d)     Continuing to seek additional information where claimants have provided adequate proof of disability, thus unfairly shifting the burden of the investigation to Dr. Neely.

(e)     Selectively using independent medical examinations (IMEs) to Defendant's own advantage;

(f)     Selectively using portions of medical records and IME findings to Defendant's own advantage;

(g)     Overruling the opinion of Dr. Neely's treating physician after Defendant's in house medical personnel have conducted a paper review of the Plaintiff's claim; and

(h)     Overruling the opinion of in house medical personnel who supported a finding of disability or the need for specific objective testing.

33.     Due to Defendants' conduct, Dr. Neely has incurred damages not limited to past due and future benefits and interests on said benefits.

34.     Dr. Neely seeks all compensatory damages available to him under the law of the State of Tennessee.

35.     From May 25, 2016 to the present date, **365** days, the Defendants are guilty of engaging in unfair and deceptive acts or practices in the conduct of its' business within the State of Tennessee, involving Dr. Neely's claim for benefits and continued denial of said benefits.

36.     Dr. Neely alleges that from the time Dr. Neely received his initial denial of disability benefits from Provident and Unum, May 25, 2016, up to the present date, the Defendants are guilty of engaging in unfair and deceptive acts or practices in the conduct of its'

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 140 of 256 PageID #: 148

business within the State of Tennessee, involving his claim for benefits and continued denial of said benefits.

37.     Defendants are guilty of violating the Tennessee Consumer Protection Act in its' dealings with the Plaintiff, as codified at Tennessee Code Annotated, Section, 47-18-101 through Section 47-18-109.

38.     The Defendants acted knowingly, intentionally and in bad faith in its dealings with Dr. Neely and the continued denial of the Plaintiff's claim.

39.     The Defendants are guilty of misrepresentation in the handling and denial of Dr. Neely's claim for individual disability.

40.     The Defendants have knowingly concealed relevant information from Dr. Neely as to their internal methodology and reasoning for denial of his claim for individual disability benefits and that said acts are ongoing and continuing by the Defendants to this date.

41.     Dr. Neely seeks punitive damages for the Defendants' willful, intentional and malicious conduct in denying his claim, including any interest that may accumulate or accrue from the time of the date of the onset of disability and/or date of denial of disability and/or upon any damages awarded in this matter.

42.     Dr. Neely seeks treble damages and all attorney fees at trial and on appeal if necessary regarding damages determined pursuant to violations of the Tennessee Consumer Protection Act.

43.     Dr. Neely seeks any and all such other damages they may have sustained which were proximately caused by the Defendant's acts and/or omissions herein above described.

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 141 of 256 PageID #: 149

Wherefore, premises considered, the Dr. Neely respectfully prays:

1.      That proper process issue requiring the Defendants to answer this Complaint in the time prescribed by law and in the event that Defendants fail to timely Answer then Dr. Neely hereby moves the Court of an Order granting Default Judgment pursuant to Tenn. R. Civ. P. Rule 55;

2.      Damages for the specific amount of disability benefits Dr. Neely is entitled to receive under the policy for his disabilities as an orthopedic surgeon;

3.      Prejudgment and post-judgment interest;

4.      Dr. Neely seeks a judgment against the Defendants for the sum of greater than $300,000.00 in compensatory damages;

5.      Dr. Neely seeks not less than $900,000.00 in punitive damages (treble damages) against the Defendants; and

6.      Dr. Neely would further seek any and all equitable relief and other relief, whether general or specific that this Court should deem appropriate under the circumstances, including any and all costs and attorney fees available under the law.

_Stephen M. Neely_ 25 May 17

Dr. Stephen M. Neely

Respectfully Submitted,

_[signature]_

Jason G. Denton, BPR No. 22759
Brett Rozell, BPR No. 32718
Attorney for Plaintiff
ROCHELLE, McCULLOCH & AULDS, PLLC
109 Castle Heights Avenue North
Lebanon, TN 37087
615.443.8772 or 615.443.8780
615.443.8775 (facsimile)
E-mail: jdenton@rma-law.com

STATE OF TENNESSEE          )
                            )
COUNTY OF __Wilson__        )

I, __Stephen Neely__, being first duly sworn, hereby makes oath and aver that I have read the foregoing Complaint to be filed in this cause on his behalf; and that all of the statements contained in said Complaint are true and complete to the best of my knowledge, information and belief.

_Stephen M. Neely_

Sworn to and subscribed before me this 25th day of May 2017

_[signature]_
NOTARY PUBLIC

[notary seal: ALICIA H BROWNING STATE OF TENNESSEE NOTARY PUBLIC RUTHERFORD COUNTY]

My Commission Expires:

1-28-2019



F I L E D

A.M. MAY 2 5 2017 P.M.
3:29.
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# I



# PROVIDENT

## LIFE AND ACCIDENT INSURANCE COMPANY
A Stock Company . . . Chattanooga, Tennessee



Hereby insures you, the person named below as the Insured, subject to the exceptions and other provisions herein contained, against loss covered by this policy commencing while it is in force and resulting from: (1) accidental bodily injuries occurring while this policy is in force, hereinafter referred to as Injuries; or (2) sickness or disease which is first manifested while this policy is in force, hereinafter referred to as Sickness.

This policy is issued in consideration of the payment in advance of the required premium shown herein, and of the statements and representations in the application, a copy of which is attached to and made a part of the policy.

All of the provisions on this and the following pages are a part of this policy.

_John Barnes_  
Vice President

_Winston W Walker_  
President and Chief Executive Officer

Countersigned by _Todd Baker_  
Duly Licensed Resident Agent.

**NOTICE TO INSURED OF 10 DAY RIGHT TO EXAMINE POLICY**
It is the Company's wish that you fully understand and be entirely satisfied with the coverage afforded under your policy. Read it carefully. If for any reason you are not satisfied with the policy you may return it within 10 days from the date you receive it. In this event the policy shall be deemed void from the beginning and any premium paid for it will be refunded.

ACCIDENT AND SICKNESS POLICY

NON-CANCELLABLE AND GUARANTEED CONTINUABLE
TO AGE 65

QUALIFIED RIGHT TO CONTINUE TO AGE 70

PREMIUMS GUARANTEED TO AGE 65

330 (MW)

330 65-65 (80)

DUPLICATE

INSURED STEPHEN M NEELY MD          POLICY NUMBER 6PC-462691

**NON-CANCELLABLE AND GUARANTEED CONTINUABLE TO AGE 65 AT GUARANTEED PREMIUMS:** You have the right to continue this policy in force by the payment of premiums when due at the premium rate expressed herein until the next premium due date after your 65th birthday.

**QUALIFIED RIGHT TO CONTINUE TO AGE 70:** If you are actively and gainfully employed on a full-time basis on the next premium due date after your 65th birthday, you shall have the guaranteed right to renew this policy to the next premium due date after your 70th birthday by the payment of premiums when due at the Company's premium rates in force at time of renewals. The maximum benefit periods applicable to periods of disability commencing while this policy is so continued are set forth in the Policy Schedule on Page 3. The monthly benefits shall be the same as shown in the Policy Schedule unless you elect to renew this policy with a lesser monthly benefit.

**TERM:** The first term of this policy begins on the Effective Date shown in the Policy Schedule and ends on the First Renewal Date shown therein. Subsequent terms shall be the periods for which renewal premiums are paid by you when due. All terms shall begin and end at 12:01 A.M., Standard Time, at your residence. The renewal premium for each term shall be due on the day the preceding term expires, subject to the Grace Period.

**GRACE PERIOD:** A grace period of 31 days from the date due will be granted for the payment of any premium after the first premium, during which grace period this policy shall continue in force.

**WAIVER OF PREMIUM:** If injuries or Sickness result in Total Disability requiring the care and attendance of a Physician, and if such Total Disability continues for 90 days, the Company (a) will refund any premiums already paid which became due during such 90 day period and (b) will waive the payment of each premium which may thereafter become due during the continuance of such Total Disability, even beyond the period for which indemnity is payable. After the termination of a period of Total Disability during which the premium has been waived, the insurance provided by this policy shall continue in full force and effect, until the next premium due date, at which time you shall have the right to resume the payment of premiums to the extent provided in this policy.

**SUSPENSION DURING MILITARY SERVICE:** If you enter full-time active duty in the military (land, sea or air) service of any nation or international authority (other than active duty for training lasting 3 months or less), you shall have the option to suspend this policy. The provisions of the policy will not be in effect during a period of suspension and premium payment will not be required. If you elect suspension, the Company will, upon receipt of your written request to suspend the policy, refund the pro-rata portion of any premium paid for any period beyond the date such request is received.

Upon termination of your full-time active duty in military service, you shall have the right to place this policy back in force, without evidence of insurability, effective upon receipt by the Company of your written request to place the policy back in force and payment of the required pro-rata premium for coverage until the next premium due date, provided such request and payment is received within 90 days following the date such full-time active duty terminates. Premiums will be payable at the same rate that would have been applicable had the policy remained in force. The policy shall not cover loss resulting from accidental bodily injuries which occurred, or sickness or disease which was first manifested, during the period of suspension. In all other respects you and the Company shall have the same rights under the policy as you each had before it was suspended.

330 65-65 (80)

DUPLICATE

INSURED STEPHEN M NEELY MD          POLICY NUMBER 6PC-462691

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 146 of 256 PageID #: 154

# P O L I C Y   S C H E D U L E

EFFECTIVE DATE – MARCH 04, 1981          FIRST RENEWAL DATE –     JUNE 04, 1981
POLICY PREMIUM – $610.89                 RENEWAL TERM –           THREE MONTHS

---------------------------MONTHLY BENEFIT FOR TOTAL DISABILITY---------------------

ACCIDENT OR SICKNESS – $4,950.00   COMMENCING ON THE 91st DAY OF TOTAL DISABIL-
ITY (NO BENEFITS ARE PAYABLE FOR THE FIRST    DAYS OF TOTAL DISABILITY). BEN-
EFITS ARE PAYABLE FOR AS LONG AS THE APPLICABLE MAXIMUM BENEFIT PERIOD SET
FORTH BELOW.

------------------MAXIMUM BENEFIT PERIODS WHILE TOTALLY DISABLED-----------------

TOTAL DISABILITY COMMENCING PRIOR TO YOUR 65TH BIRTHDAY . . . . . . TO YOUR 65TH
                                                                    BIRTHDAY, BUT
                                                                    NOT LESS THAN
                                                                    24 MONTHS
TOTAL DISABILITY COMMENCING ON OR AFTER YOUR 65TH BIRTHDAY. . . .24 MONTHS

REHABILITATION EXPENSE. . . . . . . . . . . . . . . $4,950.00   MAXIMUM AMOUNT

TREATMENT OF INJURIES (PAID IN LIEU OF OTHER
BENEFITS AT YOUR OPTION). . . . . . . . . . . . $2,475.00   MAXIMUM AMOUNT

-----------------------------ADDITIONAL BENEFITS----------------------------
    (THE PREMIUM SHOWN FOR EACH BENEFIT IS INCLUDED IN THE POLICY PREMIUM)

RESIDUAL DISABILITY..............................PAGE 5(D)..PREMIUM $69.80
   RESIDUAL DISABILITY MONTHLY BENEFIT AMOUNT IS A PERCENTAGE OF THE MONTHLY
   BENEFIT FOR TOTAL DISABILITY SHOWN AT TOP OF THIS PAGE.
COST OF LIVING ADJUSTMENT.........................PAGE 5(E)..PREMIUM $126.35

           THIS POLICY IS ISSUED IN LIEU OF AND REPLACES POLICY
               NUMBER 06 PO- 203641 DATED DECEMBER 01, 1974.

330,65-65 (80)

DUPLICATE

INSURED  STEPHEN M NEELY MD          POLICY NUMBER 6PO-462691

## BENEFIT PROVISIONS

### DEFINITION OF TOTAL DISABILITY:

(a) Until the date you attain age 55, or until the date Indemnity for total disability has been paid during a period of disability under this policy for 5 years, whichever is later, "Total Disability" means your inability to perform the duties of your occupation.

(b) During the continuance of a period of disability beyond the later of either of the two dates named in (a) above, Total Disability means your inability to engage in any gainful occupation in which you might reasonably be expected to engage because of education, training or experience, and with due regard to your vocation and earnings at the beginning of disability.

Nothing in this definition shall be construed to extend or limit the maximum periods for which indemnity for disability is payable under this policy.

### DEFINITION OF PHYSICIAN: "Physician" means any legally qualified physician other than yourself.

### SEPARATE PERIODS OF DISABILITY: Successive periods of disability will be considered separate periods of disability unless the later period of disability is due to the same or a related cause and commences less than 6 months after the end of the previous period of disability.

### TOTAL DISABILITY—ACCIDENT OR SICKNESS: If Injuries or Sickness result in Total Disability, the Company will pay periodically during the continuance of such Total Disability, Indemnity at the rate of the Monthly Benefit for Total Disability shown in the Policy Schedule and commencing on the applicable specified day, but indemnity will not be paid beyond the applicable Maximum Benefit Period shown in the Policy Schedule during a period of disability.

Indemnity will not be paid for disability during any period of time that you are not under the care and attendance of a Physician.

### PRESUMPTIVE TOTAL DISABILITY — LOSS OF SPEECH, HEARING OR SIGHT, OR USE OF TWO LIMBS—ACCIDENT OR SICKNESS: If Injuries or Sickness result in the entire and irrecoverable loss of speech or hearing or sight of both eyes, or result in the entire and irrecoverable loss of the use of both hands, both feet or one hand and one foot, and satisfactory proof of such loss is furnished, you shall be deemed to be totally disabled, irrespective of your ability to engage in any gainful occupation and without requirement of further medical care and attendance. Indemnity will be payable in accordance with the Total Disability provisions of this policy except that payment will begin from the date of such loss, if earlier than the day on which benefits commence as shown in the Policy Schedule and, if such loss occurs prior to your 65th birthday, indemnity will, regardless of the Maximum Benefit Period shown in the Policy Schedule, be paid for so long as you shall live.

### REHABILITATION—ACCIDENT OR SICKNESS:

Total Disability—If Injuries or Sickness result in Total Disability and, while so disabled, you participate in a program of occupational rehabilitation, such participation will not of itself be deemed recovery from Total Disability.

Expense—If Injuries or Sickness result in Total Disability and you participate in occupational rehabilitative training which is approved by the Company, the Company will pay the expense actually incurred by you for such training, but payment shall not exceed in the aggregate the Maximum Amount shown in the Policy Schedule for Rehabilitation Expense.

### TREATMENT OF INJURIES (Payable in lieu of other policy benefits, at your option): If Injuries require medical treatment prescribed by a Physician and no other benefit is paid under this policy for disability or other loss as a result of the same accident, the Company will pay a benefit equal to the expense you incur for such treatment, but payment shall not exceed in the aggregate, as the result of any one accident, the Maximum Amount shown in the Policy Schedule for Treatment of Injuries.

## EXCEPTIONS

This policy does not cover loss caused by (1) war or any act of war, whether war is declared or not; or (2) pregnancy.

C-330-DR(4)

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 148 of 256 PageID #: 156

## AMENDMENT CHANGING "DEFINITION OF TOTAL DISABILITY"

The words "age 65" replace the words "age 55" appearing in paragraph (a) of the "DEFINITION OF TOTAL DISABILITY" on Page 4 of the policy, thereby changing the definition to read as follows:

### "DEFINITION OF TOTAL DISABILITY:

(a) Until the date you attain age 65, or until the date indemnity for total disability has been paid during a period of disability under this policy for 5 years, whichever is later, "Total Disability" means your inability to perform the duties of your occupation.

(b) During the continuance of a period of disability beyond the later of either of the two dates named in (a) above, "Total Disability" means your inability to engage in any gainful occupation in which you might reasonably be expected to engage because of education, training or experience, and with due regard to your vocation and earnings at the beginning of disability.

Nothing in this definition shall be construed to extend or limit the maximum periods for which indemnity for disability is payable under this policy."

This amendment forms a part of the policy to which it is attached.

PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY

W. H. Wyatt
Vice President

330 (65-5)

Amendment Changing "Definition of Total Disability"

The following provision becomes a part of the section of the policy titled "Benefit Provisions."

### RESIDUAL DISABILITY — ACCIDENT OR SICKNESS

(Nothing herein stated shall be construed to limit the policy definition of "Total Disability")

**General Definitions**

"Monthly Income" means monthly income from salary, wages, bonuses, commissions, fees or other remuneration, after deduction of normal and customary business expenses but before deduction of any income taxes, earned for services performed by you. It does not include dividends, rents, royalties, annuities or other forms of unearned income.

"Prior Monthly Income" means your average Monthly Income during the 12 months immediately prior to the period of Total Disability which preceded the Residual Disability for which claim is being made or your average Monthly Income during the calendar year immediately prior to said period of Total Disability, whichever average is the greater.

"Current Monthly Income" means your Monthly Income during each month of Residual Disability for which claim is made.

"Loss of Monthly Income" means the difference between Prior Monthly Income and Current Monthly Income with the loss of income being caused by the Residual Disability for which claim is being made. However, such difference must be at least equal to 25% of Prior Monthly Income to be deemed Loss of Monthly Income under this provision. If the Loss of Monthly Income is more than 75% of Prior Monthly Income, it shall be deemed to be 100%.

"Residual Disability" means:

(a) your inability to perform one or more of your important daily business duties, or

(b) your inability to perform your usual daily business duties for as much time as is usually required for the performance of such duties.

"Monthly Benefit for Total Disability" is shown in the Policy Schedule.

"Residual Disability Monthly Benefit" is the benefit payable for Residual Disability under this provision, determined monthly by the following formula:

$$\frac{\text{Loss of Monthly Income}}{\text{Prior Monthly Income}} \times \text{Monthly Benefit for Total Disability} = \text{Residual Disability Monthly Benefit}$$

**Residual Disability Benefit:**

If Injuries or Sickness result in Residual Disability immediately following a period of Total Disability which resulted from the same or a related cause and such Total Disability continued as long as or longer than the Minimum Qualification Period for Residual Disability specified in the Policy Schedule, the Company, beginning on the later of:

(1) the day following the Minimum Qualification Period for Residual Disability shown in the Policy Schedule, or

(2) the day shown in the Policy Schedule as to when Indemnity for Total Disability would have commenced, or

(3) the day following a period of Total Disability described above for which benefits have been paid,

will pay periodically during the continuance of such Residual Disability, Indemnity at the rate of the Residual Disability Monthly Benefit until your 65th birthday. In no event, however, will Indemnity for Residual Disability be payable for longer than 18 months if you were age 55 or older at the commencement of Total Disability and the period of Total Disability did not exceed 365 days.

Benefits payable for the first 6 months of Residual Disability during a period of disability will be at the rate of 50% of the Monthly Benefit for Total Disability or at the rate of the Residual Disability Monthly Benefit, whichever is greater.

Indemnity for Residual Disability will not be paid (1) for any period of time during which your Loss of Monthly Income is not at least 25% of your Prior Monthly Income, nor (2) for any period of time that you are not under the care and attendance of a Physician, nor (3) for any period of time for which Indemnity is payable under this policy for Total Disability or Presumptive Total Disability.

The Company reserves the right to require reasonable proof of your Current Monthly Income and Prior Monthly Income.

The premium for the above benefit provisions is included in the Policy Premium shown in the Policy Schedule and is also shown separately therein.

PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY

Vice President

330-RD-65

(rc)

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 150 of 256 PageID #: 158

This benefit provision is a part of your policy.

## COST OF LIVING ADJUSTMENT FOR TOTAL AND RESIDUAL DISABILITY

### DEFINITIONS

**CPI-U** means the Consumer Price Index for All Urban Consumers. It is published by the Bureau of Labor Statistics of the United States Department of Labor. If the CPI-U is discontinued or if its method of computation is changed, the Company may use another nationally published index. An index comparable in scope and purpose to the CPI-U will be chosen. CPI-U will then mean the chosen index.

**Review Date** means each anniversary date of the start of a period of disability.

**Index Month** means the calendar month three months before the Review Date. But, the first Index Month means the calendar month three months before the start of a period of disability. All changes in the CPI-U will be measured from the first Index Month.

**Monthly Benefit for Total Disability** is shown on Page 3.

**Adjusted Monthly Benefit for Total Disability** means the Monthly Benefit for Total Disability plus the Cost of Living Adjustment.

### BENEFITS

For Total or Residual Disability, the Cost of Living Adjustment will be computed on each Review Date. In computing the adjustment, the Company will compare the CPI-U for the latest Index Month to the one for the first Index Month.

Annual computations of the Cost of Living Adjustment will end on the earliest of:

1) the date your disability ends, subject to the definition of Separate Periods of Disability on Page 4;
2) the date a benefit period ends; or
3) your 65th birthday.

If the computations end because of 1) or 2) above, benefits payable at the start of a later Separate Period of Disability will not include the Cost of Living Adjustment. A new first Index Month and Review Date will apply to a later Separate Period of Disability.

If the computations end because of 3) above and if you qualify for monthly benefits beyond your 65th birthday for a period of disability starting before your 64th birthday, the Company will continue to pay the same monthly benefit amount payable just before your 65th birthday. No more adjustments will be made. One adjustment will be made on the first Review Date for a period of disability that starts between your 64th and 65th birthdays.

If Injuries or Sickness results in a period of disability lasting at least one year, your benefits will be adjusted as follows:

For Total Disability—

1) For any Monthly Benefit for Total Disability which accrues on or after each Review Date, the Company will pay instead the Adjusted Monthly Benefit for Total Disability.
2) On each Review Date, the Adjusted Monthly Benefit for Total Disability will be computed by multiplying the Monthly Benefit for Total Disability by a factor equal to the CPI-U for the latest Index Month divided by the CPI-U for the first Index Month. But, the Adjusted Monthly Benefit for Total Disability will not:
   a) be paid if you are engaged in any occupation for wage or profit;
   b) exceed the Monthly Benefit for Total Disability increased at 6% compounded annually from the first to the latest Index Month;
   c) exceed two times the Monthly Benefit for Total Disability; or
   d) be reduced below the amount of the Monthly Benefit for Total Disability.
3) If during a period of disability you qualify for Total Disability benefits after Residual Disability benefits were payable, the Company will start paying the Adjusted Monthly Benefit for Total Disability. It will be paid as if your entire period of disability had been Total Disability.

(Continued on Reverse Side)

330-COLA-TR



F I L E D

A.M. MAY 2 5 2017 P.M.
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# II

805 ALDER CT • NASHVILLE, TN 37220
PHONE 615-444-4406 • FAX 615-444-4496 • E-MAIL PRICECHAD@HOTMAIL.COM

# CHAD PRICE

## EMPLOYMENT

Elite Sports Medicine and Orthopaedic Center – *2013-present*

Chad T. Price, MD, PC – *2010- 2013*

Petty Orthopedics and Sports Medicine, *2008-2009*

## EDUCATION

BACHELOR OF SCIENCE

*UNIVERSITY OF TENNESSEE, KNOXVILLE, 1994-1998*

- Major: Biology

DOCTOR OF MEDICINE

*UNIVERSITY OF TENNESSEE, MEMPHIS, 1998-2002*

RESIDENT PHYSICIAN

*UNIVERSITY OF FLORIDA/SHANDS HOSPITAL, GAINESVILLE, 2002-2007*

FELLOWSHIP – Sports Medicine and Shoulder Reconstruction

*STEADMAN HAWKINS CLINIC, SPARTANBURG, SC, 2007-2008*

## AWARDS/HONORS

*Alpha Omega Alpha (2002) – Medical Honor Society*

*Imhotep Society (2000) – UT Memphis leadership honor society*

*Phi Beta Kappa (1998) – academic honor society*

## EXPERIENCE

*Administrative Chief Resident, University of Florida (2006-7)*

*Team Physician, Oak Hall School, Gainesville, FL (2006-2007)*

*Team Physician, Broom High School, Spartanburg, SC (2007)*

*Assistant to Team Physician, University of South Carolina, Upstate (2007)*

*Spring Training Physician, Colorado Rockies (2008)*

*Team Physician, Mt. Juliet High School, Mt. Juliet, TN (2008-present)*

*Affiliate Team Physician, Tennessee Titans (2009-2012)*

## PUBLICATIONS

*"Tibial Fixation of Bone-Patellar Tendon-Bone Grafts in Anterior Cruciate Ligament Reconstruction: A Cadaveric Study of Bovine Bone Screw and Biodegradable Interference Screw" Zheng, Price, Indelicato, AJSM, Dec 2008.*

## LICENSES AND CERTIFICTAIONS

*Tennessee Medical License – 42715*

*Florida Medical License - ME 93221*

*USMLE Exams - Step 1 (1999), Step 2 (2000), Step 3 (2002)*

*Orthopedic Licensing Exam – Board Certified 2010*

*Subspecialty Certification in Sports Medicine – 2012*



**ELITE**
SPORTS MEDICINE AND
ORTHOPAEDIC CENTER

July 15, 2016

This is an Independent Medical Examination for Dr. Steven Neely. Dr. Neely is 70 years of age with a date of birth June 1, 1945. I am a board certified orthopedic surgeon with an additional certificate of qualification in sports medicine. My CV is attached.

Dr. Neely was involved in an accident on May 5, 2015. He was performing a total hip replacement 300 pound patient. While pulling on a bone to dislocate the femoral head, he felt a strain in his shoulder. He then had a second accident on May 11, 2015 while performing a total knee replacement. He was pulling out the intramedullary guide rod and felt another strain in the same right shoulder.

Since the incident under the care of Dr. Jon Cornelius. I have his records available for review. He has attempted physical therapy, and intra-articular injection of steroids, rest, and activity modification. An MRI was performed on July 23, 2015. The MRI showed a high-grade partial-thickness rotator cuff tear of the infraspinatus, a labral tear with associated paralabral cysts, and a low-grade partial-thickness tear of the supraspinatus. So far the nonsurgical treatments to Dr. Neely's shoulder have been unsuccessful. He continues to have pain with overhead activity, weakness with overhead activity and with extension of the arm away from the body, and a moderate degree of rest pain. Professionally this is caused him to stop operating. Being his dominant arm, he was unable to continue safely performing surgery. The weakness and pain have also caused him to limit recreational activities that he wants enjoyed such as golf. He has considered surgical treatment for his shoulder; however, he has significant medical risk from his cardiac condition. In addition, his cardiologist does not want him to stop anticoagulants. This bleeding risk complicates the potential for arthroscopic surgery.

NASHVILLE • MIDTOWN • MEDICALPLAZAII • 2021 CHURCH STREET, SUITE 200 • NASHVILLE, TENNESSEE 37203
NASHVILLE • GREEN HILLS • 2001 WOODMONT BLVD • NASHVILLE, TENNESSEE 37216
NASHVILLE • CENTENNIAL CAMPUS • 356 24TH AVENUE NORTH, SUITE 200 • NASHVILLE, TENNESSEE 37203
COOLSPRINGS • MEDICAL OFFICE BUILDING • 7105 SOUTH SPRINGS DRIVE, SUITE 100 & 111 • FRANKLIN, TENNESSEE 37067
LEBANON • MEDICAL OFFICE BUILDING • 107 GLIDEPATH WAY • LEBANON, TENNESSEE 37090
phone 615.284.1600 • toll free 877.284.3840 • fax 615.284.0008
www.ELITEORTHOPAEDIC.com



**ELITE**
SPORTS MEDICINE AND
ORTHOPAEDIC CENTER

## Physical examination

He has a well-developed well-nourished male in no acute distress and cooperative with the examination.

Right shoulder

- full passive range of motion in all planes including 160° forward elevation, 65° external rotation at the side, at 90° of abduction there is 90° of external rotation and 60° internal rotation.
- Active range of motion - 140° forward elevation, 65° external rotation at the side, internal rotation to L2 midline
- Strength testing – 4/5 abduction; 4+/5 external rotation; 5/5 internal rotation; 5/5 biceps and triceps; 5/5 wrist flexion and extension; 5/5 hand intrinsics
- Signs - positive Neer, positive Hawkins, positive O'Brien's, negative apprehension, negative posterior drawer
- Neurovascular - 2+ radial pulse, normal sensation, normal reflexes

Cervical spine - expected range of motion with no pain; negative Spurling's sign bilaterally

Left shoulder

- Full passive and active range of motion in all planes
- Strength testing – 5/5 abduction, external rotation, internal rotation of the shoulder; 5/5 biceps, triceps, wrist flexion and extension, hand intrinsics
- Signs - negative Neer, Hawkins, O'Brien's, apprehension, posterior drawer
- Neurovascular - 2+ radial pulse, normal sensation, normal reflexes

## Impression

This is a 70-year-old orthopedic surgeon with a work-related injury to his right shoulder. This injury is now over a year old. Dr. Neely has been unable to return to his normal occupation as an operating orthopedic surgeon as a result of this injury. I find that because of his weakness in the dominant shoulder that he would have reasonable difficulty performing total joint replacement surgery. This type

NASHVILLE• MIDTOWN • MEDICAL PLAZA II • 2021 CHURCH STREET, SUITE 200 • NASHVILLE, TENNESSEE 37203
NASHVILLE • GREEN HILLS • 2001 WOODMONT BLVD • NASHVILLE, TENNESSEE 37215
NASHVILLE • CENTENNIAL CAMPUS • 356 24TH AVENUE NORTH, SUITE 200 • NASHVILLE, TENNESSEE 37203
COOLSPRINGS • MEDICAL OFFICE BUILDING • 7105 SOUTH SPRINGS DRIVE, SUITE 100 & 111 • FRANKLIN, TENNESSEE 37067
LEBANON • MEDICAL OFFICE BUILDING • 107 GLIDEPATH WAY • LEBANON, TENNESSEE 37090
phone 615.324.1600 • toll free 877.284.3040 • fax 615.284.2008
www.ELITEORTHOPAEDIC.com •



ELITE
SPORTS MEDICINE AND
ORTHOPAEDIC CENTER

of surgery is very physically demanding. Maneuvers such as dislocating a hip, holding a saw at eye level to perform the necessary cuts, and using a hammer to impact components would not be possible due to the level of weakness demonstrated in his right shoulder. Given that extensive conservative treatment has failed to alleviate his symptoms and return his strength and normal, I think it is unlikely that his shoulder strength will return to a level necessary to perform orthopedic surgery. There is a possibility that operative intervention might help, but there are no guarantees that his strength would return to normal even with surgery. I will give him permanent restrictions of no overhead lifting, no lifting/pushing/pulling greater than 10 pounds with the right arm, and no repetitive overhead movements. I give these opinions with a reasonable degree of medical certainty.

Sincerely,

Chad T Price M.D.

NASHVILLE • MIDTOWN • MEDICALPLAZAII • 2021 CHURCH STREET, SUITE 200 • NASHVILLE, TENNESSEE 37203
NASHVILLE • GREEN HILLS • 2001 WOODMONT BLVD • NASHVILLE, TENNESSEE 37215
NASHVILLE • CENTENNIAL CAMPUS • 366 24TH AVENUE NORTH, SUITE 200 • NASHVILLE, TENNESSEE 37203
COOLSPRINGS • MEDICAL OFFICE BUILDING • 7105 SOUTH SPRINGS DRIVE, SUITE 100 & 111 • FRANKLIN, TENNESSEE 37067
LEBANON • MEDICAL OFFICE BUILDING • 107 OLDEPATH WAY • LEBANON, TENNESSEE 37090
phone 615.324.1600 • toll free 877.284.5840 • fax 615.284.2006
WWW.ELITEORTHOPAEDIC.com



F I L E D

A.M. MAY 2 5 2017 P.M.

BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# III

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: 1-888-226-7959
Fax: 1-866-562-4794
www.unum.com



May 25, 2016

STEPHEN M NEELY MD
169 POWELL GROVE ROAD
LEBANON, TN 37090

RE:   Neely, Stephen M
      Claim Number:            5200462691001
      Provident Life and Accident Insurance Company

Dear Dr. Neely:

This letter is a follow-up to our conversation on May 25, 2016 about the decision we have made on your Individual Disability benefits. As we discussed, we will not be able to approve your claim and continue the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason
- Information about your benefit check
- Other important information
- Information that supports our decision
- Provisions outlined in your Individual disability policy
- Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

02875005511400601

**Decision/Reason:**

We have determined that you are able to perform the duties of your occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent you from performing these duties on a full-time basis.

Because you are not disabled according to the policy, benefits are not payable.

**Information About Your Benefit Check:**

Our last benefit payment, in the amount of $4,950.00, was mailed directly to you on April 27, 2016.

**Other Important Information:**

We provided benefits under a Reservation of Rights while our claim decision was pending. We paid four months' worth of benefits, totaling $19,800.00. We will not be requesting repayment of these benefits.

**Information That Supports Our Decision:**

We received your claim on January 21, 2016. You stated that as of October 1, 2015 you were no longer performing the duties of your occupation as an orthopedic surgeon. You were seeing patients for regular office visits and independent medical evaluations, but not performing surgery.

You explained that you were unable to continue working due to an injury that occurred on May 5, 2015 while you were doing an orthopedic procedure. You tried to dislocate a hip with a bone hook and felt a sharp pain in your right shoulder, followed by weakness. You continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Your treatment plan included injections and topical creams. You state that your shoulder became inflamed but you tried to continue performing surgery; however, you were unable to do so.

You informed us you stopped performing surgeries on September 30, 2015 because of shoulder pain and because it was taking longer for you to complete procedures.

On the Attending Physician Statement completed by Dr. Jonathan P. Cornelius on January 20, 2016, he listed restrictions of "no lifting, pushing, pulling over 15 lbs, right arm" and "no work at shoulder level or above with right arm." He listed limitations of "He is unable to transfer patients to OR table, unable to position patients on OR table, unable to manipulate patient's extremities during orthopedic surgery, unable to use OR equipment, such as mallets or saws..., unable to examine heavy patients." Dr. Cornelius gave the duration of these restrictions and limitations as extending from September 30, 2015 to "permanent."

We requested treatment records from Dr. Cornelius. This information was reviewed by our physician who is board-certified in orthopedic surgery. The records indicate that you reported right shoulder injuries on May 5 and May 11, 2015, but were not advised to stop working until September 30, 2015. You were able to golf after the incidents. Our physician told us that the

July 23, 2015 MRI revealed primarily tendinosis of cuff with questioned tearing, no retraction of tendons, and no atrophy of cuff muscles.

To improve our understanding of your condition and any associated restrictions (activities you should not do) and limitations (activities you cannot do), our physician spoke to Dr. Cornelius on March 9, 2016. Dr. Cornelius said that there were no surgical indications, and no muscle atrophy on the MRI, but added that you were noticing weakness while doing surgery.

You continued to work as a primary surgeon for joint replacement and shoulder arthroscopy, as documented in the 2015 CPT code information submitted by your employer. The CPT data shows that you continued to perform surgery through September 2015; no surgeries were noted after September 2015. Although the months of May and June 2015 appear to show billing charges below prior months' charges, the charges increased in July 2015 and August 2015 to a level similar to some months prior to May 2015. Billing charges were lower in May and June 2015 when compared to previous months, but they increased in July and August 2015 to approximate prior levels.

Our physician advised us that restrictions and limitations are not supported by the medical information. Our physician noted that your shoulder does not need surgery, and your range of motion was satisfactory with no obvious atrophy of shoulder musculature. Our physician further noted that in the month when you stopped doing surgery, September 2015, you also performed procedures that would require right shoulder strength and mobility; these procedures reflected your usual and customary procedures prior to your reported injury in May 2015.

Our vocational consultant reviewed the occupation information provided to us, including your Occupation Description form, Physician Questionnaire, and CPT/production data from your employer. The important duties of your occupation involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient exam, review of x-rays, performing injections, prescribing medication and physical therapy, performing office-based procedures (e.g., aspirations, debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

The strength demands of your occupation are in the "light" range. "Light" is defined as the occasional lifting or applying force up to 20 lbs. or the frequent lifting or applying force up to 10 lbs. Other physical demands of your occupation include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

Our physician advised us that the medical records support your ability to perform the physical demands of your occupation.

In view of the lack of agreement between our physician and Dr. Cornelius on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported, explaining that the limited diagnostic findings and limited treatment are not consistent with a severity of pain that would be expected to impact your functional capacity.

Based on our review, the information in your claim file indicates you are able to perform the duties of your own occupation on a full-time basis. As you do not meet the policy's definition of Total Disability, we are unable to approve your claim and provide further benefits. Your claim has been closed effective May 25, 2016.

### Information about the waiver of premium benefit

Your policy provides a Waiver of Premium benefit, which was approved as of November 1, 2015. Please note that the refund of the November 1, 2015 semi-annual premium was paid under Reservation of Rights. Your policy premiums are due on a semi-annual basis (May 1 and November 1 of each year). Waiver of premium will end and billing will resume starting with the November 1, 2016 premium.

### Policy renewal information

In order to keep this policy in force, you must be actively and gainfully working full time; there is no age limit. Before the enhancement that was effective on June 1, 1986, you could renew your policy only to age 75. Your policy is now renewable for life.

### Policy Provisions And Definitions:

The following provisions and definitions are applicable to our claim decision.

### Individual Disability policy 6PC-462691

We included a copy of your Individual Disability policy 6PC-462691 with our previous letter dated February 8, 2016. The following policy provisions and/or definitions can be found in that copy.

- Information regarding the renewability of your policy after age 65 can be found on the policy Improvement brochure dated April 1987
- The definition for "Waiver of Premium" can be found on page 2 of the policy
- The definition for "Total Disability" can be found on page 4
- The amendment changing the "Definition Of Total Disability" can be found on page 5(A)

### Next Steps Available To You:

### What if you disagree with the decision and you have *new information* to submit?

If you disagree with our decision and you have new information to submit, you may request to have your file reevaluated by the Disability Benefits Specialist who made the initial decision.

### How much time do you have to request a reevaluation of your claim?

Please submit your written request within 180 days from the date you receive this letter.

### How does the reevaluation process work?

If you have new information you want us to consider, please send it to us as soon as possible. The Disability Benefits Specialist who made the initial decision will review the claim again, taking the new information into consideration. The Disability Benefits Specialist will provide you with a written response within 90 days of our receipt of the new information.

After this review, we will send you a letter explaining our decision. If you still disagree with our decision, you will have the option to request an additional independent review by our Appeals Department.

### What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for reevaluation and new information?

Reevaluation Request
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

### What if you disagree with the decision, but *do not have new information to submit?*

If you disagree with our decision but do not have new information to submit, you may request to have your file reviewed by our Appeals Department. Please submit a written letter of appeal outlining the basis for your disagreement.

### How much time do you have to request an Appeal?

Please submit your written request for appeal within 180 days from the date you receive this letter.

### How does the Appeal process work?

An Appeals Specialist will review your entire claim and may consult medical and vocational experts or other resources. The Appeal Specialist will make an independent decision on your claim.

### How much time does the Appeal review take?

We are committed to making an appeal decision within 45 days after we receive your written appeal. There may be special circumstances in which the review can take longer. We will notify you if more time is needed.

### What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for Appeal?

The Appeals Unit
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

We will send you a letter acknowledging receipt of your request within 7 days.

Dr. Neely, if you have questions about your claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension 75352.

We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist



F I L E D

MAY 25 2017

A.M. 3:29 P.M.

BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# IV

Jason G. Denton
615/443-8772
jdenton@rma-law.com



Rochelle, McCulloch & Aulds, PLLC

ATTORNEYS AT LAW

Jere N. McCulloch
(1973 – 2013)

Robert Rochelle
Jo Ann "Jody" Aulds
David B. Foutch
Alan Poindexter
Gregory S. Gill
Julie M. Robinson
T. Price Thompson, III
Byron M. Gill
Jason G. Denton
Matthew H. Ryan
Tom Walsh
Debra L. Dishmon
Brett Rozell

September 7, 2016

*via facsimile 866.562.4794*
*and FedEx No.:*

UNUM
The Appeals Unit
P.O. Box 15112
Worcester, MA 01615-0112

RE:  Client/Claimant:  Stephen Neely
     Claim No.:        5200462691001

## NOTICE OF APPEAL OF DENIAL OF INDIVIDUAL DISABILITY BENEFITS

To the Appeals Unit:

Please be advised that Dr. Stephen Neely does hereby appeal the denial of individual disability benefits for his right shoulder injuries that occurred while he was at work on May 5, 2015 and May 11, 2015 *(please see attached denial, Exhibit A)*. In support of this appeal, attached please find causation and damage statements from Dr. Gregory White and Dr. Chad Price, as well as affidavits from Dr. Stephen Neely, Dr. Jonathan Cornelius, David Eldridge, and Kenny Oliver *(please see attached, collective Exhibit B)*.

### I.  Dr. Neely No Longer Can Perform Physically Accurate Surgeries

Dr. Neely has been irreparably damaged as a result of his injuries. He is an orthopaedic surgeon, and did perform orthopaedic surgeries at an extremely high rate before 2015. Surgeries require very precise maneuvers and 100% accuracy, and his physical limitations simply prevented him from continuing as he had in the past. The required physical demands of the surgeries are intense. He was unable to perform a number of duties that were required to make each surgery a success. Dr. Neely opposes the description by your vocational consultant that orthopaedic surgery is "light" work, as it is a very strenuous activity that requires banging and cutting limbs and bones with hammers and saws, and is incredibly taxing on the body.

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 166 of 256 PageID #: 174



Dr. Neely could not simply modify his operative techniques after he realized he could not get his right arm in a stable position to make pocket saw cuts. There were legal considerations Dr. Neely had to take into consideration as well because he knew his lack of strength, dexterity, and precision were compromised. Counter to what is in his denial report, Dr. Neely desperately worked on improving his physical conditioning through range of motion and band exercises once a day for over a month. He was confident he could do those exercises as part of his physical therapy, as he is an orthopaedic surgeon and knows the importance of repetition, stretching, and strengthening. Also, it is mentioned in the denial report that he was able to modify his golf swing after his work injuries, and as such, should be able to modify his surgical operative techniques. That is a correct statement about his golf swing, but it has literally no bearing on his ability to perform life-altering, corrective surgical procedures at a very high level as he had done numerous times in the past. Standing on a practice range striking golf balls posed no risk to anyone but Dr. Neely. Inaccurately hitting, splicing, or hooking a golf ball holds no weight as compared to the consequence of being even millimeters off when performing surgery on a patient's body. You cannot simply remove more bone and tissue if mistakes are made and assume that the results would be as good as index perfect cuts.

As it was becoming apparent that Dr. Neely could not perform his surgical duties as he had in the past due to pain and weakness in his right arm and shoulder, Dr. Jonathon Cornellius was brought along to help with the remaining surgeries he had through July, August, and September of 2015. Dr. Neely is a very well-respected surgeon in Middle Tennessee, and many of the surgeries from July through September 2015 were scheduled many months in advance. He felt he could not let those patients down by cancelling or not being involved in the ones that were already scheduled, but he could not fully participate in them as well. Dr. Neely would adhere to the lighter physical work as he could during this time, and Dr. Cornellius would use the mallet and saw and perform all or most of the physical and grueling parts of these procedures when Dr. Neely could not. As a result of that arrangement, he split the fees with Dr. Cornellius accordingly. That is the reason that billing codes were still high during this period even though Dr. Neely was not performing the physically demanding aspects of them.

## II.    Supportive Medical Testimony

In his letter, Dr. Gregory White gives his opinion as an active general orthopedic surgeon that orthopedic surgery in general, and specifically the practice of total joint and trauma surgery, are two of the most physically demanding and labor-intensive of all surgical disciplines. It often requires lifting, holding, and manipulation of very heavy, dead-weighted extremities, and

2 | P a g e

Case 3:17-cv-00996    Document 1-2    Filed 06/29/17    Page 167 of 256 PageID #: 175



can be performed at awkward positions which require significant strength and stamina, and also puts great stress on the surgeons' body.

Dr. Chad Price performed an Independent Medical Exam of Dr. Neely on July 15, 2016. It shows that an MRI was performed on July 23, 2015, which found a high-grade partial-thickness rotator cuff tear of the infraspinatus, a labral tear with associated paralabral cysts, and a low-grade partial-thickness tear of the supraspinatus. Dr. Price opined that nonsurgical treatments to the shoulder had been unsuccessful, and there was continued pain and weakness resulting in Dr. Neely no longer performing surgery because of safety issues, and recreational activities had also been greatly limited. Dr. Price unequivocally states that Dr. Neely is unable to return to his normal occupation as an operating surgeon as a result of his work-related shoulder injuries. Weakness would cause reasonable difficulty in maneuvers such as dislocating a hip, and holding a saw at eye level to perform necessary cuts. Using a hammer to impact components would not be possible due to the physically-demanding task of performing total joint replacement surgeries.

In his affidavit, Dr. Stephen Neely states that he injured his right shoulder on May 5, 2015 while performing a hip procedure. He continued to work as normal, and approximately one week later, injured his shoulder again during a total knee replacement on an obese patient. An effort was made to continue operating on a reduced surgical schedule, but he was unable to complete some of the tasks necessary on a routine basis. Unable to safely use the saw or mallet, Dr. Cornellius' services were required to complete already scheduled hip, shoulder, and knee surgeries from July through September 2015. During this time, Dr. Neely lost approximately $10,000.00 as the receipts from surgery that were split with Dr. Cornellius, and the portions in which Dr. Neely could not perform were completed by Dr. Cornellius. Due to the worsening of his shoulder, Dr. Neely had to stop performing surgeries on September 30, 2015.

Dr. Jonathon Cornellius opines in his affidavit that he assisted Dr. Neely during the months of July through September 2015 because Dr. Neely was unable to perform multiple hip, shoulder, and knee procedures by himself because of his shoulder injuries. Dr. Neely continued to worsen so much that he could not perform any surgery of any kind after September 30, 2015. Dr. Cornellius completed an Attending Physician Statement, giving Dr. Neely permanent restrictions of no lifting, pushing, or pulling over 15 pounds with his right arm and no work at shoulder level or above with his right arm. It was also noted that Dr. Neely was no longer able to transfer patients to the operating table, unable to position patients on the operating table, and unable to manipulate patient's extremities during orthopedic surgery, unable to use equipment in the operating room such as mallets or saws, and unable to examine heavy patients.

3 | P a g e

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 168 of 256 PageID #: 176



Rochelle, McCulloch & Aulds, PLLC

David Eldridge and Kenny Oliver are certified surgical technicians and certified first assistants, and have worked with Dr. Neely for 25 years. In their affidavits, Mr. Eldridge and Mr. Oliver state that Dr. Neely hurt his right shoulder on May 5, 2015, then reinjured it one week later. Due to those injuries, Dr. Neely was unable to perform total shoulder arthroplasty or total hip replacements by himself. It was noted that Dr. Cornellius scrubbed in to assist in surgeries from July through September 2015, and that Dr. Neely has not been able to perform surgery at all since September 2015.

## III.   Conclusion

As is stated above, Dr. Neely's permanent medical injuries and conditions prevent him from performing his duties as an orthopaedic surgeon in an accurate, safe, and physically beneficial manner for his clients without the medical and physical assistance of another surgeon or medical professional. Therefore, the previous denial of individual disability benefits for his 2015 shoulder injuries is hereby appealed. Dr. Neely requests that these benefits be approved going forward, and back benefits be rewarded from May 2016, the time when benefits were denied. Your time and consideration of this matter is greatly appreciated.

Sincerely,

ROCHELLE, McCULLOCH & AULDS, PLLC

Jason G. Denton

JGD/blr

Enclosures

4 | P a g e

www.rma-law.com
109 North Castle Heights Avenue • Lebanon, TN 37087 • 615/444-1433 • Fax 615/443-8775
2745 North Mt. Juliet Road • Mt. Juliet, TN 37122



F I L E D

A.M. MAY 2 5 2017 P.M.
3:29

BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# EXHIBIT

# A

Unum
The Benefit Center
PO Box 100202
Columbia, SC 20202
Phone: 1-888-226-7959
Fax: 1-800-562-4784
www.unum.com



May 25, 2016

STEPHEN M NEELY MD
169 POWELL GROVE ROAD
LEBANON, TN 37090

RE:   Neely, Stephen M
      Claim Number:              5200462691001
      Provident Life and Accident Insurance Company

Dear Dr. Neely:

This letter is a follow-up to our conversation on May 25, 2016 about the decision we have made on your Individual Disability benefits. As we discussed, we will not be able to approve your claim and continue the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason
- Information about your benefit check
- Other important Information
- Information that supports our decision
- Provisions outlined in your Individual disability policy
- Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1342-00

02875006511400601

## Decision/Reason:

We have determined that you are able to perform the duties of your occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent you from performing these duties on a full-time basis.

Because you are not disabled according to the policy, benefits are not payable.

## Information About Your Benefit Check:

Our last benefit payment, in the amount of $4,950.00, was mailed directly to you on April 27, 2016.

## Other Important Information:

We provided benefits under a Reservation of Rights while our claim decision was pending. We paid four months' worth of benefits, totaling $19,800.00. We will not be requesting repayment of these benefits.

## Information That Supports Our Decision:

We received your claim on January 21, 2016. You stated that as of October 1, 2015 you were no longer performing the duties of your occupation as an orthopedic surgeon. You were seeing patients for regular office visits and independent medical evaluations, but not performing surgery.

You explained that you were unable to continue working due to an injury that occurred on May 5, 2015 while you were doing an orthopedic procedure. You tried to dislocate a hip with a bone hook and felt a sharp pain in your right shoulder, followed by weakness. You continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Your treatment plan included injections and topical creams. You state that your shoulder became inflamed but you tried to continue performing surgery; however, you were unable to do so.

You informed us you stopped performing surgeries on September 30, 2015 because of shoulder pain and because it was taking longer for you to complete procedures.

On the Attending Physician Statement completed by Dr. Jonathan P. Cornelius on January 20, 2016, he listed restrictions of "no lifting, pushing, pulling over 15 lbs., right arm" and "no work at shoulder level or above with right arm." He listed limitations of "He is unable to transfer patients to OR table, unable to position patients on OR table, unable to manipulate patient's extremities during orthopedic surgery, unable to use OR equipment, such as mallets or saws..., unable to examine heavy patients." Dr. Cornelius gave the duration of these restrictions and limitations as extending from September 30, 2015 to "permanent."

We requested treatment records from Dr. Cornelius. This information was reviewed by our physician who is board-certified in orthopedic surgery. The records indicate that you reported right shoulder injuries on May 5 and May 11, 2015, but were not advised to stop working until September 30, 2015. You were able to golf after the incidents. Our physician told us that the

0287500551400602



July 23, 2015 MRI revealed primarily tendinosis of cuff with questioned tearing, no retraction of tendons, and no atrophy of cuff muscles.

To improve our understanding of your condition and any associated restrictions (activities you should not do) and limitations (activities you cannot do), our physician spoke to Dr. Cornelius on March 9, 2016. Dr. Cornelius said that there were no surgical indications, and no muscle atrophy on the MRI, but added that you were noticing weakness while doing surgery.

You continued to work as a primary surgeon for joint replacement and shoulder arthroscopy, as documented in the 2015 CPT code information submitted by your employer. The CPT data shows that you continued to perform surgery through September 2015; no surgeries were noted after September 2015. Although the months of May and June 2015 appear to show billing charges below prior months' charges, the charges increased in July 2015 and August 2015 to a level similar to some months prior to May 2015. Billing charges were lower in May and June 2015 when compared to previous months, but they increased in July and August 2015 to approximate prior levels.

Our physician advised us that restrictions and limitations are not supported by the medical information. Our physician noted that your shoulder does not need surgery, and your range of motion was satisfactory with no obvious atrophy of shoulder musculature. Our physician further noted that in the month when you stopped doing surgery, September 2015, you also performed procedures that would require right shoulder strength and mobility; these procedures reflected your usual and customary procedures prior to your reported injury in May 2015.

Our vocational consultant reviewed the occupation information provided to us, including your Occupation Description form, Physician Questionnaire, and CPT/production data from your employer. The important duties of your occupation involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient exam, review of x-rays, performing injections, prescribing medication and physical therapy, performing office-based procedures (e.g., aspirations, debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

The strength demands of your occupation are in the "light" range. "Light" is defined as the occasional lifting or applying force up to 20 lbs, or the frequent lifting or applying force up to 10 lbs. Other physical demands of your occupation include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

Our physician advised us that the medical records support your ability to perform the physical demands of your occupation.

In view of the lack of agreement between our physician and Dr. Cornelius on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported, explaining that the limited diagnostic findings and limited treatment are not consistent with a severity of pain that would be expected to impact your functional capacity.

Based on our review, the information in your claim file indicates you are able to perform the duties of your own occupation on a full-time basis. As you do not meet the policy's definition of Total Disability, we are unable to approve your claim and provide further benefits. Your claim has been closed effective May 25, 2016.

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 173 of 256 PageID #: 181

## Information about the waiver of premium benefit

Your policy provides a Waiver of Premium benefit, which was approved as of November 1, 2015. Please note that the refund of the November 1, 2015 semi-annual premium was paid under Reservation of Rights. Your policy premiums are due on a semi-annual basis (May 1 and November 1 of each year). Waiver of premium will end and billing will resume starting with the November 1, 2016 premium.

## Policy renewal information

In order to keep this policy in force, you must be actively and gainfully working full time; there is no age limit. Before the enhancement that was effective on June 1, 1986, you could renew your policy only to age 75. Your policy is now renewable for life.

## Policy Provisions And Definitions:

The following provisions and definitions are applicable to our claim decision.

### Individual Disability policy 6PC-462691

We included a copy of your Individual Disability policy 6PC-462691 with our previous letter dated February 8, 2016. The following policy provisions and/or definitions can be found in that copy.

- Information regarding the renewability of your policy after age 65 can be found on the policy Improvement brochure dated April 1987
- The definition for "Waiver of Premium" can be found on page 2 of the policy
- The definition for "Total Disability" can be found on page 4
- The amendment changing the "Definition Of Total Disability" can be found on page 5(A)

## Next Steps Available To You:

### What if you disagree with the decision and you have *new information* to submit?

If you disagree with our decision and you have new information to submit, you may request to have your file reevaluated by the Disability Benefits Specialist who made the initial decision.

### How much time do you have to request a reevaluation of your claim?

Please submit your written request within 180 days from the date you receive this letter.

### How does the reevaluation process work?

If you have new information you want us to consider, please send it to us as soon as possible. The Disability Benefits Specialist who made the initial decision will review the claim again, taking the new information into consideration. The Disability Benefits Specialist will provide you with a written response within 90 days of our receipt of the new information.

After this review, we will send you a letter explaining our decision. If you still disagree with our decision, you will have the option to request an additional independent review by our Appeals Department.



**What information is available to you?**

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

**Where do you mail or fax your written request for reevaluation and new information?**

Reevaluation Request
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

**What if you disagree with the decision, but _do not have new information_ to submit?**

If you disagree with our decision but do not have new information to submit, you may request to have your file reviewed by our Appeals Department. Please submit a written letter of appeal outlining the basis for your disagreement.

**How much time do you have to request an Appeal?**

Please submit your written request for appeal within 180 days from the date you receive this letter.

**How does the Appeal process work?**

An Appeals Specialist will review your entire claim and may consult medical and vocational experts or other resources. The Appeal Specialist will make an independent decision on your claim.

**How much time does the Appeal review take?**

We are committed to making an appeal decision within 45 days after we receive your written appeal. There may be special circumstances in which the review can take longer. We will notify you if more time is needed.

**What information is available to you?**

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

**Where do you mail or fax your written request for Appeal?**

The Appeals Unit
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

We will send you a letter acknowledging receipt of your request within 7 days.

Dr. Neely, if you have questions about your claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension 75352.

02875005511400602

We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist

02875005511400602    00002035



F I L E D
A.M. MAY 2 5 2017 P.M.
3 . 2 9
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# EXHIBIT

# B



## FLORIDA HOSPITAL
### NEW SMYRNA
**HealthCare Partners**

Dear Mr. Denton,

    I am writing to you as an active general orthopedic surgeon, to express my objection to the notion that the practice of orthopedic surgery is less than exceptionally strenuous. Orthopedic surgery, specifically the practice of total joint and trauma surgery are two of the most physically demanding and labor-intensive of all surgical disciplines. Performing these procedures often requires lifting, holding, and manipulation of very heavy extremities in order to achieve stability in the repair long bone fractures or to manipulate joint implants to attain joint stability. Often times, this is performed from awkward positions requiring the weight of the extremity to be lifted and manipulated away from the surgeons body. Doing this moves the center of gravity away from the surgeon's body which multiplies the stress moment arm and thusly, requires significant strength and stamina.

    Orthopedic surgery, as a surgical specialty may be the most physically strenuous of the surgical specialties, and is supported by multiple articles in peer reviewed literature and sustained by the American Academy of Orthopedic Surgery. I hope this can contribute to your knowledge when considering the physical requirements of an orthopedic practice.

Sincerely,

Gregory G. White MD, FAAOS, FACS

**Gregory White, MD**
Orthopaedics

600 Palmetto Street • New Smyrna Beach, FL 32168
Office: (386) 424-3845 • Fax: (386) 424-3847

www.HCPPhysicians.org

805 ALDER CT • NASHVILLE, TN 37220
PHONE 615-444-4406 • FAX 615-444-4490 • E-MAIL PRICECHAD@HOTMAIL.COM

# CHAD PRICE

## EMPLOYMENT

Elite Sports Medicine and Orthopaedic Center – *2013-present*

Chad T. Price, MD, PC – *2010-2013*

Petty Orthopedics and Sports Medicine, *2008-2009*

## EDUCATION

BACHELOR OF SCIENCE

*UNIVERSITY OF TENNESSEE, KNOXVILLE, 1994-1998*

- Major: Biology

DOCTOR OF MEDICINE

*UNIVERSITY OF TENNESSEE, MEMPHIS, 1998-2002*

RESIDENT PHYSICIAN

*UNIVERSITY OF FLORIDA/SHANDS HOSPITAL, GAINESVILLE, 2002-2007*

FELLOWSHIP – Sports Medicine and Shoulder Reconstruction

*STEADMAN HAWKINS CLINIC, SPARTANBURG, SC, 2007-2008*

## AWARDS/HONORS

*Alpha Omega Alpha (2002) – Medical Honor Society*

*Imhotep Society (2000) – UT Memphis leadership honor society*

*Phi Beta Kappa (1998) – academic honor society*

## EXPERIENCE

*Administrative Chief Resident, University of Florida (2006-7)*

*Team Physician, Oak Hall School, Gainesville, FL (2006-2007)*

*Team Physician, Broom High School, Spartanburg, SC (2007)*

*Assistant to Team Physician, University of South Carolina, Upstate (2007)*

*Spring Training Physician, Colorado Rockies (2008)*

*Team Physician, Mt. Juliet High School, Mt. Juliet, TN (2008-present)*

*Affiliate Team Physician, Tennessee Titans (2009-2012)*

## PUBLICATIONS

*"Tibial Fixation of Bone-Patellar Tendon-Bone Grafts in Anterior Cruciate Ligament Reconstruction: A Cadaveric Study of Bovine Bone Screw and Biodegradable Interference Screw" Zheng, Price, Indelicato, AJSM, Dec 2008.*

## LICENSES AND CERTIFICTAIONS

*Tennessee Medical License – 42715*

*Florida Medical License - ME 93221*

*USMLE Exams – Step 1 (1999), Step 2 (2000), Step 3 (2002)*

*Orthopedic Licensing Exam – Board Certified 2010*

*Subspecialty Certification in Sports Medicine – 2012*



**ELITE**
SPORTS MEDICINE AND
ORTHOPAEDIC CENTER

July 15, 2016

This is an Independent Medical Examination for Dr. Steven Neely. Dr. Neely is 70 years of age with a date of birth June 1, 1945. I am a board certified orthopedic surgeon with an additional certificate of qualification in sports medicine. My CV is attached.

Dr. Neely was involved in an accident on May 5, 2015. He was performing a total hip replacement 300 pound patient. While pulling on a bone to dislocate the femoral head, he felt a strain in his shoulder. He then had a second accident on May 11, 2015 while performing a total knee replacement. He was pulling out the intramedullary guide rod and felt another strain in the same right shoulder.

Since the incident under the care of Dr. Jon Cornelius, I have his records available for review. He has attempted physical therapy, and intra-articular injection of steroids, rest, and activity modification. An MRI was performed on July 23, 2015. The MRI showed a high-grade partial-thickness rotator cuff tear of the infraspinatus, a labral tear with associated paralabral cysts, and a low-grade partial-thickness tear of the supraspinatus. So far the nonsurgical treatments to Dr. Neely's shoulder have been unsuccessful. He continues to have pain with overhead activity, weakness with overhead activity and with extension of the arm away from the body, and a moderate degree of rest pain. Professionally this is caused him to stop operating. Being his dominant arm, he was unable to continue safely performing surgery. The weakness and pain have also caused him to limit recreational activities that he wants enjoyed such as golf. He has considered surgical treatment for his shoulder; however, he has significant medical risk from his cardiac condition. In addition, his cardiologist does not want him to stop anticoagulants. This bleeding risk complicates the potential for arthroscopic surgery.

NASHVILLE • MIDTOWN • MEDMALLPLAZA II • 2021 CHURCH STREET, SUITE 200 • NASHVILLE, TENNESSEE 37203
NASHVILLE • GREEN HILLS • 2001 WOODMONT BLVD • NASHVILLE, TENNESSEE 37215
NASHVILLE • CENTENNIAL CAMPUS • 356 24TH AVENUE NORTH, SUITE 200 • NASHVILLE, TENNESSEE 37203
COOL SPRING • MEDICAL OFFICE BUILDING • 7105 SOUTH SPRINGS DRIVE, SUITE 100 & 111 • FRANKLIN, TENNESSEE 37067
LEBANON • MEDICAL OFFICE BUILDING • 107 GLIDEPATH WAY • LEBANON, TENNESSEE 37090
phone 615.284.1600 • toll free 877.284.3840 • fax 615.284.2003
www.ELITEORTHOPAEDIC.com



**ELITE**
SPORTS MEDICINE AND
ORTHOPAEDIC CENTER

## Physical examination

He has a well-developed well-nourished male in no acute distress and cooperative with the examination.

Right shoulder-

- full passive range of motion in all planes including 160° forward elevation, 65° external rotation at the side, at 90° of abduction there is 90° of external rotation and 60° internal rotation.
- Active range of motion - 140° forward elevation, 65° external rotation at the side, internal rotation to L2 midline
- Strength testing – 4/5 abduction; 4+/5 external rotation; 5/5 internal rotation; 5/5 biceps and triceps; 5/5 wrist flexion and extension; 5/5 hand intrinsics
- Signs - positive Neer, positive Hawkins, positive O'Brien's, negative apprehension, negative posterior drawer
- Neurovascular - 2+ radial pulse, normal sensation, normal reflexes

Cervical spine - expected range of motion with no pain; negative Spurling's sign bilaterally

Left shoulder-

- Full passive and active range of motion in all planes
- Strength testing – 5/5 abduction, external rotation, internal rotation of the shoulder; 5/5 biceps, triceps, wrist flexion and extension, hand intrinsics
- Signs - negative Neer, Hawkins, O'Brien's, apprehension, posterior drawer
- Neurovascular - 2+ radial pulse, normal sensation, normal reflexes

## Impression

This is a 70-year-old orthopedic surgeon with a work-related injury to his right shoulder. This injury is now over a year old. Dr. Neely has been unable to return to his normal occupation as an operating orthopedic surgeon as a result of this injury. I find that because of his weakness in the dominant shoulder that he would have reasonable difficulty performing total joint replacement surgery. This type

NASHVILLE• MIDTOWN • MEDICALPLAZAII • 2021 CHURCH STREET, SUITE 200 • NASHVILLE, TENNESSEE 37203
NASHVILLE • GREEN HILLS • 2001 WOODMONT BLVD • NASHVILLE, TENNESSEE 37215
NASHVILLE • CENTENNIAL CAMPUS • 866 24TH AVENUE NORTH, SUITE 200 • NASHVILLE, TENNESSEE 37203
COOLSPRINGS • MEDICAL OFFICE BUILDING • 7106 SOUTH SPRINGS DRIVE, SUITE 100 & 111 • FRANKLIN, TENNESSEE 37067
LEBANON • MEDICAL OFFICE BUILDING • 107 OLDEPATH WAY • LEBANON, TENNESSEE 37090
phone 615.324.1600 • toll free 877.284.3840 • fax 615.284.2009
www.ELITEORTHOPAEDIC.com •



ELITE
SPORTS MEDICINE AND
ORTHOPAEDIC CENTER

of surgery is very physically demanding. Maneuvers such as dislocating a hip, holding a saw at eye level to perform the necessary cuts, and using a hammer to impact components would not be possible due to the level of weakness demonstrated in his right shoulder. Given that extensive conservative treatment has failed to alleviate his symptoms and return his strength and normal, I think it is unlikely that his shoulder strength will return to a level necessary to perform orthopedic surgery. There is a possibility that operative intervention might help, but there are no guarantees that his strength would return to normal even with surgery. I will give him permanent restrictions of no overhead lifting, no lifting/pushing/pulling greater than 10 pounds with the right arm, and no repetitive overhead movements. I give these opinions with a reasonable degree of medical certainty.

Sincerely,

Chad T Price M.D.

NASHVILLE • MIDTOWN • MEDICAL PLAZA • 2021 CHURCH STREET, SUITE 200 • NASHVILLE, TENNESSEE 37203
NASHVILLE • GREEN HILLS • 2001 WOODMONT BLVD • NASHVILLE, TENNESSEE 37215
NASHVILLE • CENTENNIAL CAMPUS • 365 24TH AVENUE NORTH, SUITE 200 • NASHVILLE, TENNESSEE 37203
COOLSPRINGS • MEDICAL OFFICE BUILDING • 7106 SOUTH SPRINGS DRIVE, SUITE 100 & 111 • FRANKLIN, TENNESSEE 37067
LEBANON • MEDICAL OFFICE BUILDING • 107 GLIDEPATH WAY • LEBANON, TENNESSEE 37090
phone 615.284.1600 • toll free 877.284.9840 • fax 615.284.2003
www.ELITEORTHOPAEDIC.com

RE:    **Claimant Name: Stephen M. Neely**
           **Claim Number: 5200462691001**

## AFFIDAVIT OF STEPHEN M. NEELY

I, Stephen M. Neely, having been duly sworn, hereby make oath that the following facts are true and correct and are based upon my personal knowledge.

1.     I am an Orthopedic Surgeon and have been performing surgeries for 35 years.

2.     On May 5, 2015, while performing a hip procedure, I injured my right shoulder.

3.     I continued to work as normal, and approximately one week later, I suffered additional injury to my shoulder during a total knee replacement on an obese patient.

4.     I tried to continue operating after first reducing my surgical schedule but was unable to complete some of the tasks necessary on a routine basis in every orthopaedic surgery procedure.

5.     Unable to perform some of the procedures by myself, I required the assistance of Dr. Jonathan Cornelius to complete necessary surgeries for the upcoming months of July, August, and September 2015.

6.     Dr. Jonathan Cornelius scrubbed in and assisted me with hip, shoulder and knee procedures scheduled during July, August, and September 2015.

7.     I was unable to safely use the saw or the mallet to be able to successfully complete these cases. Hammering was very difficult due to pain and weakness in my right shoulder.

8.  During this time, the receipts from surgery were split with Dr. Cornelius and the portions of the cases I could not perform, were done by Dr. Cornelius.

9.  I lost a total of roughly $10,000.00 as a result of having Dr. Cornelius assist with my surgeries during July, August, and September 2015.

10. Due to worsening of my shoulder, I had to stop performing surgeries on September 30, 2015. I could no longer safely perform orthpaedic surgical procedures.

Further this Affiant saith not.



_____
Stephen M. Neely

Sworn to and subscribed before me this the ⎯1 9ᵗʰ⎯ day of ⎯July⎯, 2016.

_____
Notary Public

My Commission Expires: ⎯11-27-18⎯

RE:    Claimant Name: Stephen M. Neely
       Claim Number: 5200462691001

---

## AFFIDAVIT OF JONATHAN CORNELIUS

I, Jonathan Cornelius, having been duly sworn, hereby make oath that the following facts are true and correct and are based upon my personal knowledge.

1.    I am an Orthopedic Surgeon and have been performing surgeries for 10 years.

2.    On May 5, 2015, Dr. Stephen Neely injured his right shoulder while performing a hip procedure. Approximately one week later, he sustained an additional injury to his right shoulder performing a total knee replacement.

3.    During the months of July, August, and September 2015, I scrubbed in and assisted Dr. Neely in multiple hip, shoulder and knee procedures as he was unable to perform these surgeries by himself due to his shoulder injuries.

4.    Dr. Neely and I split the receipts from these surgeries.

5.    Dr. Neely's shoulder injuries progressively worsened and he became unable to perform surgery of any kind on September 30, 2015.

6.    On January 20, 2016, I completed an Attending Physician Statement with permanent restrictions which began on September 30, 2015.

7.    Dr. Neely has permanent restrictions of no lifting, pushing, or pulling over 15 pounds with his right arm and no work at shoulder level or above with his right arm.

8.    Dr. Neely is unable to transfer patients to the Operating Table, unable to position patients on the Operating Table, unable to manipulate patient's extremities during

orthopedic surgery, unable to use equipment in the Operating Room, such as mallets or saws, and he is unable to examine heavy patients.

Further this Affiant saith not.

_____
Jonathan Cornelius



Sworn to and subscribed before me this the 19th day of July , 2016.

_____
Notary Public

My Commission Expires: 11-27-17

## AFFIDAVIT OF DAVID ELDRIDGE

I, David Eldridge, having been duly sworn, hereby make oath that the following facts are true and correct and are based upon my personal knowledge.

1.    I am a Certified Surgical Technician and Certified First Assistant and have worked with Dr. Stephen Neely for 25 years.

2.    On May 5, 2015, Dr. Neely injured his right shoulder while performing a hip surgery.

3.    Dr. Neely suffered another injury to his right shoulder during another procedure, approximately one week later.

4.    Following the injuries to his right shoulder, Dr. Neely was unable to perform total shoulder arthroplasty or total hip replacement by himself.

5.    Dr. Jonathan Cornelius scrubbed in to assist Dr. Neely with these surgeries during July, August, and September 2015.

6.    Dr. Neely has not been able to perform surgery at all since September 2015.

Further this Affiant saith not.

David Eldridge

Sworn to and subscribed before me this the 19th day of July, 2016.

Betty Leffreck
Notary Public

My Commission Expires: 11-27-18

---

## AFFIDAVIT OF KENNY OLIVER

I, Kenny Oliver, having been duly sworn, hereby make oath that the following facts are true and correct and are based upon my personal knowledge.

1.   I am a Certified Surgical Technician and Certified First Assistant and have worked with Dr. Stephen Neely for 25 years.

2.   On May 5, 2015, Dr. Neely injured his right shoulder while performing a hip surgery.

3.   Dr. Neely suffered another injury to his right shoulder during another procedure, approximately one week later.

4.   Following the injuries to his right shoulder, Dr. Neely was unable to perform total shoulder arthroplasty or total hip replacement by himself.

5.   Dr. Jonathan Cornelius scrubbed in to assist Dr. Neely with these surgeries during July, August, and September 2015.

6.   Dr. Neely has not been able to perform surgery at all since September 2015.

Further this Affiant saith not.

_Kenny Oliver_
Kenny Oliver

Sworn to and subscribed before me this the 19th day of July_____, 2016.

Betsy Leftrick
Notary Public

My Commission Expires: 11-27-17





F I L E D
A.M. MAY 2 5 2017 P.M.
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# V

Unum
THE BENEFIT CENTER
PO BOX 100262
COLUMBIA, SC 29202

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: 1-888-226-7959
Fax: 1-866-562-4794
www.unum.com



December 7, 2016

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

RE:   Neely, Stephen M
      Claim Number:              5200462691001
      Provident Life and Accident Insurance Company

Dear Attorney Denton:

I attempted to reach you via telephone on December 7, 2016 and left you a voice mail. This letter is about the decision we have made on your client, Dr. Stephen Neely's Individual Disability claim for benefits. We will not be able to approve the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason
- Information that supports our decision
- Information Regarding the Appeal Notice
- Provisions outlined in your client's individual disability policy
- Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
L242-03



## Decision/Reason:

We have determined Dr. Stephen Neely is able to perform the duties of his occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent him from performing these duties. Because he is not disabled according to the policy, benefits are not payable.

## Information That Supports Our Decision:

Dr. Neely initially submitted claim forms on January 21, 2016. He stated as of October 1, 2015 he was no longer performing the duties of his occupation as an orthopedic surgeon. He states he continues to see patients for regular office visits and independent medical evaluations, but he is not performing surgery.

He explained that he was unable to continue working due to an injury that occurred on May 5, 2015 while he was doing an orthopedic procedure. He informed us he continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Although Dr. Neely listed Crohns Disease and a Cardiac event as a secondary diagnosis, per our telephone conversation with Dr. Neely on February 17, 2016, he indicated the Crohns Disease is very well controlled and he sees his GI doctor once per year and has a colonoscopy done every 14-18 months. Dr. Neely also states he sees his cardiologist every six months for checkups relating to his Cardiac event that occurred on September 7, 2013.

Dr. Neely indicated that he stopped performing surgical procedures on September 30, 2015 because of shoulder pain and because it was taking him longer to complete procedures.

In our letter to Dr. Neely dated May 25, 2016, we informed him based on our review, the information in his claim file indicates he is able to perform the duties of his own occupation on a full-time basis. As he did not meet the policy's definition of Total Disability, we were unable to approve his claim and provide further benefits. His claim was closed effective May 25, 2016.

I have attached a copy of the letter that was mailed to Dr. Neely on May 25, 2016, as this provides details of our decision.

We received an appeal notice from your office dated September 7, 2016 with new information for us to review. The appeal notice included new medical records, an insured acquired Orthopedic Consultation of Dr. Chad Price, and affidavits of Dr. Jonathan Cornelius, Mr. Kenny Oliver (surgical technician), Mr. David Eldridge (surgical technician) as well as a Causation and Damage report from Dr. Gregory White.

Dr. Cornelius reported for July, August and September of 2015 he assisted Dr. Neely with surgical activities and they "split the fees" for those procedures. The affidavit signed by the surgical technicians noted Dr. Cornelius assisted Dr. Neely in the last three months (July, August and September of 2015) of surgeries.

Dr. White, in his letter, asserted orthopedics is not a light duty occupation, but did not quantify as to what level it was other than "physically demanding and labor intensive." Our onsite physician opines that Dr. White provided a personal opinion with no ergonomic data. Our

Vocational Representative also reviewed the file and found that with the retractions and limitations given, Dr. Neely could perform his occupational activities of surgery.

Dr. Price performed a consultation on July 15, 2016 on behalf of Dr. Neely and noted "pain (and weakness) with overhead activity, with extension of the arm away from the body and moderate rest pain." Examination of the right upper shoulder recorded 140 degrees forward flexion with adequate external and internal rotations and full strength 5/5 on the right including biceps and triceps, wrist and hand, except 4/5 abduction and 4+/5 external rotation. The opinion of Dr. Price was that weakness of the right shoulder excluded surgical activities as an orthopedist. He outlined restrictions (activities Dr. Neely should not do) and limitations (activities Dr. Neely cannot do) of no overhead lifting, no lifting, no pushing/pulling greater than 10 pounds with the right arm and no repetitive overhead movements. He outlined these restrictions and limitations to be permanent.

Our onsite physician, who is board-certified in orthopedic surgery, reviewed the information and agreed that Dr. Neely should restrict above shoulder activities and forward flexion beyond 150 degrees and notes that the records support that Dr. Neely has full passive right shoulder motion and active at 140 degrees past shoulder height, with good but not normal strength in abduction and external rotation. The records support that Dr. Neely would have the ability to sit, stand and walk without difficulty, lifting up to 15-25 lbs to chest, with no overhead activities, but to 150 degrees forward flexion, with full strength.

In view of the lack of agreement between our physician and Dr. Price on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported.

The information presented supports the restrictions and limitations as proposed by our on-site physician; however, they would not preclude the performance of an orthopedic surgeon. Our vocational consultant has reviewed Dr. Neely's file. He indicated that the important duties of an orthopedic surgeon, involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient examinations, review of x-rays, performing injections, prescribing medication and physical therapy, performing office based procedures e.g. aspirations, debridement; performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

Our Vocational Representative reviewed the supported restrictions and limitations against the physical demands of Dr. Neely's occupation and determined that although it may be reasonable to conclude that Dr. Neely would sometimes assist in the positioning of a patient on the operating table, there are a number of staff in the operating room to assist with positioning or transferring patients. Manipulating and positioning extremities could also be performed with assistance from other OR staff.

Also, the weight of such equipment as mallets and saws would not exceed his weight restrictions. The posture of his arm required to use these types of equipment will vary depending on the size of the equipment, the required angle of use and the height of the OR table . However, it is unlikely that such equipment would require Dr. Neely's arm to be above shoulder level. Also, if needed, the lowering of the OR table would aid in reducing the flexion or abduction demands of his arm.

The supported restrictions and limitations indicate that Dr. Neely has full strength with 150 degrees flexion. This would suggest that he would not have difficulty grasping and using necessary equipments such as saws, drills and mallets below shoulder level. The lifting and reaching demands of Dr. Neely's occupation do not exceed the supported restrictions and limitations.

Based on our review, the information in Dr. Stephen Neely's claim file indicates he is able to perform the duties of his own occupation. Therefore, his claim remains closed.

<u>Policy Provisions:</u>

This information can be found on page 4 of our May 25, 2016 letter to Dr. Neely.

<u>Next Steps Available to You and Dr. Neely:</u>

We would like to remind you that the opportunity to appeal our claim determination remains available to you. Within the next 7 days, you will receive a letter from our Appeals Area which will further explain this option.

If you have questions about Dr. Stephen Neely's claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension, 75352. As we will identify his claim by his Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist

Enclosures:    -Claimant: Decision

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: 1-888-226-7959
Fax: 1-866-562-4794
www.unum.com

**unum**

May 25, 2016

STEPHEN M NEELY MD
169 POWELL GROVE ROAD
LEBANON, TN 37090

RE:    Neely, Stephen M
       Claim Number:                5200462691001
       Provident Life and Accident Insurance Company

Dear Dr. Neely:

This letter is a follow-up to our conversation on May 25, 2016 about the decision we have made on your Individual Disability benefits. As we discussed, we will not be able to approve your claim and continue the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason
- Information about your benefit check
- Other important information
- Information that supports our decision
- Provisions outlined in your individual disability policy
- Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES
L242-03

### Decision/Reason:

We have determined that you are able to perform the duties of your occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent you from performing these duties on a full-time basis.

Because you are not disabled according to the policy, benefits are not payable.

### Information About Your Benefit Check:

Our last benefit payment, in the amount of $4,950.00, was mailed directly to you on April 27, 2016.

### Other Important Information:

We provided benefits under a Reservation of Rights while our claim decision was pending. We paid four months' worth of benefits, totaling $19,800.00. We will not be requesting repayment of these benefits.

### Information That Supports Our Decision:

We received your claim on January 21, 2016. You stated that as of October 1, 2015 you were no longer performing the duties of your occupation as an orthopedic surgeon. You were seeing patients for regular office visits and independent medical evaluations, but not performing surgery.

You explained that you were unable to continue working due to an injury that occurred on May 5, 2015 while you were doing an orthopedic procedure. You tried to dislocate a hip with a bone hook and felt a sharp pain in your right shoulder, followed by weakness. You continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Your treatment plan included injections and topical creams. You state that your shoulder became inflamed but you tried to continue performing surgery; however, you were unable to do so.

You informed us you stopped performing surgeries on September 30, 2015 because of shoulder pain and because it was taking longer for you to complete procedures.

On the Attending Physician Statement completed by Dr. Jonathan P. Cornelius on January 20, 2016, he listed restrictions of "no lifting, pushing, pulling over 15 lbs., right arm" and "no work at shoulder level or above with right arm." He listed limitations of "He is unable to transfer patients to OR table, unable to position patients on OR table, unable to manipulate patient's extremities during orthopedic surgery, unable to use OR equipment, such as mallets or saws..., unable to examine heavy patients." Dr. Cornelius gave the duration of these restrictions and limitations as extending from September 30, 2015 to "permanent."

We requested treatment records from Dr. Cornelius. This information was reviewed by our physician who is board-certified in orthopedic surgery. The records indicate that you reported right shoulder injuries on May 5 and May 11, 2015, but were not advised to stop working until September 30, 2015. You were able to golf after the incidents. Our physician told us that the

July 23, 2015 MRI revealed primarily tendinosis of cuff with questioned tearing, no retraction of tendons, and no atrophy of cuff muscles.

To improve our understanding of your condition and any associated restrictions (activities you should not do) and limitations (activities you cannot do), our physician spoke to Dr. Cornelius on March 9, 2016. Dr. Cornelius said that there were no surgical indications, and no muscle atrophy on the MRI, but added that you were noticing weakness while doing surgery.

You continued to work as a primary surgeon for joint replacement and shoulder arthroscopy, as documented in the 2015 CPT code information submitted by your employer. The CPT data shows that you continued to perform surgery through September 2015; no surgeries were noted after September 2015. Although the months of May and June 2015 appear to show billing charges below prior months' charges, the charges increased in July 2015 and August 2015 to a level similar to some months prior to May 2015. Billing charges were lower in May and June 2015 when compared to previous months, but they increased in July and August 2015 to approximate prior levels.

Our physician advised us that restrictions and limitations are not supported by the medical information. Our physician noted that your shoulder does not need surgery, and your range of motion was satisfactory with no obvious atrophy of shoulder musculature. Our physician further noted that in the month when you stopped doing surgery, September 2015, you also performed procedures that would require right shoulder strength and mobility; these procedures reflected your usual and customary procedures prior to your reported injury in May 2015.

Our vocational consultant reviewed the occupation information provided to us, including your Occupation Description form, Physician Questionnaire, and CPT/production data from your employer. The important duties of your occupation involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient exam, review of x-rays, performing injections, prescribing medication and physical therapy, performing office-based procedures (e.g., aspirations, debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

The strength demands of your occupation are in the "light" range. "Light" is defined as the occasional lifting or applying force up to 20 lbs, or the frequent lifting or applying force up to 10 lbs. Other physical demands of your occupation include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

Our physician advised us that the medical records support your ability to perform the physical demands of your occupation.

In view of the lack of agreement between our physician and Dr. Cornelius on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported, explaining that the limited diagnostic findings and limited treatment are not consistent with a severity of pain that would be expected to impact your functional capacity.

Based on our review, the information in your claim file indicates you are able to perform the duties of your own occupation on a full-time basis. As you do not meet the policy's definition of Total Disability, we are unable to approve your claim and provide further benefits. Your claim has been closed effective May 25, 2016.

## Information about the waiver of premium benefit

Your policy provides a Waiver of Premium benefit, which was approved as of November 1, 2015. Please note that the refund of the November 1, 2015 semi-annual premium was paid under Reservation of Rights. Your policy premiums are due on a semi-annual basis (May 1 and November 1 of each year). Waiver of premium will end and billing will resume starting with the November 1, 2016 premium.

## Policy renewal information

In order to keep this policy in force, you must be actively and gainfully working full time; there is no age limit. Before the enhancement that was effective on June 1, 1986, you could renew your policy only to age 75. Your policy is now renewable for life.

## Policy Provisions And Definitions:

The following provisions and definitions are applicable to our claim decision.

## Individual Disability policy 6PC-462691

We included a copy of your Individual Disability policy 6PC-462691 with our previous letter dated February 8, 2016. The following policy provisions and/or definitions can be found in that copy.

- Information regarding the renewability of your policy after age 65 can be found on the policy improvement brochure dated April 1987
- The definition for "Waiver of Premium" can be found on page 2 of the policy
- The definition for "Total Disability" can be found on page 4
- The amendment changing the "Definition Of Total Disability" can be found on page 5(A)

## Next Steps Available To You:

### What if you disagree with the decision and you have new information to submit?

If you disagree with our decision and you have new information to submit, you may request to have your file reevaluated by the Disability Benefits Specialist who made the initial decision.

### How much time do you have to request a reevaluation of your claim?

Please submit your written request within 180 days from the date you receive this letter.

### How does the reevaluation process work?

If you have new information you want us to consider, please send it to us as soon as possible. The Disability Benefits Specialist who made the initial decision will review the claim again, taking the new information into consideration. The Disability Benefits Specialist will provide you with a written response within 90 days of our receipt of the new information.

After this review, we will send you a letter explaining our decision. If you still disagree with our decision, you will have the option to request an additional independent review by our Appeals Department.

### What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for reevaluation and new information?

Reevaluation Request
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

### What if you disagree with the decision, but *do not have new information* to submit?

If you disagree with our decision but do not have new information to submit, you may request to have your file reviewed by our Appeals Department. Please submit a written letter of appeal outlining the basis for your disagreement.

### How much time do you have to request an Appeal?

Please submit your written request for appeal within 180 days from the date you receive this letter.

### How does the Appeal process work?

An Appeals Specialist will review your entire claim and may consult medical and vocational experts or other resources. The Appeal Specialist will make an independent decision on your claim.

### How much time does the Appeal review take?

We are committed to making an appeal decision within 45 days after we receive your written appeal. There may be special circumstances in which the review can take longer. We will notify you if more time is needed.

### What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for Appeal?

The Appeals Unit
PO Box 15112
Worcester, MA 01615-0112
Fax Number: 1-866-562-4794

We will send you a letter acknowledging receipt of your request within 7 days.

Dr. Neely, if you have questions about your claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension 75352.

We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist

F I L E D

A.M. MAY 25 2017 P.M.
3~24
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# VI

Unum
WORCESTER BENEFITS CENTER - APPEALS UNIT
PO BOX 15112
WORCESTER, MA 01615-0112

JASON DENTON
RMA   ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

Unum
Worcester Benefits Center - Appeals Unit
PO BOX 15112
Worcester, MA 01615-0112
Phone: 1-888-226-7959
Fax: 1-774-437-7141
www.unum.com



February 14, 2017

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

RE:    Neely, Stephen M
       Claim Number:        52-00462691-001
       Provident Life and Accident Insurance Company

Dear Attorney Denton:

Provident Life and Accident Insurance Company has completed the appeal review on your client, Dr. Stephen Neely's Individual Disability claim.

Please read the following pages carefully, as they will help you understand how we reached our decision.

This letter includes the following:

* Initial Claim Decision

* The Appeal Decision

* Information that supports the Appeal Decision

* Policy Provisions that apply to the Appeal Decision

* Next steps available to you

If you would like me to review with you the information we have and how this decision was made, please call me at 1-888-226-7959, extension 77423.

Initial Claim Decision:

As indicated in their letters of May 25, 2016 and December 7, 2016, the Benefits Center determined Dr. Neely was able to perform the duties of his occupation as an orthopedic surgeon, with no restrictions or limitations to his ability to perform those duties on a full time basis. No benefits were found to be payable under the Total Disability provision, or any other provision, of his policy.

The Benefits Center did provide payments totaling $19,800 under a reservation of rights during their consideration of Dr. Neely's claim; he was not requested to repay this amount.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242.43

## Appeal Decision:

We have determined the Benefits Center's decision on Dr. Neely's claim is correct. The medical and vocational information that is available in his file to date does not support the presence of restrictions and limitations to his ability to perform the duties of his occupation on a full time basis.

Based on the facts of Dr. Neely's claim and the terms of his policy, no Total Disability or other benefits were due for his claim.

## Information that Supports our Decision:

To review in brief, Dr. Neely indicated he developed pain, weakness, and loss of range of motion in his right upper extremity beginning May 5, 2015 from conditions including right shoulder rotator cuff tear, subacromial impingement, and tendonitis biceps. He continued to work in his occupation as an orthopedic surgeon, performing surgeries until October 1, 2015. After October 1, 2015, Dr. Neely continued working in his office practice, evaluating patients and performing independent medical examinations for four to six hours on a daily basis.

Dr. Neely's policy does not provide any partial or Residual Disability benefits after age 65. As Dr. Neely was already 70 years old by the date time he first claimed any Total Disability, his claim was appropriately considered under his policy's Total Disability provision with a start date of October 1, 2015.

His Attending Physician, fellow orthopedic surgeon Dr. Jon Cornellus, indicated he advised Dr. Neely not to perform surgery after September 30, 2015. He noted restrictions and limitations to his ability to: lift, push, or pull over 15 pounds; to work at shoulder level or above; to transfer and position patients on the operating table; to manipulate patients' extremities during surgery; to use equipment such as hammers and saws; and to examine heavy patients. Surgery for his condition was not pursued due to Dr. Neely's use of blood thinners for an unrelated cardiac condition that he has stated is not source of impairment for this claim.

Enclosed please find copies of the Benefits Center's letters dated May 25, 2016 and December 7, 2016 discussing their findings that the medical and vocational information available for Dr. Neely's claim did not support the presence of, and treatment consistent with, restrictions and limitations to his ability to perform the duties of his occupation as an orthopedic surgeon on a full time basis. I find these letters to provide a detailed and accurate overview of the Benefits Center's consideration of Dr. Neely's claim, including the review of his file by two board certified orthopedic surgeons with contact made directly to Dr. Cornellus, and later with Dr. Chad Price, and refer you to them as part of today's correspondence.

You appealed the Benefits Center's May 25, 2016 decision, disputing their assessment of the vocational demands of Dr. Neely's occupation, and indicating he is unable to perform physically accurate surgeries and all of the duties needed to make a surgery successful. You indicated

Dr. Neely was unable to modify his operative techniques, could not improve his symptoms with physical therapy, and that his continued activities such as golfing as noted by the Benefits Center were not inconsistent with his inability to perform the duties of his occupation.

You provided a new evaluation by another orthopedic surgeon, Dr. Chad Price, indicating Dr. Neely should not perform orthopedic surgery, in particular total joint replacements, that would require him to use a saw "at eye level", and that shoulder weakness also precluded him from using hammers. Dr. Price noted restrictions of no overhead lifting, no lifting, pushing or pulling greater than 10 pounds with the right arm, and no repetitive overhead movements. Statements were also provided from Dr. Neely and two of his fellow orthopedic surgeons (Dr. Cornelius and Dr. Gregory White) opining on his physical duties, as well as affidavits from two surgical technicians and first assistants (Mr. David Eldridge and Mr. Kenny Oliver).

Prior to proceeding with this appeal review, we requested the Benefits Center consider if this new information changed their decision for Dr. Neely's claim. As explained in the Benefits Center's letter of December 7, 2016, this information was further considered by two physician specialists and a vocational rehabilitation consultant. This information did not change their May 5, 2016 decision for his claim, and his file was returned to me for an appeal review.

I have completed a thorough and fair consideration of the information that is available to date for Dr. Neely's claim and appeal.

I find the medical analyses completed by the Benefits Center, which included review of the available medical information by two board-certified orthopedic surgeons in addition to direct contact with Dr. Price about his examination, appropriately considered Dr. Neely's restrictions and limitations. Those restrictions and limitations, that were supported by Dr. Neely's medical testing and treatment information were referred to a vocational rehabilitation specialist to assess if they were in excess of the physical demands of his occupation.

The vocational information available to the Benefits Center demonstrated Dr. Neely retained capacity to perform surgical procedures within the physical demands of his occupation. He continued to perform surgeries after May 5, 2015, and there is no medical information to support any change to his condition to precipitating an inability to perform surgery effective October 1, 2015, including joint replacement procedures or operative arthroscopy of the shoulder or knee.

As part of this appeal review, I requested the further consideration of a vocational rehabilitation specialist who had not seen Dr. Neely's file previously. Our appeal vocational rehabilitation specialist assessed all the available occupational and vocational information for this claim and appeal and considered the medical analyses of the supported limitations and restrictions.

This specialist agreed with the Benefits Center's understanding that the important duties of Dr. Neely's occupation as an orthopedic surgeon involve the diagnosis and treatment of musculoskeletal disorders. His specific duties included patient examinations, review of x-rays, performing injections, prescribing medication and physical therapy, performing office based procedures (including aspirations and debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical

record. The strength demands of this occupation were confirmed to be in the light range.
"Light" is defined as occasional lifting or applying force up to 20 pounds or frequently lifting or
applying force up to 10 pounds. The other physical demands of this occupation would include
frequent sitting, standing, handling, and occasional walking, reaching, and bending.

The restrictions and limitations supported by the medical information in Dr. Neely's file to date
were:

- Restrict above shoulder activities
- Restrict forward flexion beyond 150 degrees
- Has full passive right shoulder motion and active at 140 degrees past shoulder height
  with good but not normal strength in abduction and external rotation.

Dr. Neely has continued working in his office-based practice, where he describes seeing
patients (referring those needing surgery to his partners), performing hospital rounds,
conducting independent medical examinations and participating in depositions. He has also
maintained the ability to:

- sit, stand and walk without difficulty
- lift up to 15-25 pounds to chest, with no overhead activities, and to 150 degrees forward
  flexion with full strength.

Based on the information available, our appeal vocational rehabilitation consultant found the
demands of Dr. Neely's occupation as an orthopedic surgeon were not excess of his supported
limitations and restrictions and he retained the physical capacity needed to perform the duties of
his occupation.

Our appeal vocational rehabilitation consultant noted:

"Giving consideration to the insured's supported R&L's (restrictions and limitations) as
noted above, the insured would retain the physical capacity needed to perform the duties
of his occupation. The insured's occupational duties would not require above the
shoulder or above the head activities or forward flexion beyond 150 degrees.

The insured's capacity for shoulder motion— ("full passive right shoulder motion and
active at 140 degrees past shoulder height with good but not normal strength in
abduction and external rotation") would also be sufficient for the performance of the
occupation.

The insured has been determined to have no difficulties with sitting, standing or walking.

As noted previously, the performance of the Orthopedic Surgeon occupation would not
require lifting/carrying/pushing/pulling in excess of the 20 lb. level..."

Our vocational rehabilitation consultant considered each of the affidavits provided for this appeal
opining on the physicality of Dr. Neely's work, including transferring patients to the operating
table, manipulating their extremities, using equipment (e.g. mallets and saws), and examining
heavy patients.



He also determined that, while it may be reasonable to conclude an orthopedic surgeon would sometimes assist in the positioning of a patient on the operating table, there are also other staff members in the operating room (for example, surgical technicians, nurses, anesthesiologist) to assist with positioning or transferring patients. In addition, the manipulating and positioning extremities could also be performed with assistance from other staff in the operating room.

With respect to the equipment used, as referenced by Dr. Cornelius, our appeal vocational rehabilitation consultant also found that the weight of such equipment, including mallets and saws, would not exceed the medically supported weight restrictions as noted above. As had been noted previously, while the posture of the arm required to use these types of equipment will vary (depending on the size of the equipment, the required angle of use, the height of the operating table, and the size of the surgeon) it is unlikely that such equipment would require his arm to be above shoulder level. By lowering the operating table, the flexion or abduction demands of his arm would be reduced.

Our appeal vocational rehabilitation consultant also agreed Dr. Neely's supported restrictions and limitations indicate that he does maintain full strength with 150 degrees flexion. This was noted to support Dr. Neely would not have difficulty grasping and using necessary equipment such as saws, drills, and mallets below shoulder level.

Based on our appeal review of the facts of Dr. Neely's claim and the terms of his policy, including the information provided with your letter of September 7, 2016, we find he has retained the ability to perform the duties of his occupation, and on a full time basis. He does not meet the definition of Total Disability benefits as defined by his contract, and does not have any coverage for partial or Residual Disability available for this claim.

## Policy Provisions that Apply to the Appeal Decision:

Provident Life and Accident Insurance Company Policy No. 00462691 includes the following provisions, cited in pertinent part below:

"DEFINITION OF TOTAL DISABILITY:

(a) Until the date you attain age 65, or until the date indemnity for total disability has been paid during a period of disability under this policy for 5 years, whichever is later, 'Total Disability' means your inability to perform the duties of your occupation.

(b) During the continuance of a period of disability beyond the later of either of the two dates named in (a) above, 'Total Disability' means your inability to engage in any gainful occupation in which you might reasonably be expected to engage because of education, training or experience, and with due regard to your vocation and earnings at the beginning of disability.

Nothing in this definition shall be construed to extend or limit the maximum benefit periods for which indemnity for disability is payable under this policy."

"'Residual Disability' means:

(a) your inability to perform one or more of your important daily business duties, or

(b) your inability to perform your usual daily business duties for as much time as is usually required for the performance of such duties."

"Residual Disability Benefit

If Injuries or Sickness results in Residual Disability immediately following a period of at least 30 days of Total Disability which resulted from the same or a related cause, the Company, beginning on:

(1) the day shown on in the Policy Schedule as to when indemnity for Total Disability would have commenced, or
(2) the day following a period of Total Disability described above for which benefits have been paid,

will pay periodically during the continuance of such Residual Disability, indemnity at the rate of the Residual Disability Monthly Benefit until your 65th birthday. In no event, however, will indemnity for Residual Disability be payable for longer than 24 months if you are age 55 or older at the commencement of the preceding period of Total Disability and such period does not exceed 180 days of Total Disability. . ."

"LEGAL ACTIONS: No action at law or in equity shall be brought to recover on this policy prior to the expiration of 60 days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of 3 years after the time written proof of loss is required to be furnished."

Our decision was made based on the policy provisions listed above, and Provident Life and Accident Insurance Company reserves its right to enforce other provisions of the policy.

Next Steps Available to your client

This completes our appeal review of the information available for Dr. Neely's claim to date. Of you have any new or different information to provide in response to this appeal decision, please do so as soon as possible or before March 14, 2017.

It is our practice to afford significant weight to information from the Social Security Administration. Based on the information available to us to date, it does not appear Dr. Neely, who has continued to perform non-surgical patient care and examinations in an office and hospital setting, has applied for or has been awarded Social Security Disability Insurance (SSDI) benefits. However, if our understanding is incorrect, and Dr. Neely has been awarded any SSDI benefits, please notify me immediately so we may secure this information for further consideration of his claim.

Attorney Denton, if you have any questions about this letter, please contact me toll free at 1-888-226-7959, extension 77423 or directly at 1-774-437-7423.



Sincerely,

*Suzanne Campbell-Lambert ALHC, ACS*

Suzanne Campbell-Lambert ALHC, ACS
Lead Appeals Specialist
Provident Life and Accident Insurance Company

Enclosures:   -Claimant Decision
              -Attorney General

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: 1-888-226-7959
Fax: 1-800-692-4794
www.unum.com

UNUM

May 25, 2016

STEPHEN M NEELY MD
169 POWELL GROVE ROAD
LEBANON, TN 37090

RE:     Neely, Stephen M
        Claim Number:        5200462691001
        Provident Life and Accident Insurance Company

Dear Dr. Neely:

This letter is a follow-up to our conversation on May 25, 2016 about the decision we have made on your Individual Disability benefits. As we discussed, we will not be able to approve your claim and continue the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

*   The decision/reason
*   Information about your benefit check
*   Other important information
*   Information that supports our decision
*   Provisions outlined in your individual disability policy
*   Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.

## Decision/Reason:

We have determined that you are able to perform the duties of your occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent you from performing these duties on a full-time basis.

Because you are not disabled according to the policy, benefits are not payable.

## Information About Your Benefit Check:

Our last benefit payment, in the amount of $4,950.00, was mailed directly to you on April 27, 2016.

## Other Important Information:

We provided benefits under a Reservation of Rights while our claim decision was pending. We paid four months' worth of benefits, totaling $19,800.00. We will not be requesting repayment of these benefits.

## Information That Supports Our Decision:

We received your claim on January 21, 2016. You stated that as of October 1, 2015 you were no longer performing the duties of your occupation as an orthopedic surgeon. You were seeing patients for regular office visits and independent medical evaluations, but not performing surgery.

You explained that you were unable to continue working due to an injury that occurred on May 5, 2015 while you were doing an orthopedic procedure. You tried to dislocate a hip with a bone hook and felt a sharp pain in your right shoulder, followed by weakness. You continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Your treatment plan included injections and topical creams. You state that your shoulder became inflamed but you tried to continue performing surgery; however, you were unable to do so.

You informed us you stopped performing surgeries on September 30, 2015 because of shoulder pain and because it was taking longer for you to complete procedures.

On the Attending Physician Statement completed by Dr. Jonathan P. Cornelius on January 20, 2016, he listed restrictions of "no lifting, pushing, pulling over 15 lbs. right arm" and "no work at shoulder level or above with right arm." He listed limitations of "He is unable to transfer patients to OR table, unable to position patients on OR table, unable to manipulate patient's extremities during orthopedic surgery, unable to use OR equipment, such as mallets or saws…, unable to examine heavy patients." Dr. Cornelius gave the duration of these restrictions and limitations as extending from September 30, 2015 to "permanent."

We requested treatment records from Dr. Cornelius. This information was reviewed by our physician who is board-certified in orthopedic surgery. The records indicate that you reported right shoulder injuries on May 5 and May 11, 2015, but were not advised to stop working until September 30, 2015. You were able to golf after the incidents. Our physician told us that the

July 28, 2015 MRI revealed primarily tendinosis of cuff with questioned tearing, no retraction of tendons, and no atrophy of cuff muscles.

To improve our understanding of your condition and any associated restrictions (activities you should not do) and limitations (activities you cannot do), our physician spoke to Dr. Cornelius on March 9, 2016. Dr. Cornelius said that there were no surgical indications, and no muscle atrophy on the MRI, but added that you were noticing weakness while doing surgery.

You continued to work as a primary surgeon for joint replacement and shoulder arthroscopy, as documented in the 2015 CPT code information submitted by your employer. The CPT data shows that you continued to perform surgery through September 2015; no surgeries were noted after September 2015. Although the months of May and June 2015 appear to show billing charges below prior months' charges, the charges increased in July 2015 and August 2015 to a level similar to some months prior to May 2015. Billing charges were lower in May and June 2015 when compared to previous months, but they increased in July and August 2015 to approximate prior levels.

Our physician advised us that restrictions and limitations are not supported by the medical information. Our physician noted that your shoulder does not need surgery, and your range of motion was satisfactory with no obvious atrophy of shoulder musculature. Our physician further noted that in the month when you stopped doing surgery, September 2015, you also performed procedures that would require right shoulder strength and mobility; these procedures reflected your usual and customary procedures prior to your reported injury in May 2015.

Our vocational consultant reviewed the occupation information provided to us, including your Occupation Description form, Physician Questionnaire, and CPT/production data from your employer. The important duties of your occupation involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient exam, review of x-rays, performing injections, prescribing medication and physical therapy, performing office-based procedures (e.g., aspirations, debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

The strength demands of your occupation are in the "Light" range. "Light" is defined as the occasional lifting or applying force up to 20 lbs. or the frequent lifting or applying force up to 10 lbs. Other physical demands of your occupation include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

Our physician advised us that the medical records support your ability to perform the physical demands of your occupation.

In view of the lack of agreement between our physician and Dr. Cornelius on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported, explaining that the limited diagnostic findings and limited treatment are not consistent with a severity of pain that would be expected to impact your functional capacity.

Based on our review, the information in your claim file indicates you are able to perform the duties of your own occupation on a full-time basis. As you do not meet the policy's definition of "Total Disability," we are unable to approve your claim and provide further benefits. Your claim has been closed effective May 25, 2016.

### Information about the waiver of premium benefit

Your policy provides a Waiver of Premium benefit, which was approved as of November 1, 2015. Please note that the refund of the November 1, 2015 semi-annual premium was paid under Reservation of Rights. Your policy premiums are due on a semi-annual basis (May 1 and November 1 of each year). Waiver of premium will end and billing will resume starting with the November 1, 2016 premium.

### Policy renewal information

In order to keep this policy in force, you must be actively and gainfully working full time; there is no age limit. Before the enhancement that was effective on June 1, 1986, you could renew your policy only to age 75. Your policy is now renewable for life.

### Policy Provisions And Definitions:

The following provisions and definitions are applicable to our claim decision.

### Individual Disability policy 6PC-462691

We included a copy of your Individual Disability policy 6PC-462691 with our previous letter dated February 8, 2016. The following policy provisions and/or definitions can be found in that copy.

* Information regarding the renewability of your policy after age 65 can be found on the policy improvement brochure dated April 1987
* The definition for "Waiver of Premium" can be found on page 2 of the policy
* The definition for "Total Disability" can be found on page 4
* The amendment changing the "Definition Of Total Disability" can be found on page 5(A)

### Next Steps Available To You:

### What if you disagree with the decision and you have new information to submit?

If you disagree with our decision and you have new information to submit, you may request to have your file reevaluated by the Disability Benefits Specialist who made the initial decision.

### How much time do you have to request a reevaluation of your claim?

Please submit your written request within 180 days from the date you receive this letter.

### How does the reevaluation process work?

If you have new information you want us to consider, please send it to us as soon as possible. The Disability Benefits Specialist who made the initial decision will review the claim again, taking the new information into consideration. The Disability Benefits Specialist will provide you with a written response within 90 days of our receipt of the new information.

After this review, we will send you a letter explaining our decision. If you still disagree with our decision, you will have the option to request an additional independent review by our Appeals Department.

## What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

## Where do you mail or fax your written request for reevaluation and new information?

Reevaluation Request
PO Box 15112
Worcester, MA  01615-0112
Fax Number: 1-866-562-4794

## What if you disagree with the decision, but do not have new information to submit?

If you disagree with our decision but do not have new information to submit, you may request to have your file reviewed by our Appeals Department. Please submit a written letter of appeal outlining the basis for your disagreement.

## How much time do you have to request an Appeal?

Please submit your written request for appeal within 180 days from the date you receive this letter.

## How does the Appeal process work?

An Appeals Specialist will review your entire claim and may consult medical and vocational experts or other resources. The Appeal Specialist will make an independent decision on your claim.

## How much time does the Appeal review take?

We are committed to making an appeal decision within 45 days after we receive your written appeal. There may be special circumstances in which the review can take longer. We will notify you if more time is needed.

## What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

## Where do you mail or fax your written request for Appeal?

The Appeals Unit
PO Box 15112
Worcester, MA  01615-0112
Fax Number: 1-866-562-4794

We will send you a letter acknowledging receipt of your request within 7 days.

Dr. Neely, if you have questions about your claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension 75352.

We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: 1-800-226-7959
Fax: 1-800-662-4794
www.unum.com



December 7, 2016

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

RE:     Neely, Stephen M
        Claim Number:            5200462691001
        Provident Life and Accident Insurance Company

Dear Attorney Denton:

I attempted to reach you via telephone on December 7, 2016 and left you a voice mail. This letter is about the decision we have made on your client, Dr. Stephen Neely's individual disability claim for benefits. We will not be able to approve the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

* The decision/reason
* Information that supports our decision
* Information Regarding the Appeal Notice
* Provisions outlined in your client's individual disability policy
* Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
4343-03



## Decision/Reason:

We have determined Dr. Stephen Neely is able to perform the duties of his occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent him from performing these duties. Because he is not disabled according to the policy, benefits are not payable.

## Information That Supports Our Decision:

Dr. Neely initially submitted claim forms on January 21, 2016. He stated as of October 1, 2015 he was no longer performing the duties of his occupation as an orthopedic surgeon. He states he continues to see patients for regular office visits and independent medical evaluations, but he is not performing surgery.

He explained that he was unable to continue working due to an injury that occurred on May 5, 2015 while he was doing an orthopedic procedure. He informed us he continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Although Dr. Neely listed Crohns Disease and a Cardiac event as a secondary diagnosis, per our telephone conversation with Dr. Neely on February 17, 2016, he indicated the Crohns Disease is very well controlled and he sees his GI doctor once per year and has a colonoscopy done every 14-18 months. Dr. Neely also states he sees his cardiologist every six months for checkups relating to his Cardiac event that occurred on September 7, 2013.

Dr. Neely indicated that he stopped performing surgical procedures on September 30, 2015 because of shoulder pain and because it was taking him longer to complete procedures.

In our letter to Dr. Neely dated May 25, 2016, we informed him based on our review, the information in his claim file indicates he is able to perform the duties of his own occupation on a full-time basis. As he did not meet the policy's definition of Total Disability, we were unable to approve his claim and provide further benefits. His claim was closed effective May 25, 2016.

I have attached a copy of the letter that was mailed to Dr. Neely on May 25, 2016, as this provides details of our decision.

We received an appeal notice from your office dated September 7, 2016 with new information for us to review. The appeal notice included new medical records, an insured-acquired Orthopedic Consultation of Dr. Chad Price, and affidavits of Dr. Jonathan Cornelius, Mr. Kenny Oliver (surgical technician), Mr. David Eldridge (surgical technician) as well as a Causation and Damage report from Dr. Gregory White.

Dr. Cornelius reported for July, August and September of 2015 he assisted Dr. Neely with surgical activities and they "split the fees" for those procedures. The affidavit signed by the surgical technicians noted Dr. Cornelius assisted Dr. Neely in the last three months (July, August and September of 2015) of surgeries.

Dr. White, in his letter, asserted orthopedics is not a light duty occupation, but did not quantify as to what level it was other than "physically demanding and labor intensive." Our onsite physician opines that Dr. White provided a personal opinion with no ergonomic data. Our

Vocational Representative also reviewed the file and found that with the retractions and limitations given, Dr. Neely could perform his occupational activities of surgery.

Dr. Price performed a consultation on July 15, 2016 on behalf of Dr. Neely and noted "pain (and weakness) with overhead activity, with extension of the arm away from the body and moderate rest pain." Examination of the right upper shoulder recorded, 140 degrees forward flexion with adequate external and internal rotations and full strength 5/5 on the right including biceps and triceps, wrist and hand, except 4/5 abduction and 4+/5 external rotation. The opinion of Dr. Price was that weakness of the right shoulder excluded surgical activities as an orthopedist. He outlined restrictions (activities Dr. Neely should not do) and limitations (activities Dr. Neely cannot do) of no overhead lifting, no lifting, no pushing/pulling greater than 10 pounds with the right arm and no repetitive overhead movements. He outlined these restrictions and limitations to be permanent.

Our onsite physician, who is board-certified in orthopedic surgery, reviewed the information and agreed that Dr. Neely should restrict above shoulder activities and forward flexion beyond 150 degrees and notes that the records support that Dr. Neely has full passive right shoulder motion and active at 140 degrees past shoulder height, with good but not normal strength in abduction and external rotation. The records support that Dr. Neely would have the ability to sit, stand and walk without difficulty, lifting up to 15-25 lbs to chest, with no overhead activities, but to 150 degrees forward flexion, with full strength.

In view of the lack of agreement between our physician and Dr. Price on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported.

The information presented supports the restrictions and limitations as proposed by our on-site physician; however, they would not preclude the performance of an orthopedic surgeon. Our vocational consultant has reviewed Dr. Neely's file. He indicated that the important duties of an orthopedic surgeon, involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient examinations, review of x-rays, performing injections, prescribing medication and physical therapy, performing office based procedures e.g. aspirations, debridement, performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

Our Vocational Representative reviewed the supported restrictions and limitations against the physical demands of Dr. Neely's occupation and determined that although it may be reasonable to conclude that Dr. Neely would sometimes assist in the positioning of a patient on the operating table, there are a number of staff in the operating room to assist with positioning or transferring patients. Manipulating and positioning extremities could also be performed with assistance from other OR staff.

Also, the weight of such equipment as mallets and saws would not exceed his weight restrictions. The posture of his arm required to use these types of equipment will vary depending on the size of the equipment, the required angle of use and the height of the OR table. However, it is unlikely that such equipment would require Dr. Neely's arm to be above shoulder level. Also, if needed, the lowering of the OR table would aid in reducing the flexion or abduction demands of his arm.

The supported restrictions and limitations indicate that Dr. Neely has full strength with 150 degrees flexion. This would suggest that he would not have difficulty grasping and using necessary equipments such as saws, drills and mallets below shoulder level. The lifting and reaching demands of Dr. Neely's occupation do not exceed the supported restrictions and limitations.

Based on our review, the information in Dr. Stephen Neely's claim file indicates he is able to perform the duties of his own occupation. Therefore, his claim remains closed.

### Policy Provisions:

This information can be found on page 4 of our May 25, 2016 letter to Dr. Neely.

### Next Steps Available to You and Dr. Neely:

We would like to remind you that the opportunity to appeal our claim determination remains available to you. Within the next 7 days, you will receive a letter from our Appeals Area which will further explain this option.

If you have questions about Dr. Stephen Neely's claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension, 75352. As we will identify his claim by his Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist

Enclosures:    Claimant Decision



F I L E D
A.M. MAY 2 5 2017 P.M.
3:29
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# VII

Jason Denton
615/443-8772
jdenton@rma-law.com



ATTORNEYS AT LAW

Rochelle, McCulloch & Aulds, PLLC

ATTORNEYS AT LAW

Jere N. McCulloch
(1973 – 2013)

Robert Rochelle
Jo Ann "Jody" Aulds
David B. Fouth
Alan Poindexter
Gregory S. Gill
Julie M. Robinson
T. Price Thompson, III
Byron M. Gill
Jason G. Denton
Matthew H. Ryan
Tom Walsh
Debra L. Dishman
Brett Rozell

March 1, 2017

Suzanne Campbell-Lambert ALHC, ACS
Lead Appeals Specialist
Provident Life & Accident Ins. Co. (Unum)
Worcester Benefits Center – Appeals Unit
P.O. Box 15112
Worcester, MA 01615-0112
(via facsimile 774-437-7141)

Re:   Client:      Stephen Neely, M.D.
      Claim No.    52-00462691-001

Dear Ms. Campbell-Lambert:

Per your letter of December 8, 2016, this correspondence will serve as our continued appeal of Dr. Neely's denial of benefits under his Individual Disability Claim policy.   Contained herein is our position statement to rebut some information in your denial.

The suggestions of raising and lowering the operating room table repeatedly to accommodate Dr. Neely's shoulder is disability is poor technique and may be bordering on poor practice of even malpractice. Surgeons have been taught to never bring a non-sterile part of the drapes into the sterile component. This is why there is a sterile drape on the side of some drapes used in hip arthroplasty if an anterior approach is to be used. Physicians would not want the extremity to hang over the side of the table – potentially contaminating it and then bring it back into the sterile operating room field. The same applies to surgical gowns which would be fine as the table goes up, but would certainly risk contamination as the table went back down. This suggestion by your consults was not well thought out and hopefully, not part of their daily routine practice. I would want to re-gown repeatedly if that practice were followed.

Your response stated that Dr. White's letter had no ergonomic data. This is "life-style ergonomic" data. When one leaves the operating room soaked and wet due to physical exertion, they were certainly not sitting in front of a computer screen, They were doing physical work equal to that of a laborer and not able to tolerate fatigue and have a non-exact osteotomy.

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 224 of 256 PageID #: 232



ATTORNEYS AT LAW

Rochelle, McCulloch & Aulds, PLLC

Attached please find an editorial, "Morbid Obesity and Total Joint Replacement: Is it okay to say NO?," from the *Blue Journal of Orthopaedics*. In the third paragraph, they assert that given the length of the surgery, which is often increased because of the size of the patient, the difficulty that positioning and exposure can present. Significant failure and/or injury can become a risk to all parties involved. "[Their] profession is already physically demanding and at times may place surgeons and staff in potentially dangerous positions." Those problems are well recognized in the orthopaedic literature and have been discussed since the 1980s as not having an easy solution.

It is also of note that when Dr. Cornelius assisted Dr. Neely in the total hip arthroplasty, he always completed the portions requiring repeated use of the mallet (note – femoral component broaching and impaction of the final component) As Dr. Neely's inability to perform those specific portions of the operations safely and expeditiously led to the final decision to stop performing orthopaedic surgery.

The right shoulder has actually worsened, there is a little less motion, but significantly more discomfort with even hammering a single nail. The multifaceted requirements of orthopaedic surgery makes this impossible for Dr. Neely to complete.

Basically, there are several classes of instruments which are used daily in the Orthopaedic Surgeons livelihood. These are saws, drills, elevators, curettes, osteotomes, and mallets. The use of the mallet/hammer has become onerous for Dr. Neely. Several blows to an object and sharp pain and weakness follow. This specifically causes him problems with the use of osteotomes but even worse with the use of broaches in the preparation of the femoral canal. This is a learned technique which combines use of the mallet, watching the broach advance, and listening for a change in the sound as the broach advances. Even more difficult is the reverse hammering to extract the broach in the preparation.

When Dr. Neely decided to stop performing surgeries, it was because he was unable to carry out the tasks essential to the precision necessary for a "perfect" outcome. He left an acetabular shell about a 1½ mm proud as he was not able to fully impact the piece for the first time in 35 years.

No matter what alternatives your consults see or suggest, there is no substitute for precision in the operating room. This involves correct, consistent use of the instruments. This is impossible when one encounters a sharp right shoulder pain and the weakness that follows when trying to perform time efficient joint arthroplasty. Dr. Neely has performed over 10,000 such procedures

www.rma-law.com

109 North Castle Heights Avenue • Lebanon, TN 37087 • 615/444-1433 • Fax 615/443-8775
2745 North Mt. Juliet Road • Mt. Juliet, TN 37122

2

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 225 of 256 PageID #: 233



**RMA**
**ATTORNEYS AT LAW**
Rochelle, McCulloch & Aulds, PLLC

and certainly is capable of knowing and acknowledging the fact that the shoulder injury prevents him from continuing as a surgeon.

It should also be noted in the practice of medicine, one is really not able to consistently arrive at a level of disability unless they have examined and listened to the history.

Dr. Price is a shoulder specialist, and physician for the Tennessee Titans. He is not and never has been professionally associated with Dr. Neely's practice. His only interest was to attempt to lessen the impact of Dr. Neely's shoulder injury, including intra articular steroid injections.

Dr. Neely continues to feel the act of performing orthopaedic procedures cannot be done either physically nor safely with this injury to his shoulder.

Thank you for your time and attention. I look forward to hearing from you soon.

Sincerely,

ROCHELLE, McCULLOCH & AULDS, PLLC

Jason G. Denton

JGD/BLR

Encl

www.rma-law.com
109 North Castle Heights Avenue • Lebanon, TN 37087 • 615/444-1433 • Fax 615/443-8775
2745 North Mt. Juliet Road • Mt. Juliet, TN 37122

3

RE:  Claimant Name:  Stephen M. Neely
Claim Number:  5200462691001

## AFFIDAVIT OF JONATHAN CORNELIUS

I, Jonathan Cornelius, having been duly sworn, hereby make oath that the following facts are true and correct and are based upon my personal knowledge.

1. I am an Orthopedic Surgeon and have been performing surgeries for 10 years. I am board certified by The American Board of Orthopaedic Surgery.

2. On May 5, 2015, Dr. Stephen Neely injured his right shoulder while performing a hip procedure. Approximately one week later, he sustained an additional injury to his right shoulder performing a total knee replacement.

3. During the months of July, August, and September 2015, I scrubbed in and assisted Dr. Neely in multiple hip, shoulder and knee procedures as he was unable to perform these surgeries by himself due to his shoulder injuries.

4. While assisting Dr. Neely in total hip arthroplasty procedures, I always completed the positions which required repeated use of the mallet, femoral component broaching and impaction of the final component.

5. Dr. Neely and I split the receipts from these surgeries.

6. Dr. Neely's shoulder injuries progressively worsened and he became unable to perform surgery of any kind on September 30, 2015.

7. On January 20, 2016, I completed an Attending Physician Statement with permanent restrictions which began on September 30, 2015.

8. Dr. Neely has permanent restrictions of no lifting, pushing, or pulling over 15 pounds with his right arm and no work at shoulder level or above with his right arm. There is also to be no repeat impacting force, ie. no hammering.

9. Dr. Neely is unable to transfer patients to the Operating Table, unable to position patients on the Operating Table, unable to manipulate patient's extremities during orthopedic surgery, unable to use equipment in the Operating Room, such as mallets, saws, broaches, reamers, or osteotomes, and he is unable to examine heavy patients.

Further this Affiant saith not.

_____
Jonathan Cornelius

Sworn to and subscribed before me this the ___ day of _____, 2017.

_____
Notary Public

My Commission Expires: 1/29/17

Jason Denton
615/443-8772
jdenton@rma-law.com



Rochelle, McCulloch & Aulds, PLLC

**ATTORNEYS AT LAW**

Jere N. McCulloch
(1973 – 2013)

Robert Rochelle
Jo Ann "Jody" Aulds
David B. Foutch
Alan Poindexter
Gregory S. Gill
Julie M. Robinson
T. Price Thompson, III
Byron M. Gill
Jason G. Denton
Matthew H. Ryan
Tom Walsh
Debra L. Dishmon
Brett Rozell

April 13, 2017

Suzanne Campbell-Lambert ALHC, ACS
Lead Appeals Specialist
Provident Life & Accident Ins. Co. (Unum)
Worcester Benefits Center – Appeals Unit
P.O. Box 15112
Worcester, MA 01615-0112
(via facsimile 774-437-7141)

      **Re:**   **Client:**   Stephen Neely, M.D.
              **Claim No.**  52-00462691-001

Dear Ms. Campbell-Lambert:

Per your letter of April 12, 2017, I have included a copy of the editorial article ("Morbid Obesity and Total Joint Replacement: Is it okay to say No?") referenced on page 2 of our March 1, 2017 letter. If you need any additional information in your review of this appeal, please let us know.

Thank you for your time and attention to this matter. I look forward to hearing from you soon.

            Sincerely,

            ROCHELLE, McCULLOCH & AULDS, PLLC

            Clay Rozell
            Paralegal to Jason G. Denton

www.rma-law.com
109 North Castle Heights Avenue • Lebanon, TN 37087 • 615/444-1433 • Fax 615/443-8775
2745 North Mt. Juliet Road • Mt. Juliet, TN 37122

1

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 229 of 256 PageID #: 237




# Morbid Obesity and Total Joint Replacement: Is It Okay to Say No?

Clint Wooten, MD; Brian Curtin, MD

Our waiting room provides evidence each day that obesity continues to be a major problem, if not an epidemic, within the United States. It is particularly challenging in the world of arthroplasty. As reported by the Centers for Disease Control and Prevention in 2013, the obesity rate is approximately 35% and has plateaued at this level for several years.[1,2] Unfortunately, the percentage of obese patients within the population of patients who seek joint replacement seems to be on the rise. In 2007, Fehring et al[3] reported that the percentage of patients undergoing total joint replacement classified as obese nearly doubled between 1990 and 2005, from 30% to 52%.

Professional organizations including the American Association of Hip and Knee Surgeons have put together work groups with the sole objective to evaluate the current evidence-based literature and reach a consensus on risk stratification based on patient body mass index (BMI) and other risk factors. Currently, they support a BMI of less than 40 kg/m² for primary joint replacement.[4] Many say that we have both an ethical and an expected duty to provide care for patients regardless of their BMI, reciting the oath we each accepted with our medical school training. However, we argue that elective total joint surgery for a morbidly obese patient with a BMI of greater than 40 kg/m² may actually place the physician at risk of violating some core

principles of that very oath. The 4 core principles of nonmaleficence, autonomy, beneficence, and justice each play a role in how we must ultimately make decisions for these patients. Often, the interplay of these 4 principles is not black and white and requires physicians to assess much more than their ability to perform the procedure.

Many technical challenges of surgery present themselves when performing hip or knee replacement for morbidly obese patients. The shear size of the extremity often limits visualization of the surgical field and may compromise the dexterity of the surgeon and/or the assistant. When the posterior approach to the hip is used, the operating room assistant is often saddled with the task of supporting and manipulating a very large extremity. Given the length of the surgery, which is increased because of the size of the patient, and the difficulty that positioning and exposure can present, significant fatigue and/or injury can become a risk for all parties involved. Our profession is already physically demanding and at times may place surgeons and staff in potentially dangerous positions. When a morbidly obese patient enters the operating room, the risk is heightened. Moving a 400-lb patient onto an operating table is physically demanding and carries risk for all involved. Appropriate positioning of these patients is often difficult. Additionally, morbidly obese patients have a higher likelihood of positional changes during the course of surgery, which can result in inadvertent malpositioning of the components.[5,6]

Nonmaleficence is generally described as an obligation not to inflict harm on one's patient. In many ways, as just described, patients' own body habitus places them in a surgical environment where they are at higher risk of complications. Failure to perform a technically sound operation has been shown to in-

*The authors are from the OrthoCarolina Hip and Knee Center, Charlotte, North Carolina.*

*Dr Wooten has no relevant financial relationships to disclose. Dr Curtin receives personal fees from DePuy Synthes and Ethicon.*

*Correspondence should be addressed to: Brian Curtin, MD, 2001 Vail Ave, Ste 200A, Charlotte, NC 28207 (brian.curtin@orthocarolina.com).*
*doi: 10.3928/01477447-20160628-02*

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 230 of 256 PageID #: 238

crease the risk of revision due to mechanical failures, particularly in total knee arthroplasty.[3] Järvenpää et al[6] reported a significantly higher number of technical errors in a group of obese patients who underwent total knee arthroplasty than in a group of nonobese patients who underwent total knee arthroplasty, noting 17 technical errors in 52 obese patients compared with 5 errors in 48 nonobese patients.

Autonomy is perhaps best described by patients' ability to provide informed consent for surgery. In the past few years, some payor entities have actually instituted restrictions based on BMI and have declined to pay for surgeries performed for patients who fall outside of these parameters.[7,8] This is alarming because it completely eliminates patient autonomy and the decision-making process. This is most likely not the answer if we wish to keep patients and surgeons involved in this decision-making process. A thorough discussion of the elevated risks associated with surgery for morbidly obese patients is often enough to persuade these patients that joint replacement is not in their immediate best interest. Obese patients undergoing total knee arthroplasty have an increased risk of perioperative medical complications, including poor wound healing, infection, respiratory complications, and venous thromboembolism.[4,9,10] Morbid obesity has independent risk factors that these individuals are subject to with each passing day, and many of these risk factors are exacerbated when coupled with a major operation such as total joint replacement. By directly explaining to patients that, as physicians, our first duty is to do no harm and that there is a real possibility of our making their conditions worse with potential complications such as stroke, heart attack, implant failure, revision, infection, or even death, we can develop a new level of physician–patient trust and reassure patients that we have their best interests in mind. Autonomy is important for our patients, but so is their ability to understand the magnitude of risk when making decisions. We understand these risks far better than our patients do because we deal with them daily. Although autonomy must be respected, we must serve as stewards to help guide patients in making intelligent decisions based on their circumstances.

The principle of intervening to benefit the well-being of patients, or beneficence, is often cited as why we must provide arthroplasty to morbidly obese patients with severe arthritis. It makes sense because we are obligated to provide the best care for our patients, but the issue becomes what level of care to provide. Conservative measures for treating symptoms are easy but, depending on the severity of the symptoms, may be inadequate in terms of pain relief and function. The difficulty that we face today is determining at what point arthroplasty is the appropriate care. We can provide care to patients that does not involve surgery. We have an obligation to treat the whole patient and not just a specific extremity. It is our duty to optimize modifiable risk factors for each patient, especially when the risks of surgery outweigh the benefits. Now, more than ever, our job involves connecting the nonoptimized patient with the appropriate resources for weight management, blood sugar control, low-impact exercise, and nutritional guidance. This excellent type of "caring" allow us to establish relationships with these patients. Although not directly acting on patients' knees or hips, we are helping them move in the right direction to improve their overall health. With appropriate concern and empathy, we can reassure patients that this plan of care is in their best interest. We must emphasize to patients that their taking control of their health is critical to the success of any intervention, whether it be weight loss or recovery from joint replacement surgery in the future. We are charged with providing care for our patients but need them to be active participants. Operative intervention will be much more successful when we work together. Weight loss in morbidly obese patients can often be used as a surrogate marker of how they may fare with rehabilitation and motivation after total joint replacement, which we know is crucial for good outcomes.

Justice can be described as an obligation to promote equal distribution of health care; however, in the current health care system, resources continue to be more finite and diligently distributed. One could argue that the health care dollars spent replacing morbidly obese patients' hips or knees may be better used treating their diabetes and heart disease and funding bariatric surgery. The morbidity and mortality among these patients are more often associated with the medical problems resulting from their obesity and not necessarily the painful arthritic joint. Relieving joint pain may improve their quality of life substantially, but diabetes and cardiovascular disease may end their life, prematurely. Numerous studies have shown that patients do not lose weight following joint replacement surgery and that obese patients have less functional improvement than their nonobese counterparts.[11-13]

As we continue to look to provide care for every patient who enters our practice, the issue is no longer whether we can technically perform the surgery but rather whether the surgery is the right course of action for a particular patient. Obesity is a major societal problem. We have to be prepared to sometimes provide tough answers to tough questions. Is it okay to say no? In the morbidly obese population, no may often be the right answer, provided we supply these patients with the resources to optimize their condition prior to surgical intervention.

## REFERENCES

1. Ogden CL, Carroll MD, Kit BK, Flegal KM. Prevalence of obesity in the United States, 2009-2010. *NCHS Data Brief.* 2012; 82:1-8.

2. Ogden CL, Carroll MD, Kit BK, Flegal KM. Prevalence of obesity among adults: United States, 2011-2012. *NCHS Data Brief.* 2013;(131):1-8.

3. Fehring TK, Odum SM, Griffin WL, Mason JB, McCoy TH. The obesity epidemic: its effect on total joint arthroplasty. *J Arthroplasty.* 2007; 22(6)(suppl 2):71-76.

COPYRIGHT © SLACK INCORPORATED

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 231 of 256 PageID #: 239

4.  Workgroup of the American Association of Hip and Knee Surgeons Evidence Based Committee. Obesity and total joint arthroplasty: a literature based review. *J Arthroplasty.* 2013; 28(5):714-721.

5.  Dorr LD, Boiardo RA. Technical considerations in total knee arthroplasty. *Clin Orthop Relat Res.* 1986; 205:5-11.

6.  Järvenpää J, Kettunen J, Kröger H, Miettinen H. Obesity may impair the early outcome of total knee arthroplasty. *Scand J Surg.* 2010; 99(1):45-49.

7.  Dehn T. Joint replacement in the overweight patient. *Ann R Coll Surg Engl.* 2007; 89(3):203.

8.  Coombes R. Rationing of joint replacements raises fears of further cuts. *BMJ.* 2005; 331(7528):1290.

9.  Yeung E, Thornton-Bott P, Walter WL. Patient obesity: a growing concern of successful total knee arthroplasty. *Semin Arthroplasty.* 2010; 21(2):87-91.

10. Pottie P, Presle N, Terlain B, Netter P, Mainard D, Berenbaum F. Obesity and osteoarthritis: more complex than predicted! *Ann Rheum Dis.* 2006; 65(11):1403-1405.

11. Gillespie GN, Porteous AJ. Obesity and knee arthroplasty. *Knee.* 2007; 14(2):81-86.

12. Collins RA, Walmsley PJ, Amin AK, Brenkel IJ, Clayton RA.)Does obesity influence clinical outcome at nine years following total knee replacement? *J Bone Joint Surg Br.* 2012; 94(10):1351-1355.

13. Amin AK, Clayton RA, Patton JT, Gaston M, Cook RE, Brenkel IJ. Total knee replacement in morbidly obese patients: results of a prospective, matched study. *J Bone Joint Surg Br.* 2006; 88(10):1321-1326.

# Retraction: "Pain Management After Total Knee Arthroplasty Using a Multimodal Approach"

This article has been retracted at the request of the authors.

We would like to formally request that the article entitled, "Pain Management After Total Knee Arthroplasty Using a Multimodal Approach," by Morteza Meftah, MD, Anthony C. Wong, BSc, Danyal H. Nawabi, MD, FRCS(Orth), Richard J. Yun, MA, Amar S. Ranawat, MD, and Chitranjan S. Ranawat, MD (volume 35, number 5, pp. e660-e664; doi: 10.3928/01477447-20120426-19), be retracted.

This is because the data were published prematurely and the authors did not have the proper permission from the combined Hospital for Special Surgery work study group. The data have been fully reported in the following publication: "Analgesia After Total Knee Replacement: Local Infiltration Versus Epidural Combined With a Femoral Nerve Blockade. A Prospective, Randomized Pragmatic Trial," by J. T. YaDeau, E. A. Goytizolo, D. E. Padgett, S. S. Liu, D. J. Mayman, A. S. Ranawat, M. C. Rade, and G. H. Westrich, *The Bone & Joint Journal* (volume 95-B, number 5, pp. 629-635; doi:10.1302/0301-620X.95B5.30406).

Morteza Meftah, MD, and Chitranjan S. Ranawat, MD
doi: 10.3928/01477447-20160621-01

Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 232 of 256 PageID #: 240



F I L E D

A.M. MAY 2 5 2017 P.M.
3:29
BARBARA WEBB, CLERK & MASTER
CHANCERY COURT, WILSON CO.

# Exhibit

# VIII

| To: | JASON DENTON<br>RMA ATTORNEYS AT LAW<br>109 NORTH CASTLE HEIGHTS AVE<br>LEBANON, TN 37087 | | |
|---|---|---|---|
| Fax: | (615) 443-8775 | | |
| Re: | Stephen Neely | # 11736927 | |
| From: | Suzanne Campbell-Lambert ALHC, ACS | | |
| Address: | Worcester Benefits Center - Appeals Unit<br>PO BOX 15112<br>Worcester, MA 01615-0112 | | |
| Fax: | 1-774-437-7141 | Phone: | 1-888-226-7959 |
| Number of Pages: | 22 | Date: | May 18, 2017 |

NOTICE REGARDING CONFIDENTIAL COMMUNICATION – The information provided in this FAX is intended only for the addressee named above. The contents of this FAX and its attachments may include proprietary or otherwise privileged information and are considered private and confidential. If you are not the intended recipient of the FAX, please promptly deliver the FAX to the intended recipient and do not leave it in a location where it can be seen by others. You are also hereby notified that any other use, dissemination, distribution or reproduction of this information is strictly prohibited. If you received this FAX in error, please immediately notify the sender to determine the best means to resolve the situation.

Unum
Worcester Benefits Center - Appeals Unit
PO BOX 15112
Worcester, MA 01615-0112
Phone: 1-888-226-7959
Fax: 1-774-437-7141
www.unum.com



May 18, 2017

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

RE:   Neely, Stephen M
      Claim Number:              52-00462691-001
      Provident Life and Accident Insurance Company

Dear Attorney Denton:

This letter is to notify you that the additional information you submitted does not change our prior appeal decision concerning your client, Dr. Stephen Neely's Individual Disability Insurance claim. A copy of our February 14, 2017 letter that explains our original decision is enclosed for your reference.

Please read the following information carefully, as it will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason

- Information that supports our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 77423.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.

Fax Server 04        5/18/2017 3:04:47 PM   PAGE    3/022   Fax Server

Claimant Name: Neely, Stephen M
Claim Number: 5200462691001

May 18, 2017
Page 2 of 4

**Decision/Reason**

As detailed in our appeal decision of February 14, 2017, we find the Benefits Center's May 25, 2016 determination Dr. Neely is able to perform the duties of his occupation as an orthopedic surgeon on a full time basis is correct. There is a lack of medical and vocational information to support the presence of restrictions and limitations to his performance of the duties of his occupation consistent with a Total Disability, and no benefits are due.

**Information That Supports Our Decision**

Dr. Neely's policy provides benefits only when he is unable to perform the duties of his occupation. As he is over age 65, the policy provides benefits for a Total Disability only; there is no coverage for partial or Residual Disability.

Please refer to our appeal decision of February 14, 2017, a copy of which is enclosed, for a detailed review of Dr. Neely's restrictions and limitations supported by the available medical information, and how the demands his occupation as an orthopedic surgeon do not exceed those supported restrictions and limitations. Rather than restating the contents of that letter here, we refer you to it as part of today's correspondence along with copies of the Benefits Centers letters of May 25, 2016 and December 7, 2016.

You responded to our appeal decision in your March 1, 2017 letter, providing additional vocational assertions. You also referenced an article about the performance of joint replacement on obese patients, and included a statement from Dr. Cornelius about his assisting Dr. Neely with procedures requiring repeated use of a mallet. There was no new or different medical information provided for consideration of any changes to Dr. Neely's right shoulder condition, which you indicated has worsened.

Your letter and attachments were provided to our vocational rehabilitation consultant for consideration. This information did not change our vocational findings for Dr. Neely's claim for the reasons outlined below.

As explained on page five of our February 14, 2017 letter, the weight of the equipment being used (including mallets and saws) would not exceed Dr. Neely's medically supported weight restrictions. While the posture of the arm required to use this equipment varies (depending on the size of the equipment, the required angle of use, the height of the operating table, and the size of the surgeon) it is unlikely that such equipment would require Dr. Neely's arm to be above shoulder level. It was observed that by lowering the operating table, flexion or abduction demands of his arm would be reduced.

You have indicated "raising and lowering the operating table repeatedly" is not sterile or an option for Dr. Neely. As noted in the paragraph above, our vocational review was in no way suggesting or contemplating scenarios which require "raising and lowering the operating table repeatedly" as you have stated. Rather, our vocational reviewer's comment simply suggests the initial setting of the operating table height to a position most advantageous to the surgeon from an ergonomic standpoint.

You have noted the information previously provided by Dr. White (referred to on page two of the Benefits Center's letter of December 7, 2016) was "life-style ergonomic" data. The Benefits



Case 3:17-cv-00996   Document 1-2   Filed 06/29/17   Page 236 of 256 PageID #: 244

Center's reviewing physician, one of two board certified orthopedic surgeons who reviewed this file, had previously observed Dr. White had submitted his personal opinion of work as an orthopedic surgeon, but no ergonomic data to support any assertion of the strength demands of this occupation as being beyond the light range.

We have previously considered your and Dr. White's description of the occupational duties of an orthopedic surgeon as having a greater level of physical exertion, at times equivalent to those performed by a "laborer". The physical demands of Dr. Neely's occupation have already been described in the prior vocational reviews, as cited in the Benefits Center's correspondence with you and in our February 14, 2017 appeal decisions. However, the anecdotal description and vocational conclusions you have provided are inconsistent with accepted physical exertion descriptions of the occupation of an orthopedic surgeon and as such, they did not serve as a basis to change our vocational specialist's conclusions.

You referenced and later provided a copy of an editorial article about joint replacement and obese patients, which we considered upon receipt. Our vocational specialist notes that this information explaining the additional physical demands associated with treating obese patients does not alter the overall assessment of the physical demands of Dr. Neely's occupation.

He notes, as has been communicated to you previously, that while it may be reasonable to conclude that the orthopedic surgeon would sometimes assist in the positioning of a patient on the operating table, there are a number of other staff members in the operating room to assist with positioning or transferring patients (for example, surgical technicians, nurses, and anesthesiologist). In addition, manipulating and positioning extremities could also be performed with assistance from other operating room staff. As such, the contents of this article did not serve to alter our prior vocational conclusions.

You provided an additional statement from Dr. Cornelius about his having assisted Dr. Neely with some procedures requiring repeated use of mallet, and also your own assessment of Dr. Neely's physical ability or inability to use various surgical tools in a precise manner. Our vocational specialist considered your comments and Dr. Cornelius' observations about Dr. Neely's level of work capacity. This information, which was not accompanied by any further medical documentation to support any new or different restrictions and limitations for Dr. Neely, does not change our vocational findings for this appeal.

You have indicated Dr. Neely's right shoulder has worsened, with less motion and more discomfort. Again, no new or different medical information has been provided for us to further consider any restrictions and limitations relating to Dr. Neely's claim of Total Disability from October 1, 2015, forward.

Based on the facts of Dr. Neely's claim and the terms of his policy, including the additional information you have provided for this appeal to date, we continue to find the Benefits Center's decision for Dr. Neely's claim was correct. The medical and vocational information available supports he has retained the ability to perform the duties of his occupation on a full time basis, and is not eligible for Total Disability benefits as defined by his policy.

We remind you Dr. Neely must be actively and gainfully employed on a full-time basis to keep his policy in force, paying premiums when due. It is our understanding Dr. Neely continued to work in the non-surgical duties of his occupation beyond October 1, 2015 at a reported rate of 4-

6 hours per day, performing patient care and examinations in office and hospital settings. If our understanding is not correct, and Dr. Neely's condition status has changed, please notify us directly.

It is our practice to give significant weight to the findings of the Social Security Administration. Based on the information available to us to date, Dr. Neely has not applied for or been awarded any Social Security Disability Insurance (SSDI) benefits. If our understanding is incorrect, and Dr. Neely has been awarded SSDI benefits, please notify us immediately so we consider this information.

This completes our further appeal review of Dr. Neely's claim. If you have any new or different information in response to this appeal decision, please forward it my attention directly for additional consideration.

Attorney Denton, if you have questions about this appeal decision, you may reach me toll free at 1-888-226-7959, extension 77423 or directly at 1-774-437-7423, extension 77423.

Sincerely,

*Suzanne Campbell-Lambert ALHC, ACS*

Suzanne Campbell-Lambert ALHC, ACS
Lead Appeals Specialist
Provident Life and Accident Insurance Company

Enclosures:       -Attorney: Appeal
                  -Attorney: General
                  -Claimant: Decision

Unum
Worcester Benefits Center - Appeals Unit
PO BOX 15112
Worcester, MA 01615-0112
Phone: **1-888-226-7959**
Fax: 1-774-437-7141
www.unum.com

**unum**

February 14, 2017

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

RE:   Neely, Stephen M
      Claim Number:           52-00462691-001
      Provident Life and Accident Insurance Company

Dear Attorney Denton:

Provident Life and Accident Insurance Company has completed the appeal review on your client, Dr. Stephen Neely's Individual Disability claim.

Please read the following pages carefully, as they will help you understand how we reached our decision.

This letter includes the following:

- Initial Claim Decision

- The Appeal Decision

- Information that supports the Appeal Decision

- Policy Provisions that apply to the Appeal Decision

- Next steps available to you

If you would like me to review with you the information we have and how this decision was made, please call me at 1-888-226-7959, extension 77423.

**Initial Claim Decision:**

As indicated in their letters of May 25, 2016 and December 7, 2016, the Benefits Center determined Dr. Neely was able to perform the duties of his occupation as an orthopedic surgeon, with no restrictions or limitations to his ability to perform those duties on a full time basis. No benefits were found to be payable under the Total Disability provision, or any other provision, of his policy.

The Benefits Center did provide payments totaling $19,800 under a reservation of rights during their consideration of Dr. Neely's claim; he was not requested to repay this amount.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.

**Appeal Decision:**

We have determined the Benefits Center's decision on Dr. Neely's claim is correct. The medical and vocational information that is available in his file to date does not support the presence of restrictions and limitations to his ability to perform the duties of his occupation on a full time basis.

Based on the facts of Dr. Neely's claim and the terms of his policy, no Total Disability or other benefits were due for his claim.

**Information that Supports our Decision:**

To review in brief, Dr. Neely indicated he developed pain, weakness, and loss of range of motion in his right upper extremity beginning May 5, 2015 from conditions including right shoulder rotator cuff tear, subacromial impingement, and tendonitis biceps. He continued to work in his occupation as an orthopedic surgeon, performing surgeries until October 1, 2015. After October 1, 2015, Dr. Neely continued working in his office practice, evaluating patients and performing independent medical examinations for four to six hours on a daily basis.

Dr. Neely's policy does not provide any partial or Residual Disability benefits after age 65. As Dr. Neely was already 70 years old by the date time he first claimed any Total Disability, his claim was appropriately considered under his policy's Total Disability provision with a start date of October 1, 2015.

His Attending Physician, fellow orthopedic surgeon Dr. Jon Cornelius, indicated he advised Dr. Neely not to perform surgery after September 30, 2015. He noted restrictions and limitations to his ability to: lift, push, or pull over 15 pounds; to work at shoulder level or above; to transfer and position patients on the operating table; to manipulate patients' extremities during surgery; to use equipment such as hammers and saws; and to examine heavy patients. Surgery for his condition was not pursued due to Dr. Neely's use of blood thinners for an unrelated cardiac condition that he has stated is not source of impairment for this claim.

Enclosed please find copies of the Benefits Center's letters dated May 25, 2016 and December 7, 2016 discussing their findings that the medical and vocational information available for Dr. Neely's claim did not support the presence of, and treatment consistent with, restrictions and limitations to his ability to perform the duties of his occupation as an orthopedic surgeon on a full time basis. I find these letters to provide a detailed and accurate overview of the Benefits Center's consideration of Dr. Neely's claim, including the review of his file by two board certified orthopedic surgeons with contact made directly to Dr. Cornelius, and later with Dr. Chad Price, and refer you to them as part of today's correspondence.

You appealed the Benefits Center's May 25, 2016 decision, disputing their assessment of the vocational demands of Dr. Neely's occupation, and indicating he is unable to perform physically accurate surgeries and all of the duties needed to make a surgery successful. You indicated

Dr. Neely was unable to modify his operative techniques, could not improve his symptoms with physical therapy, and that his continued activities such as golfing as noted by the Benefits Center were not inconsistent with his inability to perform the duties of his occupation.

You provided a new evaluation by another orthopedic surgeon, Dr. Chad Price, indicating Dr. Neely should not perform orthopedic surgery, in particular total joint replacements, that would require him to use a saw "at eye level", and that shoulder weakness also precluded him from using hammers. Dr. Price noted restrictions of no overhead lifting, no lifting, pushing or pulling greater than 10 pounds with the right arm, and no repetitive overhead movements. Statements were also provided from Dr. Neely and two of his fellow orthopedic surgeons (Dr. Cornelius and Dr. Gregory White) opining on his physical duties, as well as affidavits from two surgical technicians and first assistants (Mr. David Eldridge and Mr. Kenny Oliver).

Prior to proceeding with this appeal review, we requested the Benefits Center consider if this new information changed their decision for Dr. Neely's claim. As explained in the Benefits Center's letter of December 7, 2016, this information was further considered by two physician specialists and a vocational rehabilitation consultant. This information did not change their May 5, 2016 decision for his claim, and his file was returned to me for an appeal review.

I have completed a thorough and fair consideration of the information that is available to date for Dr. Neely's claim and appeal.

I find the medical analyses completed by the Benefits Center, which included review of the available medical information by two board-certified orthopedic surgeons in addition to direct contact with Dr. Price about his examination, appropriately considered Dr. Neely's restrictions and limitations. Those restrictions and limitations that were supported by Dr. Neely's medical testing and treatment information were referred to a vocational rehabilitation specialist to assess if they were in excess of the physical demands of his occupation.

The vocational information available to the Benefits Center demonstrated Dr. Neely retained capacity to perform surgical procedures within the physical demands of his occupation. He continued to perform surgeries after May 5, 2015, and there is no medical information to support any change to his condition to precipitating an inability to perform surgery effective October 1, 2015, including joint replacement procedures or operative arthroscopy of the shoulder or knee.

As part of this appeal review, I requested the further consideration of a vocational rehabilitation specialist who had not seen Dr. Neely's file previously. Our appeal vocational rehabilitation specialist assessed all the available occupational and vocational information for this claim and appeal and considered the medical analyses of the supported limitations and restrictions.

This specialist agreed with the Benefits Center's understanding that the important duties of Dr. Neely's occupation as an orthopedic surgeon involve the diagnosis and treatment of musculoskeletal disorders. His specific duties included patient examinations, review of x-rays, performing injections, prescribing medication and physical therapy, performing office based procedures (including aspirations and debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical

record. The strength demands of this occupation were confirmed to be in the light range. "Light" is defined as occasional lifting or applying force up to 20 pounds or frequently lifting or applying force up to 10 pounds. The other physical demands of this occupation would include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

The restrictions and limitations supported by the medical information in Dr. Neely's file to date were:

- Restrict above shoulder activities
- Restrict forward flexion beyond 150 degrees
- Has full passive right shoulder motion and active at 140 degrees past shoulder height with good but not normal strength in abduction and external rotation.

Dr. Neely has continued working in his office-based practice, where he describes seeing patients (referring those needing surgery to his partners), performing hospital rounds, conducting independent medical examinations and participating in depositions. He has also maintained the ability to:

- sit, stand and walk without difficulty
- lift up to 15-25 pounds to chest, with no overhead activities, and to 150 degrees forward flexion with full strength,

Based on the information available, our appeal vocational rehabilitation consultant found the demands of Dr. Neely's occupation as an orthopedic surgeon were not excess of his supported limitations and restrictions and he retained the physical capacity needed to perform the duties of his occupation.

Our appeal vocational rehabilitation consultant noted:

"Giving consideration to the insured's supported R&L's [restrictions and limitations] as noted above, the insured would retain the physical capacity needed to perform the duties of his occupation. The insured's occupational duties would not require above the shoulder or above the head activities or forward flexion beyond 150 degrees.

The insured's capacity for shoulder motion—("full passive right shoulder motion and active at 140 degrees past shoulder height with good but not normal strength in abduction and external rotation") would also be sufficient for the performance of the occupation.

The insured has been determined to have no difficulties with sitting, standing or walking.

As noted previously, the performance of the Orthopedic Surgeon occupation would not require lifting/carrying/pushing/pulling in excess of the 20 lb. level..."

Our vocational rehabilitation consultant considered each of the affidavits provided for this appeal opining on the physicality of Dr. Neely's work, including transferring patients to the operating table, manipulating their extremities, using equipment (e.g. mallets and saws), and examining heavy patients.

Claimant Name: Neely, Stephen M                                    February 14, 2017
Claim Number: 5200462691001                                             Page 5 of 7

He also determined that, while it may be reasonable to conclude an orthopedic surgeon would
sometimes assist in the positioning of a patient on the operating table, there are also other staff
members in the operating room (for example, surgical technicians, nurses, anesthesiologist) to
assist with positioning or transferring patients. In addition, the manipulating and positioning
extremities could also be performed with assistance from other staff in the operating room.

With respect to the equipment used, as referenced by Dr. Cornelius, our appeal vocational
rehabilitation consultant also found that the weight of such equipment, including mallets and
saws, would not exceed the medically supported weight restrictions as noted above. As had
been noted previously, while the posture of the arm required to use these types of equipment
will vary (depending on the size of the equipment, the required angle of use, the height of the
operating table, and the size of the surgeon) it is unlikely that such equipment would require his
arm to be above shoulder level.   By lowering the operating table, the flexion or abduction
demands of his arm would be reduced.

Our appeal vocational rehabilitation consultant also agreed Dr. Neely's supported restrictions
and limitations indicate that he does maintain full strength with 150 degrees flexion. This was
noted to support Dr. Neely would not have difficulty grasping and using necessary equipment
such as saws, drills, and mallets below shoulder level.

Based on our appeal review of the facts of Dr. Neely's claim and the terms of his policy,
including the information provided with your letter of September 7, 2016, we find he has retained
the ability to perform the duties of his occupation, and on a full time basis. He does not meet
the definition of Total Disability benefits as defined by his contract, and does not have any
coverage for partial or Residual Disability available for this claim.

**Policy Provisions that Apply to the Appeal Decision:**

Provident Life and Accident Insurance Company Policy No. 00462691 includes the following
provisions, cited in pertinent part below:

> **"DEFINITION OF TOTAL DISABILITY:**
>
> (a) Until the date you attain age 65, or until the date indemnity for total disability has
> been paid during a period of disability under this policy for 5 years, whichever is later,
> 'Total Disability' means your inability to perform the duties of your occupation.
>
> (b) During the continuance of a period of disability beyond the later of either of the two
> dates named in (a) above, 'Total Disability' means your inability to engage in any gainful
> occupation in which you might reasonably be expected to engage because of education,
> training or experience, and with due regard to your vocation and earnings at the
> beginning of disability.
>
> Nothing in this definition shall be construed to extend or limit the maximum benefit
> periods for which indemnity for disability is payable under this policy."

> **"'Residual Disability' means:**

(a) your inability to perform one or more of your important daily business duties, or

(b) your inability to perform your usual daily business duties for as much time as is usually required for the performance of such duties."

"Residual Disability Benefit:

If Injuries or Sickness results in Residual Disability immediately following a period of at least 30 days of Total Disability which resulted from the same or a related cause, the Company, beginning on:

(1) the day shown on in the Policy Schedule as to when indemnity for Total Disability would have commenced, or
(2) the day following a period of Total Disability described above for which benefits have been paid,

will pay periodically during the continuance of such Residual Disability, indemnity at the rate of the Residual Disability Monthly Benefit until your 65th birthday. In no event, however, will indemnity for Residual Disability be payable for longer than 24 months if you are age 55 or older at the commencement of the preceding period of Total Disability and such period does not exceed 180 days of Total Disability..."

"LEGAL ACTIONS: No action at law or in equity shall be brought to recover on this policy prior to the expiration of 60 days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of 3 years after the time written proof of loss is required to be furnished."

Our decision was made based on the policy provisions listed above, and Provident Life and Accident Insurance Company reserves its right to enforce other provisions of the policy.

Next Steps Available to your client:

This completes our appeal review of the information available for Dr. Neely's claim to date. Of you have any new or different information to provide in response to this appeal decision, please do so as soon as possible or before March 14, 2017.

It is our practice to afford significant weight to information from the Social Security Administration. Based on the information available to us to date, it does not appear Dr. Neely, who has continued to perform non-surgical patient care and examinations in an office and hospital setting, has applied for or has been awarded Social Security Disability Insurance (SSDI) benefits. However, if our understanding is incorrect, and Dr. Neely has been awarded any SSDI benefits, please notify me immediately so we may secure this information for further consideration of his claim.

Attorney Denton, if you have any questions about this letter, please contact me toll free at 1-888-226-7959, extension 77423 or directly at 1-774-437-7423.

Sincerely,

*Suzanne Campbell-Lambert ALHC, ACS*

Suzanne Campbell-Lambert ALHC, ACS
Lead Appeals Specialist
Provident Life and Accident Insurance Company

Enclosures:    -Claimant: Decision
               -Attorney: General

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: 1-888-226-7959
Fax: 1-866-562-4794
www.unum.com



December 7, 2016

JASON DENTON
RMA ATTORNEYS AT LAW
109 NORTH CASTLE HEIGHTS AVE
LEBANON, TN 37087

RE:    Neely, Stephen M
       Claim Number:           5200462691001
       Provident Life and Accident Insurance Company

Dear Attorney Denton:

I attempted to reach you via telephone on December 7, 2016 and left you a voice mail. This letter is about the decision we have made on your client, Dr. Stephen Neely's Individual Disability claim for benefits. We will not be able to approve the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason
- Information that supports our decision
- Information Regarding the Appeal Notice
- Provisions outlined in your client's individual disability policy
- Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

**Decision/Reason:**

We have determined Dr. Stephen Neely is able to perform the duties of his occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent him from performing these duties. Because he is not disabled according to the policy, benefits are not payable.

**Information That Supports Our Decision:**

Dr. Neely initially submitted claim forms on January 21, 2016. He stated as of October 1, 2015 he was no longer performing the duties of his occupation as an orthopedic surgeon. He states he continues to see patients for regular office visits and independent medical evaluations, but he is not performing surgery.

He explained that he was unable to continue working due to an injury that occurred on May 5, 2015 while he was doing an orthopedic procedure. He informed us he continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Although Dr. Neely listed Crohns Disease and a Cardiac event as a secondary diagnosis, per our telephone conversation with Dr. Neely on February 17, 2016, he indicated the Crohns Disease is very well controlled and he sees his GI doctor once per year and has a colonoscopy done every 14-18 months. Dr. Neely also states he sees his cardiologist every six months for checkups relating to his Cardiac event that occurred on September 7, 2013.

Dr. Neely indicated that he stopped performing surgical procedures on September 30, 2015 because of shoulder pain and because it was taking him longer to complete procedures.

In our letter to Dr. Neely dated May 25, 2016, we informed him based on our review, the information in his claim file indicates he is able to perform the duties of his own occupation on a full-time basis. As he did not meet the policy's definition of Total Disability, we were unable to approve his claim and provide further benefits. His claim was closed effective May 25, 2016.

I have attached a copy of the letter that was mailed to Dr. Neely on May 25, 2016, as this provides details of our decision.

We received an appeal notice from your office dated September 7, 2016 with new information for us to review. The appeal notice included new medical records, an insured acquired Orthopedic Consultation of Dr. Chad Price, and affidavits of Dr. Jonathan Cornelius, Mr. Kenny Oliver (surgical technician), Mr. David Eldridge (surgical technician) as well as a Causation and Damage report from Dr. Gregory White.

Dr. Cornelius reported for July, August and September of 2015 he assisted Dr. Neely with surgical activities and they "split the fees" for those procedures. The affidavit signed by the surgical technicians noted Dr. Cornelius assisted Dr. Neely in the last three months (July, August and September of 2015) of surgeries.

Dr. White, in his letter, asserted orthopedics is not a light duty occupation, but did not quantify as to what level it was other than "physically demanding and labor intensive." Our onsite physician opines that Dr. White provided a personal opinion with no ergonomic data. Our

Vocational Representative also reviewed the file and found that with the retractions and limitations given, Dr. Neely could perform his occupational activities of surgery.

Dr. Price performed a consultation on July 15, 2016 on behalf of Dr. Neely and noted "pain (and weakness) with overhead activity, with extension of the arm away from the body and moderate rest pain." Examination of the right upper shoulder recorded 140 degrees forward flexion with adequate external and internal rotations and full strength 5/5 on the right including biceps and triceps, wrist and hand, except 4/5 abduction and 4+/5 external rotation. The opinion of Dr. Price was that weakness of the right shoulder excluded surgical activities as an orthopedist. He outlined restrictions (activities Dr. Neely should not do) and limitations (activities Dr. Neely cannot do) of no overhead lifting, no lifting, no pushing/pulling greater than 10 pounds with the right arm and no repetitive overhead movements. He outlined these restrictions and limitations to be permanent.

Our onsite physician, who is board-certified in orthopedic surgery, reviewed the information and agreed that Dr. Neely should restrict above shoulder activities and forward flexion beyond 150 degrees and notes that the records support that Dr. Neely has full passive right shoulder motion and active at 140 degrees past shoulder height, with good but not normal strength in abduction and external rotation. The records support that Dr. Neely would have the ability to sit, stand and walk without difficulty, lifting up to 15-25 lbs to chest, with no overhead activities, but to 150 degrees forward flexion, with full strength.

In view of the lack of agreement between our physician and Dr. Price on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported.

The information presented supports the restrictions and limitations as proposed by our on-site physician; however, they would not preclude the performance of an orthopedic surgeon. Our vocational consultant has reviewed Dr. Neely's file. He indicated that the important duties of an orthopedic surgeon, involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient examinations, review of x-rays, performing injections, prescribing medication and physical therapy, performing office based procedures e.g. aspirations, debridement; performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

Our Vocational Representative reviewed the supported restrictions and limitations against the physical demands of Dr. Neely's occupation and determined that although it may be reasonable to conclude that Dr. Neely would sometimes assist in the positioning of a patient on the operating table, there are a number of staff in the operating room to assist with positioning or transferring patients. Manipulating and positioning extremities could also be performed with assistance from other OR staff.

Also, the weight of such equipment as mallets and saws would not exceed his weight restrictions. The posture of his arm required to use these types of equipment will vary depending on the size of the equipment, the required angle of use and the height of the OR table . However, it is unlikely that such equipment would require Dr. Neely's arm to be above shoulder level. Also, if needed, the lowering of the OR table would aid in reducing the flexion or abduction demands of his arm.

The supported restrictions and limitations indicate that Dr. Neely has full strength with 150 degrees flexion.  This would suggest that he would not have difficulty grasping and using necessary equipments such as saws, drills and mallets below shoulder level.  The lifting and reaching demands of Dr. Neely's occupation do not exceed the supported restrictions and limitations.

Based on our review, the information in Dr. Stephen Neely's claim file indicates he is able to perform the duties of his own occupation.  Therefore, his claim remains closed.

<u>Policy Provisions</u>:

This information can be found on page 4 of our May 25, 2016 letter to Dr. Neely.

<u>Next Steps Available to You and Dr. Neely</u>:

We would like to remind you that the opportunity to appeal our claim determination remains available to you.  Within the next 7 days, you will receive a letter from our Appeals Area which will further explain this option.

If you have questions about Dr. Stephen Neely's claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday.  If you prefer to speak with me personally, I can be reached at the same toll-free number at extension, 75352.  As we will identify his claim by his Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist

Enclosures:     -Claimant: Decision

Unum
The Benefit Center
PO Box 100262
Columbia, SC 29202
Phone: **1-888-226-7959**
Fax: 1-866-562-4794
www.unum.com

**unum**

May 25, 2016

STEPHEN M NEELY MD
169 POWELL GROVE ROAD
LEBANON, TN 37090

RE:   Neely, Stephen M
      Claim Number:                5200462691001
      Provident Life and Accident Insurance Company

Dear Dr. Neely:

This letter is a follow-up to our conversation on May 25, 2016 about the decision we have made on your Individual Disability benefits. As we discussed, we will not be able to approve your claim and continue the payment of these benefits.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason
- Information about your benefit check
- Other important information
- Information that supports our decision
- Provisions outlined in your individual disability policy
- Next steps available to you if you disagree with our decision

I am available to review in detail the information we have and how this decision was made. You can reach me at 1-888-226-7959, extension 75352.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.
1242-03

02875005511400601

Claimant Name: Neely, Stephen M
Claim Number: 5200462691001

May 25, 2016
Page 2 of 6

### Decision/Reason:

We have determined that you are able to perform the duties of your occupation as an orthopedic surgeon. The medical records do not support restrictions or limitations that would prevent you from performing these duties on a full-time basis.

Because you are not disabled according to the policy, benefits are not payable.

### Information About Your Benefit Check:

Our last benefit payment, in the amount of $4,950.00, was mailed directly to you on April 27, 2016.

### Other Important Information:

We provided benefits under a Reservation of Rights while our claim decision was pending. We paid four months' worth of benefits, totaling $19,800.00. We will not be requesting repayment of these benefits.

### Information That Supports Our Decision:

We received your claim on January 21, 2016. You stated that as of October 1, 2015 you were no longer performing the duties of your occupation as an orthopedic surgeon. You were seeing patients for regular office visits and independent medical evaluations, but not performing surgery.

You explained that you were unable to continue working due to an injury that occurred on May 5, 2015 while you were doing an orthopedic procedure. You tried to dislocate a hip with a bone hook and felt a sharp pain in your right shoulder, followed by weakness. You continued to work, but reinjured the same shoulder approximately one week later (around May 11, 2015) while performing another procedure.

Your treatment plan included injections and topical creams. You state that your shoulder became inflamed but you tried to continue performing surgery; however, you were unable to do so.

You informed us you stopped performing surgeries on September 30, 2015 because of shoulder pain and because it was taking longer for you to complete procedures.

On the Attending Physician Statement completed by Dr. Jonathan P. Cornelius on January 20, 2016, he listed restrictions of "no lifting, pushing, pulling over 15 lbs., right arm" and "no work at shoulder level or above with right arm." He listed limitations of "He is unable to transfer patients to OR table, unable to position patients on OR table, unable to manipulate patient's extremities during orthopedic surgery, unable to use OR equipment, such as mallets or saws..., unable to examine heavy patients." Dr. Cornelius gave the duration of these restrictions and limitations as extending from September 30, 2015 to "permanent."

We requested treatment records from Dr. Cornelius. This information was reviewed by our physician who is board-certified in orthopedic surgery. The records indicate that you reported right shoulder injuries on May 5 and May 11, 2015, but were not advised to stop working until September 30, 2015. You were able to golf after the incidents. Our physician told us that the

July 23, 2015 MRI revealed primarily tendinosis of cuff with questioned tearing, no retraction of tendons, and no atrophy of cuff muscles.

To improve our understanding of your condition and any associated restrictions (activities you should not do) and limitations (activities you cannot do), our physician spoke to Dr. Cornelius on March 9, 2016. Dr. Cornelius said that there were no surgical indications, and no muscle atrophy on the MRI, but added that you were noticing weakness while doing surgery.

You continued to work as a primary surgeon for joint replacement and shoulder arthroscopy, as documented in the 2015 CPT code information submitted by your employer. The CPT data shows that you continued to perform surgery through September 2015; no surgeries were noted after September 2015. Although the months of May and June 2015 appear to show billing charges below prior months' charges, the charges increased in July 2015 and August 2015 to a level similar to some months prior to May 2015. Billing charges were lower in May and June 2015 when compared to previous months, but they increased in July and August 2015 to approximate prior levels.

Our physician advised us that restrictions and limitations are not supported by the medical information. Our physician noted that your shoulder does not need surgery, and your range of motion was satisfactory with no obvious atrophy of shoulder musculature. Our physician further noted that in the month when you stopped doing surgery, September 2015, you also performed procedures that would require right shoulder strength and mobility; these procedures reflected your usual and customary procedures prior to your reported injury in May 2015.

Our vocational consultant reviewed the occupation information provided to us, including your Occupation Description form, Physician Questionnaire, and CPT/production data from your employer. The important duties of your occupation involve the diagnosis and treatment of musculoskeletal disorders. Specific duties included patient exam, review of x-rays, performing injections, prescribing medication and physical therapy, performing office-based procedures (e.g., aspirations, debridement), performing orthopedic surgery, performing post-surgical follow-up, supervising staff, providing consultations, and documenting the medical record.

The strength demands of your occupation are in the "light" range. "Light" is defined as the occasional lifting or applying force up to 20 lbs. or the frequent lifting or applying force up to 10 lbs. Other physical demands of your occupation include frequent sitting, standing, handling, and occasional walking, reaching, and bending.

Our physician advised us that the medical records support your ability to perform the physical demands of your occupation.

In view of the lack of agreement between our physician and Dr. Cornelius on the subject of restrictions and limitations, we asked another physician to review the same medical information. This physician, board-certified in orthopedic surgery, concurred with our first physician and agreed that restrictions and limitations are not supported, explaining that the limited diagnostic findings and limited treatment are not consistent with a severity of pain that would be expected to impact your functional capacity.

Based on our review, the information in your claim file indicates you are able to perform the duties of your own occupation on a full-time basis. As you do not meet the policy's definition of Total Disability, we are unable to approve your claim and provide further benefits. Your claim has been closed effective May 25, 2016.

Claimant Name: Neely, Stephen M
Claim Number: 5200462691001

May 25, 2016
Page 4 of 6

### Information about the waiver of premium benefit

Your policy provides a Waiver of Premium benefit, which was approved as of November 1, 2015. Please note that the refund of the November 1, 2015 semi-annual premium was paid under Reservation of Rights. Your policy premiums are due on a semi-annual basis (May 1 and November 1 of each year). Waiver of premium will end and billing will resume starting with the November 1, 2016 premium.

### Policy renewal information

In order to keep this policy in force, you must be actively and gainfully working full time; there is no age limit. Before the enhancement that was effective on June 1, 1986, you could renew your policy only to age 75. Your policy is now renewable for life.

### Policy Provisions And Definitions:

The following provisions and definitions are applicable to our claim decision.

### Individual Disability policy 6PC-462691

We included a copy of your Individual Disability policy 6PC-462691 with our previous letter dated February 8, 2016. The following policy provisions and/or definitions can be found in that copy.

- Information regarding the renewability of your policy after age 65 can be found on the policy improvement brochure dated April 1987
- The definition for "Waiver of Premium" can be found on page 2 of the policy
- The definition for "Total Disability" can be found on page 4
- The amendment changing the "Definition Of Total Disability" can be found on page 5(A)

### Next Steps Available To You:

### What if you disagree with the decision and you have *new information* to submit?

If you disagree with our decision and you have new information to submit, you may request to have your file reevaluated by the Disability Benefits Specialist who made the initial decision.

### How much time do you have to request a reevaluation of your claim?

Please submit your written request within 180 days from the date you receive this letter.

### How does the reevaluation process work?

If you have new information you want us to consider, please send it to us as soon as possible. The Disability Benefits Specialist who made the initial decision will review the claim again, taking the new information into consideration. The Disability Benefits Specialist will provide you with a written response within 90 days of our receipt of the new information.

After this review, we will send you a letter explaining our decision. If you still disagree with our decision, you will have the option to request an additional independent review by our Appeals Department.

Claimant Name: Neely, Stephen M         May 25, 2016
Claim Number: 5200462691001          Page 5 of 6

### What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for reevaluation and new information?

Reevaluation Request
PO Box 15112
Worcester, MA  01615-0112
Fax Number: 1-866-562-4794

### What if you disagree with the decision, but *do not have new information* to submit?

If you disagree with our decision but do not have new information to submit, you may request to have your file reviewed by our Appeals Department. Please submit a written letter of appeal outlining the basis for your disagreement.

### How much time do you have to request an Appeal?

Please submit your written request for appeal within 180 days from the date you receive this letter.

### How does the Appeal process work?

An Appeals Specialist will review your entire claim and may consult medical and vocational experts or other resources. The Appeal Specialist will make an independent decision on your claim.

### How much time does the Appeal review take?

We are committed to making an appeal decision within 45 days after we receive your written appeal. There may be special circumstances in which the review can take longer. We will notify you if more time is needed.

### What information is available to you?

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

### Where do you mail or fax your written request for Appeal?

The Appeals Unit
PO Box 15112
Worcester, MA  01615-0112
Fax Number: 1-866-562-4794

We will send you a letter acknowledging receipt of your request within 7 days.

Dr. Neely, if you have questions about your claim or this process, please call our Contact Center at 1-888-226-7959, 8 a.m. to 8 p.m. Eastern Time, Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension 75352.

Claimant Name: Neely, Stephen M
Claim Number: 5200462691001

May 25, 2016
Page 6 of 6

We will identify your claim by your Social Security number or claim number, so please have one of these numbers available when you call.

Sincerely,

*Gemelee DePasquale*

Gemelee DePasquale
Disability Benefits Specialist